# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF GEORGIA, *ex rel.* BROOK GONITE, <br><br> Plaintiff, <br><br> v. <br><br> UNITEDHEALTHCARE OF GEORGIA, INC., a Georgia Corporation; UNITEDHEALTH GROUP, INC., a Delaware corporation; UNITED HEALTHCARE SERVICES, INC.; a Minnesota corporation; UNITEDHEALTHCARE, INC., a Delaware Corporation; UNITEDHEALTHCARE INSURANCE COMPANY, a Connecticut corporation; OPTUM, INC., a Delaware corporation; OPTUMINSIGHT, INC., a Delaware corporation; OPTUM CARE SERVICES COMPANY, a Minnesota corporation; OPTUMHEALTH CARE SOLUTIONS, LLC, a Minnesota corporation; OPTUM SERVICES, INC., a Minnesota corporation; and OVATIONS, INC., a Delaware corporation, <br><br> Defendants. | Civil Action No. _____ <br><br> **COMPLAINT** <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** <br><br> **DEMAND FOR JURY TRIAL** |

## COMPLAINT

COMES NOW Plaintiff Brook Gonite ("Relator"), on behalf of the United States of America and the State of Georgia, and files this *qui tam* action against Defendants UnitedHealthcare of Georgia, Inc., UnitedHealth Group, Inc., United Healthcare Services, Inc., UnitedHealthcare, Inc., United Healthcare Insurance Company, Optum, Inc., OptumInsight, Inc., Optum Care Services Company, OptumHealth Care Solutions, LLC, Optum Services, Inc., and Ovations, Inc. (collectively, "UnitedHealth Defendants") to recover all damages, penalties, and

other remedies under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA") and the Georgia

False Medicaid Claims Act, O.C.G.A. §§ 49-4-168 *et seq*. ("Georgia FMCA").

## **INTRODUCTION**

1.      The Medicare Program consists of four parts:  Part A covers inpatient care, Part B

covers outpatient care, Part C is the Medicare Advantage Program, and Part D covers

prescription drugs.  If a Medicare beneficiary chooses to be covered under what is commonly

referred to as "traditional" Medicare (Parts A and B), then the Centers for Medicare and

Medicaid Services ("CMS") reimburses healthcare providers for services rendered to the

beneficiary via submission of claims, which is known as a fee-for-service payment system.  If

instead, a Medicare beneficiary chooses to enroll in a Medicare Advantage Plan managed by a

private insurance company under Part C, CMS pays the Medicare Advantage Plan a set

capitation payment for the complete care of the beneficiary, and the beneficiary, depending on

his income level and Medicaid status, pays a monthly premium and copayment.  *See* Subchapter

XVIII of the Social Security Act, 42 U.S.C. §§ 1395w-21 to 1395w-28.  This case is about the

UnitedHealth Defendants' direct fraud on Medicare Part C, which indirectly also impacted the

Georgia Medicaid program.

2.      The UnitedHealth Defendants generated fraudulent Medicare Part C business at

the Government's expense by using improper and illegal means to solicit vulnerable, elderly

patients for its Medicare Advantage Special Needs Nursing Home Plans.

3.      Medicare was not the only Government program harmed by these illegal

marketing practices.  The UnitedHealth Defendants' improper and illegal marketing tactics also

harmed the Georgia Medicaid program since the Medicaid program paid the Medicare

Advantage Plan premiums for illegally targeted Medicaid members, who met certain income-level requirements.

4.      The UnitedHealth Defendants' improper and illegal solicitation of vulnerable, elderly patients violated the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Anti-Kickback Statute, Medicare regulations and marketing guidelines, and Georgia Medicaid polices that prohibit obtaining a list of Medicaid patients.

5.      If the Government had known these vulnerable, elderly patients had enrolled in the plans as a result of the UnitedHealth Defendants' improper marketing, the Medicare program would not have paid the monthly capitated payments for these members to the UnitedHealth Defendants, and the Medicaid program would not have paid the illegally solicited members' premiums.

6.      Soliciting vulnerable, elderly patients for Medicare Advantage Special Needs Nursing Home Plans through HIPAA violations and otherwise employing improper marketing tactics go to the very essence of the bargain between the Government and the Medicare Advantage Plans -- Medicare pays the capitated payments and Medicaid pays certain members' premiums to Medicare Advantage Plans to benefit eligible beneficiaries, not to subject their vulnerable, elderly beneficiaries to exploitation, illegal conduct, and abusive marketing practices.

7.      The UnitedHealth Defendants have actual knowledge that they are engaging in illegal misconduct, including knowledge that their marketing practices were illegal under HIPAA and violated the Anti-Kickback Statute, Medicare regulations, Medicare guidelines, and Medicaid policies, or recklessly disregarded these laws and regulations.  Defendants have chosen to profit from committing this fraud against the Government Programs instead of following legal practices for marketing it Medicare Advantage Special Needs Nursing Home Plans.

## JURISDICTION AND VENUE

8.      This action arises under the federal False Claims Act, as amended, 31 U.S.C. §§ 3729 *et seq*., and the Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168 *et seq.*

9.      Pursuant to 28 U.S.C. § 1331, Defendants are subject to federal question jurisdiction in this Court because this action arises under the laws of the United States, including the False Claims Act and other relevant federal statutes.  In addition, the False Claims Act specifically confers jurisdiction upon the United States District Court.  *See* 31 U.S.C. § 3732(a).

10.     Supplemental jurisdiction for counts related to the Georgia False Medicaid Claims Act arises under 28 U.S.C. § 1367, since these claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.  In addition, 31 U.S.C. § 3732(b) provides jurisdiction for "any action brought under the laws of any state for the recovery of funds paid by a State or local government if the action arises from the same transaction or occurrence as an action brought under section 3730."  The state claims at issue here arise out of the same transaction or occurrence as the federal claims.

11.     Additionally, Defendants are subject to jurisdiction and venue in this Court where "one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."  31 U.S.C. § 3732(a).  Accordingly, jurisdiction and venue are appropriate because, among other reasons, Defendants can be found, maintain offices, transact business, and reside in the Middle District of Georgia.  In addition, acts proscribed by 31 U.S.C. § 3729 occurred in the Middle District of Georgia.  Furthermore, venue is proper in this District under 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a).

12.     Relator has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided disclosure of the allegations of this

Complaint to the United States of America and the State of Georgia prior to filing, as required by the relevant statutes. None of the allegations set forth in this Complaint are based on a public disclosure of allegations or transactions as defined in 31 U.S.C. §3730(e)(4)(A). Furthermore, if there has been a public disclosure of any of the allegations underlying this action, Relator qualifies as an original source of such information, pursuant to 31 U.S.C. §3730(e)(4)(B).

## PARTIES

13.     Plaintiff Relator is an individual and citizen of the United States of America and the State of Georgia, currently residing in Atlanta, Georgia. He is a Georgia-licensed insurance agent (License Number 816549). Relator began his career in the health insurance industry as an Enrollment Counselor, Medicare Inside Sales Representative, and Supervisor for Inside Sales for PacificCare, which the UnitedHealth Defendants later acquired, and Ovations, which sold the UnitedHealth Defendants' Medicare products. After starting in data entry, Relator worked his way up within the company over his ten-year career. He left the company in 2013, because he did not want to relocate. In June 2015, Relator returned to the UnitedHealth Defendants, working in a part-time position in telesales for three months until being offered a full-time job out of their office in Norcross, Georgia. As a Sales Implementation Manager, Relator was responsible for executing new facility implementation plans in skilled nursing facilities throughout Georgia, and he received a Champion of Excellence Award in 2015, 2016, and 2017. The UnitedHealth Defendants terminated his employment in August 2018.

14.     Relator's direct and firsthand knowledge of the fraudulent activity discussed herein began in 2016, when James Rodgers became the Director of Sales across several states

including Georgia. To Relator's knowledge and belief, Defendants' fraudulent conduct continued after he left.

15.    During his time working for the UnitedHealth Defendants, Relator personally witnessed and gained direct and independent knowledge of the information on which the below allegations are based, and Relator herein voluntarily discloses such information to the Government pursuant to 31 U.S.C. § 3730(e)(4)(B)(i). To the extent any of Relator's allegations have been publicly disclosed as contemplated by 31 U.S.C. § 3730(e)(4)(A), Relator's knowledge is independent of and materially adds to those allegations pursuant to 31 U.S.C. § 3730(e)(4)(B)(ii).

16.    Defendant UnitedHealthcare of Georgia, Inc. is a domestic for-profit corporation with its main office located at 3720 Davinci Court, Suite 300, Norcross, Georgia 30092. Defendant UnitedHealthcare of Georgia, Inc. transacts business in the Middle District of Georgia and the state of Georgia by offering and providing Medicare Advantage Special Needs Nursing Home plans.

17.    Defendant UnitedHealth Group, Inc. is a publicly traded Delaware corporation. It is the parent company of the other Defendants in this action. Defendant UnitedHealth Group, Inc., the other Defendants, and their affiliates have offices in various locations throughout the United States, including in the Middle District of Georgia. Defendant UnitedHealth Group, Inc. offers a broad spectrum of products and services through two distinct primary direct corporate subsidiaries (each of which has numerous direct and indirect subsidiaries of its own): (1) UnitedHealthcare, Inc., a health benefits (i.e., insurance) company; and (2) Optum, Inc., a health services company. Accordingly, Defendant UnitedHealth Group, Inc.'s healthcare insurance products, including those under Parts C and D of the Medicare Program, are offered by, and

Defendant UnitedHealth Group, Inc.'s Medicare Advantage Plans are managed by, various entities that are Defendant UnitedHealth Group, Inc.'s direct or indirect subsidiaries, including, but not limited to, the other Defendants identified herein. Defendant UnitedHealth Group, Inc. controls all of these entities.

18.     Defendant United Healthcare Services, Inc. is a for-profit corporation with is main office located at UnitedHealth Group Center, 9900 Bren Road East, Minnetonka, MN 55343. Defendant United Healthcare Services, Inc. transacts business in the Middle District of Georgia and the state of Georgia by offering and providing Medicare Advantage Special Needs Nursing Home plans.

19.     Defendant UnitedHealthcare, Inc. is a for-profit corporation registered in Delaware. Defendant UnitedHealthcare, Inc. transacts business in the Middle District of Georgia and the state of Georgia by offering and providing Medicare Advantage Special Needs Nursing Home plans.

20.     Defendant UnitedHealthcare Insurance Company is an insurance company registered in Connecticut. Defendant UnitedHealthcare Insurance Company transacts business in the Middle District of Georgia and the state of Georgia by offering and providing Medicare Advantage Special Needs Nursing Home plans.

21.     Defendant Optum, Inc. is a health services company registered in Delaware. It is a direct or indirect subsidiary of Defendant UnitedHealth Group, Inc. Defendant Optum, Inc. provides services in the Middle District of Georgia and the state of Georgia related to the Medicare Advantage Special Needs Nursing Home plans offered by Defendant UnitedHealth Group and its affiliates.

22.     Defendant OptumInsight, Inc. is a health services company registered in Delaware.  It is a direct or indirect subsidiary of Defendant UnitedHealth Group, Inc.  Defendant OptumInsight, Inc. provides services in the Middle District of Georgia and the state of Georgia related to the Medicare Advantage Special Needs Nursing Home plans offered by Defendant UnitedHealth Group and its affiliates.

23.     Defendant Optum Care Services Company is a for-profit corporation with its main office located at 9900 Bren Road East Minnetonka, MN 55343.  Defendant Optum Care Services Company provides services in the Middle District of Georgia and the state of Georgia related to the Medicare Advantage Special Needs Nursing Home plans offered by Defendant UnitedHealth Group and its affiliates.

24.     Defendant OptumHealth Care Solutions, LLC is a for-profit corporation with its main office located at 11000 Optum Circle, Eden Prairie, MN 55344.  Defendant OptumHealth Care Solutions, LLC provides services in the Middle District of Georgia and the state of Georgia related to the Medicare Advantage Special Needs Nursing Home plans offered by Defendant UnitedHealth Group and its affiliates.

25.     Defendant Optum Services, Inc. is a for-profit corporation with its main office located at 11000 Optum Circle, Eden Prairie, MN 55344.  Defendant Optum Services, Inc. provides services in the Middle District of Georgia and the state of Georgia related to the Medicare Advantage Special Needs Nursing Home plans offered by Defendant UnitedHealth Group and its affiliates.

26.     Defendant Ovations, Inc. is a Delaware corporation. It is a direct subsidiary of Defendant United HealthCare Services, Inc. and an indirect subsidiary of Defendant UnitedHealth Group.  Defendant Ovations, Inc. provides services in the Middle District of

Georgia and the state of Georgia related to the Medicare Advantage Special Needs Nursing Home plans offered by Defendant UnitedHealth Group and its affiliates.

## THE LAW

### A. *The False Claims Act*

27.     During all times relevant to the facts of this case, the False Claims Act provides in pertinent part that:

> (a) any person who - - (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
>
> * * * *
>
> is liable to the United States Government for a civil penalty of not less than $5,500.00 and not more than $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410), plus three times the amount of damages which the Government sustains because of the act of that person.
>
> * * * *
>
> (b) . . . For purposes of this section (1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud; (2) the term "claim" (A) means any request or demand, whether under contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; . . . (3) the term

"obligation" means an established duty, whether or not fixed, arising from an expressed or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and (4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

31 U.S.C. § 3729 (2009).

### B. The Georgia False Medicaid Claims Act

28.     The Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168, *et seq.*, imposes

liability on any person who:

> (1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;
> (2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;
>
> (3) Conspires to commit a violation of paragraph (1), (2), (4), (5), (6), or (7) of this subsection;
>
> (7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program.

O.C.G.A. § 49-4-168.l.

29.     The civil penalties for violating the statute are:

> consistent with the civil penalties provision of the federal False Claims Act, 31 U.S.C. 3729(a), as adjusted by the federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461; Public law 101-410), and as further amended by the federal Civil Penalties Inflation Adjustment Improvements Act of 2015 (Sec. 701 of Public Law 114-74), plus three times the amount of damages which the Georgia Medicaid program sustains because of the act of such person.

*Id.*

30.    Under O.C.G.A. § 49-4-168, "knowing" and "knowingly" require no proof of specific intent to defraud and mean that a person, with respect to information:

> **(A)** Has actual knowledge of the information;
> **(B)** Acts in deliberate ignorance of the truth or falsity of the information; or
> **(C)** Acts in reckless disregard of the truth or falsity of the information.

31.    The statute defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  O.C.G.A. § 49-4-168(3).

32.    The statute defines "claim" as:

> any request or demand, whether under a contract or otherwise, for money, property, or services, which is made to the Georgia Medicaid program, or to any officer, employee, fiscal intermediary, grantee or contractor of the Georgia Medicaid program, or to other persons or entities if it results in payments by the Georgia Medicaid program, if the Georgia Medicaid program provides or will provide any portion of the money or property requested or demanded, or if the Georgia Medicaid program will reimburse the contractor, grantee, or other recipient for any portion of the money or property requested or demanded. A claim includes a request or demand made orally, in writing, electronically, or magnetically. Each claim may be treated as a separate claim. O.C.G.A. § 49-4-168(1).

## FEDERAL HEALTHCARE PROGRAMS

### A. *The Medicare Advantage Program*

33.    The Medicare Program is a federal government-funded medical assistance program, primarily benefiting the elderly and disabled, which was created in 1965 when Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* (hereinafter, "Medicare").  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a division of the United States Department of Health and Human Services ("HHS"), and is funded by taxpayer revenue.  Medicare was designed to be a health insurance program and

to provide for the payment of hospital services, medical services, and durable medical equipment to persons older than 65 years of age and others who qualify under its terms.

34.    Parts A and B of the Medicare Program are known as "traditional" Medicare.  Part A covers inpatient and institutional care. Part B covers physician, hospital, outpatient, and ancillary services and durable medical equipment.  Under Medicare Parts A and B, CMS reimburses healthcare providers using the fee-for-service system, in which providers submit claims to CMS for healthcare services actually rendered.  CMS then pays the providers directly for each service based on payment rates pre-determined by the Government.

35.    Under Medicare Part C, Medicare beneficiaries may opt out of "traditional" Medicare and instead may enroll in Medicare Advantage Plans to receive healthcare services managed by those Plans.  The Medicare Advantage Plans are run by Medicare Advantage organizations, which are often private insurers such as the UnitedHealth Defendants.  *See* 42 C.F.R. §§ 422.2, 422.503(b)(2).

36.    Medicare Advantage Plans must provide Medicare beneficiaries all of the services that they are entitled to receive from the traditional Medicare Program.

37.    Under Part C, the Government pays each Medicare Advantage Organization a predetermined base monthly capitated amount for each Medicare beneficiary in its Medicare Advantage Plans. This monthly payment is known as a "per-member, per-month" payment.

38.    Under Medicare Part D, Medicare beneficiaries can elect to enroll in either a Prescription Drug plan (known as a "PD Plan") or a Medicare Advantage Plan that provides prescription drug coverage in addition to the physician office visit and hospital outpatient and inpatient coverage provided under Part C (known as a "Medicare Advantage Prescription Drug Plan").  For simplicity, in this Complaint, Relator refers to Parts C and D collectively as the

"Medicare Advantage Program" and refers collectively to Medicare Advantage Plans, Prescription Drug Plans, and Medicare Advantage Prescription Drug Plans as "Plans."

39.    Medicare Advantage Organizations are "risk-bearing" entities that must be licensed by the State in which they are located.  42 C.F.R. §§ 422.2 & 422.503(b)(2).  Each Medicare Advantage Organization agrees to bear the risk that the amount that it pays providers for the health services rendered to a particular beneficiary enrolled in one of its Plans may exceed the amount that it was paid by the Government to insure the beneficiary.

40.    Medicare beneficiaries who enroll in a Medicare Advantage, Prescription Drug, or Medicare Advantage Prescription Drug Plan are considered members of and enrollees in that Plan.  In this Complaint, the terms "beneficiaries," "members," and "enrollees" are used interchangeably, but mean the same thing, that is individuals enrolled in Plans.

41.    Medicare Advantage Organizations' obligations to the Medicare Advantage Program and the requirements for them to participate in the Program are set forth in federal regulations.  Each year, the Medicare Advantage Organizations must agree in writing to comply with those regulations and to other terms and conditions in order to participate in the Medicare Advantage Program.  42 C.F.R. §§ 422.504 & 422.505 (Part C); 42 C.F.R. §§ 423.504 & 423.505 (Part D).

42.    In addition, Medicare Advantage Organizations sign certifications that they will comply with requirements set forth in statutes, such as the False Claims Act, and guidance documents, such as the Medicare Managed Care Manual, the Medicare Prescription Drug Benefit Manual, Medicare Communications and Marketing Guidelines, the Risk Adjustment Participant Guides, and Medicare Advantage operating instructions.

43.    Pursuant to Medicare regulations, a related entity "means any entity that is related to the Medicare Advantage organization by common ownership or control and (1) [p]erforms some of the Medicare Advantage organization's management functions under contract or delegation; [or] (2) [f]urnishes services to Medicare enrollees under an oral or written agreement …." *Id.* Related entities such as the Optum and Ovation entities described herein must, among other things: perform their services in a manner that complies with the Medicare Advantage organization's contractual obligations to the Government, *id.* at §422.504(i)(3)(iii); agree to "comply with all applicable Medicare laws, regulations, and CMS instructions," *id.* at §422.504(i)(4)(v); and receive effective compliance training and education relating to preventing fraud, waste, and abuse, *id.* at §422.504(l)(3).

44.    A Medicare Organization "maintains ultimate responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS."  42 C.F.R. § 422.504(*i*)(1).  Thus, a Medicare Advantage Organization cannot delegate away its ultimate responsibility for its obligations to the Government.

**B. Medicare Regulations Regarding Marketing of Medicare Advantage Plans**

45.    Medicare regulations define "marketing" as "activities and use of materials that meet the following:  (1) conducted by the Medicare Advantage organization; (2) intended to draw a beneficiary's attention to a Medicare Advantage plan or plans; and (3) intended to influence a beneficiary's decision-making process when selecting a Medicare Advantage plan for enrollment or deciding to stay enrolled in a plan."  42 C.F.R. §422.2260.

46.    42 C.F.R. §422.2268(b)(13) expressly prohibits Medicare Advantage organizations, such as the UnitedHealth Defendants, from marketing its plans by "[s]olicit[ing]

door-to-door for Medicare beneficiaries or through other unsolicited means of direct contact, including calling a beneficiary without the beneficiary initiating the contact."

47.    42 C.F.R. §422.2268(b)(4) also prohibits Medicare Advantage organizations, such as the UnitedHealth Defendants, from marketing "any health care related product during a marketing appointment beyond the scope agreed upon by the beneficiary, and documented by the plan, prior to the appointment."

48.    CMS imposes even stricter requirements on Plan-Initiated Provider Activities in the Healthcare Setting.

49.    42 C.F.R. §422.2268(b)(7) prohibits Medicare Advantage organizations, such as the UnitedHealth Defendants, from "conduct[ing] sales presentations or distribut[ing] and accept[ing] MA plan enrollment forms in provider offices or other areas where health care is delivered to individuals, except in the case where such activities are conducted in common areas in health care settings."

50.    42 C.F.R. §422.2268(b)(11) also prohibits Medicare Advantage organizations, such as the UnitedHealth Defendants, from "[e]ngag[ing] in any other marketing activity prohibited by CMS in its marketing guidance."

51.    CMS' Medicare Communications and Marketing Guidelines ("the Guidelines") reiterate these requirements.  Section 40.2 of the Guidelines expressly prohibits "[u]s[ing] door-to-door solicitation", "[a]pproach[ing] potential enrollees in common areas", or "[u]s[ing] telephonic solicitation."

52.    Instead, according to Section 40.3, Medicare Advantage organizations, such as the UnitedHealth Defendants, may only "[c]all individuals who have given permission for a plan or sales agent to contact them (examples of permission include filling out a business reply card,

emailing the Plan/Part D sponsor requesting a return call, or asking a customer service representative to have an agent contact them)."

53.     Section 60 of the Guidelines outlines the permissible scope of marketing activities in the healthcare setting.  CMS defines "plan-initiated activities" as "those activities where either a Plan/Part D sponsor requests contracted providers to perform a task or the provider is acting on behalf of the Plan/Part D sponsor."  The Guidelines make clear that the "Plan/Part D sponsor must ensure compliance with requirements applicable to communications and marketing" for these plan-initiated activities.  *Id*. at Section 60.2.

54.     Section 60.2 states that Plans/Part D sponsors may not allow contracted providers to:

- Accept/collect scope of appointment forms;
- Accept Medicare enrollment applications;
- Make phone calls or direct, urge, or attempt to persuade their patients to enroll in a specific Plan based on financial or any other interests of the provider;
- Mail marketing materials on behalf of Plans/Part D sponsors;
- Offer inducements to persuade their patients to enroll in a particular Plan or organization;
- Conduct health screenings as a marketing activity;
- Distribute marketing materials/applications in areas where care is being delivered;
- Offer anything of value to induce enrollees to select them as their provider; or
- Accept compensation from the Plan for any marketing or enrollment activities.

55.     Instead, Plans/Part D sponsors may only allow contracted providers to:

- Make available, distribute, and display communication materials, including in areas where care is being delivered; and
- Provide or make available Plan marketing materials and enrollment forms outside of the areas where care is delivered (such as common entryways, vestibules, hospital or nursing home cafeterias, and community, recreational, or conference rooms).

56.     Section 60.4.1 of the Guidelines is entitled "Special Guidance for Institutional Special Needs Plans Serving Long-Term Care Facility Residents."  While CMS permits Plans/Part D sponsors to schedule appointments with residents upon a resident's request, the Guidelines specifically state, "If a resident did not request an appointment, any visit by an agent or broker is considered unsolicited door-to-door marketing."

57.     Similarly, 42 C.F.R. §423.2268(b)(13) expressly prohibits Plan D sponsors from "[s]olicit[ing] door-to-door for Medicare beneficiaries or through other unsolicited means of direct contact, including calling a beneficiary without the beneficiary initiating the contact."

58.     42 C.F.R. §423.2268(b)(4) also imposes similar prohibitions on Part D sponsors from marketing "any health care related product during a marketing appointment beyond the scope agreed upon by the beneficiary, and documented by the plan, prior to the appointment."

59.     The regulations give CMS the authority to terminate a Medicare Advantage Organization's contract if the Medicare Advantage Organization meets any of the following: "(1) Has failed substantially to carry out the contract; (2) Is carrying out the contract in a manner that is inconsistent with the efficient and effective administration of this part; or (3) No longer substantially meets the applicable conditions of this part."  42 C.F.R. §422.510(a).

60.     CMS may make the determination that one of these factors have been met if the Medicare Advantage Organization:

(i) Based on creditable evidence, has committed or participated in false, fraudulent, or abusive activities affecting the Medicare, Medicaid or other State or Federal health care programs, including submission of false or fraudulent data."  42 C.F.R. §422.510(a)(4)(i).

…

(iv) Substantially fails to comply with the requirements in subpart V of this part. 42 C.F.R. §422.510(a)(4)(i).

61.     Under 42 C.F.R. §422.510(b)(2)(i), CMS may immediately terminate a Medicare Advantage Organization if the termination is based on 42 C.F.R. §422.510(a)(4)(i)(related to false, fraudulent, or abusive activities).

62.     Similarly, 42 C.F.R. §422.510(c)(2) makes clear that Medicare Advantage organizations terminated based on 42 C.F.R. §422.510(a)(4)(i) are not given 30 days to develop and implement a corrective action plan.

*C. HIPAA*

63.     The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. §1320d-6(a), makes it illegal to knowingly:

    (1)     use[] or cause[] to be used a unique health identifier;

    (2)     obtain[] individually identifiable health information relating to an individual; or

    (3)     disclose[] individually identifiable health information to another person."

64.     HIPAA contains stiff penalties:

**(b) PENALTIES.** A person described in subsection (a) shall—

**(1)** be fined not more than $50,000, imprisoned not more than 1 year, or both;

**(2)** if the offense is committed under false pretenses, be fined not more than $100,000, imprisoned not more than 5 years, or both; and

**(3)** if the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm, be fined not more than $250,000, imprisoned not more than 10 years, or both.

42 U.S.C. §1320d-6(b).

65.     The Government also imposes civil penalties for improper disclosures of protected health information. *See* 42 U.S.C. §1320d-5(a)(1).

66.     45 C.F.R. §164.502 prohibits covered entities or business associates from "us[ing] or disclos[ing] protected health information" unless otherwise permitted in the regulations.

67.     45 C.F.R. §164.502(a)(5)(ii)(A) prohibits covered entities from selling protected health information.

68.     45 C.F.R. §164.502(a)(5)(ii)(B)(1) defines "sale" as any disclosure where "the covered entity or business associate directly or indirectly receives remuneration from or on behalf of the recipient of the protected health information in exchange for the protected health information."

69.     Further, regulations make clear that the patient's authorization is required prior to sharing his protected health information.  "Except as otherwise permitted or required by this subchapter, a covered entity may not use or disclose protected health information without an authorization that is valid under this section."  45 C.F.R. §164.508(a)(1).

70.     In addition, the regulations state:

> (**3**) *Authorization required: Marketing.*
>
>     (i) Notwithstanding any provision of this subpart, other than the transition provisions in § 164.532, a covered entity must obtain an authorization for any use or disclosure of protected health information for marketing, except if the communication is in the form of:
>
> > (A)   A face-to-face communication made by a covered entity to an individual; or
> >
> > (B)   A promotional gift of nominal value provided by the covered entity.
>
>     (ii) If the marketing involves financial remuneration, as defined in paragraph (3) of the definition of marketing at § 164.501, to the covered entity from a third party, the authorization must state that such remuneration is involved.

45 C.F.R. §164.508(a)(3).

## D. The Anti-Kickback Statute and the False Claims Act

71.     The Anti-Kickback Statute makes it illegal for individuals or entities to:

knowingly and willfully offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person

(A) to refer an individual or a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program….

42 U.S.C. § 1320a-7b(b)(2).

72.    Underscoring the breadth of the statutory definition, the HHS OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991), broadly define the term "remuneration" as "anything of value in any form or manner whatsoever." *See* HHS-OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991); *accord United States ex rel. Fry v. The Health Alliance of Greater Cincinnati*, 2008 U.S. Dist. LEXIS 102411, at *17 (S.D. Ohio Dec. 18, 2008).

73.    Violation of the Anti-Kickback Statute is a felony punishable by fines and imprisonment and can result in exclusion from participation in federal health care programs.  42 U.S.C. § 1320a-7b(b); 42 U.S.C. § 1320a-7b(7).

74.    As codified in the Patient Protection and Affordable Care Act of 2010 ("PPACA"), 42 U.S.C. § 1320a-7b(g), "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]."

75.    According to the legislative history of the PPACA, this amendment to the Anti-Kickback Statute was intended to clarify "that all claims resulting from illegal kickbacks are considered false claims for the purpose of civil actions under the False Claims Act, even when the claims are not submitted directly by the wrongdoers themselves."  155 Cong. Rec. S10852, S10854 (Oct. 28, 2009).

20

76.    Compliance with the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), is a condition of payment under the federal healthcare programs. *See also United States ex rel. Lutz v. Berkeley Heartlab, Inc*., 2017 U.S. Dist. LEXIS 138722, at *9 (D.S.C. Aug. 27, 2017) (applying common sense and weight of authority to hold that taint of illegal kickback scheme would be material to decision to pay claims).

### E. Georgia Medicaid Program

77.    The Medicaid Program was created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income, blind, or disabled persons, or to members of families with dependent children or qualified pregnant women or children.  The Medicaid Program is a jointly funded federal-state program and is administered by CMS at the federal level.   Within broad federal rules, each state determines eligibility requirements for Medicaid, the services covered, payment levels for services, and administrative and operational procedures.

78.    In order to qualify for federal funds, the Georgia Medicaid program is required to implement a State Plan containing certain specific minimum criteria for coverage and payment of claims, as set forth by the federal Medicaid statute.  See 42 U.S.C. § 1396a.

79.    The Georgia Department of Community Health ("DCH") is responsible for the administration and supervision of the Medicaid program.  Georgia law authorizes DCH "to establish such rules and regulations as may be necessary or desirable in order to execute the [S]tate [P]lan and to receive the maximum amount of federal financial participation available in expenditures made pursuant to the [S]tate [P]lan . . . ." O.C.G.A § 49-4-142(a). Georgia law also authorizes and requires DCH to "publish the terms and conditions for receipt of medical assistance in Policies and Procedures manuals for each of the categories of services authorized

under the State Plan." Ga. Comp. R. & Regs. R. 350-1-.02(3). These manuals are disseminated

to providers enrolled in the applicable category of service, and amendments thereto are effective

"as specified by the Department at the time of dissemination." *Id.* Thus, DCH sets the rules for

the provision of medical services to Georgia Medicaid recipients, the circumstances in which

providers can become enrolled in Georgia Medicaid, and how Georgia Medicaid reimburses

providers for these claims.

80.    According to the Medicaid Secondary Claims User Guide, Georgia Medicaid will

pay Medicare Part C coinsurance and deductible payments up to the Medicaid maximum

allowable amount for certain beneficiaries.  Georgia Department of Community Health (DCH),

Part II Medicaid Secondary Claims User Guide (April 1, 2019).

81.    Beneficiaries who receive assistance include dual eligible Medicare and Medicaid

beneficiaries who are part of one of the following Medicare Savings Programs:

| Coverage Group | Criteria | Benefits |
| --- | --- | --- |
| Qualified Medicare Beneficiary | Individual is entitled to Medicare Part A, has income that does not exceed 100% of the Federal Poverty Level, and whose resources do not exceed twice the Supplemental Security Income limit | Medicaid payment of Medicare premiums, deductibles, and co-insurance and co-pays (except for Part D) |
| QMB Plus | Individual is entitled to Medicare Part A, has income that does not exceed 100% of the Federal Poverty Level, whose resources do not exceed twice the Supplemental Security Income limit, and also meets the financial criteria for full Medicaid coverage | Medicaid payment of Medicare premiums, deductibles, co-insurance and co-pays (except for Part D), and all benefits available under the State Plan to a fully eligible Medicaid recipient |

| Coverage Group | Criteria | Benefits |
|---|---|---|
| Specified Low-income Medicare Beneficiary | Individual is entitled to Medicare Part A, has income that exceeds 100% of the Federal Poverty Level but is less than 120%, and whose resources do not exceed twice the Supplemental Security Income limit | Medicaid payment of Medicare Part B premium |
| Qualifying Individual | Individual is entitled to Medicare Part A, has income that exceeds 120% of the Federal Poverty Level but is less than 135%, and whose resources do not exceed twice the Supplemental Security Income limit | Medicaid payment of Medicare Part B premium |

### F. Georgia Medicaid Policies

82.   All Georgia Medicaid providers that submit claims electronically must complete

an Electronic Funds Transfer Agreement and agree to the following:

> Legal Compliance. Provider shall abide by all federal and state laws governing the Medicaid program.
>
> * * * *
>
> Provider further acknowledges and agrees that only Payees who have agreed in writing to: 1) comply with all Department policies regarding the payment of medical assistance; and 2) be subject to the recoupment policies outlined in the Provider's Statement of Participation and as set forth in the Power of Attorney for Electronic Claims Submission, shall be deemed acceptable Payees.
>
> * * * *
>
> Provider certifies by such acceptance [of funds] that Provider presented the claims for the services . . . and that the services were rendered by or under the supervision of Provider. Provider understands that payment will be from federal and state funds and that any falsification, or concealment of a material fact, may be

prosecuted under federal and state laws.

Georgia Department of Community Health Electronic Funds Transfer Agreement.

83.     At all times relevant to the Complaint, in order to receive payment for Medicaid services, a provider must first enroll in the Georgia Medicaid program and enter into a provider agreement with the State called a "Statement of Participation."   Among the express understandings in the Statement of Participation include the following:

> Provider shall comply with all of the Department's requirements applicable to the category(ies) of service in which Provider participates under this Statement of Participation, including Part I, Part II, and the applicable Part III manuals.

> \* \* \* \*

> Claims Submissions: Certification of Claims. Provider shall submit claims for Covered Services rendered to eligible Medicaid recipients in the form and format designated by the Department. For each claim submitted by or on behalf of Provider, Provider shall certify each claim for truth, accuracy and completeness . . . .

> \* \* \* \*

> Provider shall maintain in an orderly manner and ensure the confidentiality of all original source documents, medical records, identifying recipient data, and any copies thereof, as may be necessary to fully substantiate the nature and extent of all services provided.

> \* \* \* \*

> Provider shall render Covered Services, as defined in the Department's Policies and Procedures manuals, to eligible Medicaid recipients that are medically necessary as defined by the Department, within the parameters permitted by Provider's license or certification, and within the category(ies) of services indicated in the Provider Enrollment documents. By submitting claims for reimbursement, Provider certifies that Covered Services were rendered in the amount, duration, scope and frequency indicated on the claims.

> \* \* \* \*

> Payment shall be made in conformity with the provisions of the Medicaid program, applicable federal and state laws, rules and regulations promulgated by the U.S. Department of Health and Human Services and the State of Georgia, and the Department's Policies and Procedures manuals in effect on the date the service was rendered. . . . Provider agrees that the Department shall not reimburse any claim, or portion thereof, for services rendered . . . for which federal financial participation is not available.
>
> * * * *
>
> Provider acknowledges that payment of claims submitted by or on behalf of Provider will be from federal and state funds, and the Department may withhold, recoup, or recover payments as a result of Provider's failure to abide by the Department's requirements.

Department of Community Health Division of Medical Assistance, Statement of Participation, DMA-002 (Rev. 04/03).

84.　　Therefore, the UnitedHealth Defendants understood that Georgia Medicaid may withhold payment for claims submitted in violation of the Policies and Procedures manuals, incomplete or untruthful claims, unsubstantiated claims, inaccurate claims, claims submitted in violation of law, and claims submitted for which federal financial participation is not available.

85.　　The Part I Medicaid/PeachCare for Kids Manual is applicable to all providers enrolled in the Georgia Medicaid program. In addition, such providers are also bound by the terms of the Part II Manual that are applicable to the services provided.

86.　　The Part I Manual, "[a]long with the Statement of Participation, . . . encompasses the terms and conditions for receipt of reimbursement." Georgia Department of Community Health (DCH), Part I Policies and Procedures for Medicaid/PeachCare for Kids, at "Preface" (April 1, 2019). The Part I Manual reiterates and reemphasizes the importance the State of Georgia places on compliance and further delineates the specific conditions placed on providers submitting claims. For example, according to the Part I Manual, each enrolled provider must:

B)  Comply with all State and Federal laws and regulations related to furnishing Medicaid/PeachCare for Kids services.

* * * *

E)  Not contact, provide gratuities or advertise "free" services to Medicaid… members for the purpose of soliciting members' requests for services.  **Any activity such as obtaining a list of Medicaid or PeachCare for Kids Members** or canvassing neighborhoods for direct contact with Medicaid or PeachCare for Kids members **is prohibited**.  Any offer or payment of remuneration, whether direct, indirect, overt, covert, in cash or in kind, in return for the referral of a Medicaid or PeachCare for Kids member is also prohibited.

* * * *

G)  Not engage in any act or omission that constitutes or results in over utilization of services.

* * * *

J)  Neither bill the Division for any services not performed or delivered in accordance with all applicable policies . . . .

*Id.* at R. 106, p. I-43-44 (Emphasis added).

## FACTUAL ALLEGATIONS

### *A. Background on the UnitedHealth Defendants' Special Needs Nursing Home Plans*

87.    The UnitedHealth Defendants currently sell two Medicare Advantage Special Needs Nursing Home Plans in Georgia:  UnitedHealthcare Nursing Home Plan 1 and UnitedHealthcare Nursing Home Plan 2.

88.    Both UnitedHealthcare Nursing Home Plan 1 and UnitedHealthcare Nursing Home Plan 2 are Preferred Provider Organization Special Needs Plans for patients who: (1) are eligible for Medicare Part A; (2) are enrolled in Part B; (3) require a level of care that is usually provided in a nursing home; (4) are currently living in a nursing home that has a contract with the

UnitedHealth Defendants; (5) have no active discharge plans; and (6) do not have End-Stage Renal Disease at the time of enrollment.

89.    Beneficiaries of the Special Needs Nursing Home Plans receive their Medicare Part A and Part B services in addition to Part D coverage through the Medicare Advantage Plans.

90.    For 2019, the monthly premium for both plans is $25.70.  Beneficiaries of the plans must also pay Medicare Part B premiums unless they are eligible for reduced premiums.

91.    As of early 2018, according to Section 2, page 37 of the ISNP and IESNP Agent Training Book, approximately 93% of the UnitedHealth Defendants' members enrolled in the Special Needs Nursing Home Plans were eligible for both Medicare and Medicaid.  Medicaid, therefore, covers some or all of the premiums for almost all of the enrollees in the UnitedHealth Defendants' Special Needs Nursing Home Plans.

### B.  Benefits of the UnitedHealth Defendants' Special Needs Nursing Home Plans for Enrolled Nursing Homes

92.    Certain residents' enrollment in the UnitedHealth Defendants' Special Needs Nursing Home Plans can be beneficial to the nursing home.

93.    The ISNP and IESNP Agent Training Book ("the Training Book") summarizes the "Value of the CarePlus Care Model" to the nursing home as:

- o   We provide an added level of care and facility education and support.

- o   On-call for evening, holidays and weekends available.

- o   Increased efficiency:  skilled benefit without the CMS required 3-day qualifying hospitalization.

- o   Better communication and enhanced documentation:  facilitates communication among care team members and physicians. Supports state survey process and corrective action plans.

- o   Improved reimbursement:  reimbursement for 4 CPT codes not currently covered by Medicare.

> o  Maintain resident satisfaction: care model helps supplement physician visits and avoid unnecessary transfers to the hospital

*Id.* at Section 4, Page 74.

94.    First, when a nursing home (including skilled nursing facilities, or "SNFs") contracts with the UnitedHealth Defendants, OptumCare, a health services company affiliated with the UnitedHealth Defendants, provides the nursing home with on-call Nurse Practitioners and Physician Assistants to care for their enrollees.  *Id.* at Section 4, Page 74.

95.    The care provided by the Nurse Practitioners and Physician Assistants benefits both the UnitedHealth Defendants and the nursing facilities.  As explained in the Training Book:

> The UnitedHealthcare Nursing Home Plan supports census stability for the long term population with a treat-in-place care model because members receive skilled care without leaving the SNF.  The care model reduces unnecessary transfers to the emergency room or hospital admissions, resulting in the reduction of empty beds or the potential to lose residents to other SNFs once they are discharged from the hospital.

*Id.* at Section 3, Page 47.

96.    Second, contracting with the UnitedHealth Defendants provides potential additional revenue streams for the nursing home.  As the UnitedHealth Defendants explain in the Training Book, the contracts "provide the SNF with the ability to receive revenue above and beyond what they would get with Traditional Medicare. A SNF can bill for additional items in Part A and Part B and get reimbursed by UnitedHealthcare."  *Id*. at Section 9, Page 188.

97.    Traditional Medicare Part A covers skilled nursing care provided in a skilled nursing facility under certain conditions for a limited time.  The patients must have a qualifying hospital stay, defined as a three-day inpatient midnight stay in an acute care hospital.  Once the patient qualifies, the Part A services are reimbursed under a prospective payment system that pays the skilled nursing facility a daily rate and a daily room charge based on the resource utilization group (RUG) for which the patient is classified.  The more skilled the services the

patient needs, the higher the RUG, and the greater the reimbursement. If a patient leaves the hospital after only two days, the patient would not qualify for Medicare Part A skilled nursing services. If the patient leaves the skilled nursing facility or refuses daily skilled care resulting in a break of more than 30 days, the patient would need a new 3-day acute care hospital stay to qualify for additional skilled nursing facility care reimbursed under Part A.

98.    Traditional Medicare Part B services are paid on a fee-for-service basis.

99.    By comparison, under a Medicare Advantage Special Needs Nursing Home Plan, the UnitedHealth Defendants contract with CMS to provide the primary care, skilled care, hospital care, and referral services for each enrolled beneficiary. The UnitedHealth Defendants receive a per-member, per-month capitated payment that is supposed to cover the enrolled beneficiary's care. The UnitedHealth Defendants then, in turn, pay the nursing homes pursuant to the contracts negotiated.

100.    As the Training Book explains, the Medicare Advantage Special Needs Nursing Home Plan "results in payment options & financial incentives that are not usually offered to facilities." *Id*. at Section 9, Page 186. For example, the Training Book lists the following types of payment options and incentives:

- Payment of fees for delivering on-site care when hospitalization can be avoided

- Reimbursement for skilled days and intensive service days as medically necessary without the required 3-day hospital stay

- Additional programs in which facilities can participate

*Id.* at Section 9, Pages 186-87.

101.    The UnitedHealth Defendants can reimburse the skilled nursing facility in either a fee-for-service or capitated manner, but either way, the contracts permit the skilled nursing

facility to receive reimbursement from the UnitedHealth Defendants for additional items in Part A and Part B than Traditional Medicare would provide. *Id*. at Section 9, Page 188.

102.    In addition, the UnitedHealth Defendants provide different types of incentive payments to "promote collaboration" with the CarePlus model. The UnitedHealth Defendants tie the incentive payments to metrics (e.g., hospitalizations, advance care plans, flu vaccinations, etc.) to which the skilled nursing facility is already held accountable through state surveys. *Id.* at Section 9, Page 189.

103.    The Training Book makes clear that although there are many financial incentives for a nursing home to want its members to sign up for the UnitedHealth Defendants' Special Needs Nursing Home Plans as outlined above, "[i]t is important that we never say or imply that a SNF be guaranteed to make more money with Optum," *id.* at Section 5, Page 45, because doing so may constitute an offer of remuneration in violation of the Anti-Kickback Statute.

### C. UnitedHealth Defendants' Policies Regarding Soliciting Potential Beneficiaries

104.    Since the Medicare Advantage Plans supplant traditional Medicare, CMS places strict guidelines regarding the marketing of these plans, particularly to elderly seniors and their responsible parties.

105.    At all times relevant to this Complaint, the UnitedHealth Defendants were aware of the requirements found in the CMS regulations and promulgated policies consistent with these regulations by requiring potential beneficiaries' consent prior to marketing the Special Needs Nursing Home Plans to them.

106.    For example, slide 12 of a September 2015 PowerPoint presentation by Optum clearly states that CMS requires consent to contact potential enrollees:

**How Enrollment Occurs**

- CMS regulations
  - Requires consent to contact

- Family engagement
  - Facility plays a role
    - CMS approved letters, family nights, displays, materials available
  - Facility does not sell, but educates families on new option
  - Consent forms received
  - Provide responsible parties information upon request
  - Other agreed upon and approved activities
  - Drops Consent forms in drop boxes

107. In addition, Section 8, page 178 of the Training Book makes clear that "[c]ompliance with the Medicare Marketing Guidelines" is required. The Training Book states that the UnitedHealth Nursing Home Plan "is filed as a Medicare Advantage Plan with the Centers for Medicare and Medicaid Services, and is thus subject to all provisions included in the guidance." *Id*. It continues, "Compliance with these requirements is non-negotiable; failure to comply will result in disciplinary action up to, and including, termination." *Id*.

108. The UnitedHealth Defendants' Training Book also specifically underscores the importance of "educat[ing] [the Business Department of the nursing facility] on personal health information (PHI) regulations (i.e. ensure they understand the difference between providing information on UHC members vs. non-members.)." *Id*. at Section 3, Page 48.

109. Over and over again, the Training Book clearly explains the required consent needed in order for its employees to market the Medicare Advantage Special Needs Nursing Home Plans to potential beneficiaries not currently enrolled in another UnitedHealth plan.

110.   For example, the Training Book cites Sections 70.2 through 70.5.2A of the Medicare Marketing Guidelines and Policy SAO – 105 as the applicable consent to contact requirements.  The Training Book mandates:

> A resident or their responsible party's (RP) written consent to contact is required **prior** to any outreach.  No conversations about the plan can occur without one of the following:
>
> - The resident or RP approaches the sales professional (SAM, SIM, SAC, etc.) or places a call to the plan or one of the individuals operating in a sales capacity.  In these cases, the e-outreach should be documented in bConnected (the date, venue and circumstances around the contact.)
>
> - The resident or RP completes a business reply card (BRC), Authorization for Disclosure of Contact Information (ADCI or former MIPPA) or other CMS approved consent to contact form.
>
> - The resident is confirmed to be a member of a UnitedHealthcare product.
>   - In these cases, the member and RP information should be collected and sent to sales operations, for entry into the bConnected system.  Notification of the availability of the UHCNHP will be down (sic) through a central location, and outreach may be made by the sales professional.

*Id.* at Section 8, Page 179.

111.   The Training Book also states, "It is important to note that SNF staff can't 'give' the plan leads or in any way collect [consent to contact forms] with the intent to distribute to the plan."  *Id.*  at Section 8, Page 181.

112.   The Training Book further explains:

> Every interaction we have with potential members and their RPs is guided by CMS regulations known as MIPPA.  MIPPA is the Medicare Improvement Act for Patients and Providers Act of 2008.  It determines how we are able to communicate with a potential member or their RP.

Medicare recipients are considered to be a vulnerable population and CMS regulations restrict us from soliciting without consent.  Many of these guidelines are designed to protect seniors.

It is not permitted to walk up to someone, introduce ourselves and ask them if they'd like to hear about our plan. In order for us to speak about the plan, we require authorization or consent to contact.  There are multiple ways for us to obtain this consent.

*Id.* at Section 6, Page 94.

113.  Again and again, the Training Book describes the four permissible ways to obtain consent: (1) the resident or responsible party can complete a business reply card ("BRC") expressing interest; (2) the interested party may complete an Authorization for Disclosure of Contact Information ("ADCI") form; (3) the resident or responsible party can reach out directly to the account manager; and (4) agents may contact residents who are already UnitedHealthcare members to cross-sell the Special Needs Plans.  *Id.* at Section 6, Page 95.

114.  The Training Book later repeats these compliant ways to obtain leads:

- Leads are released compliantly by:
  - MIPPA/ADCI forms
  - Lead card/BRC
  - Cross sell/member
  - Call in/inbound call

*Id*. at Section 6, Pages 116-17.

115.  Employees of the UnitedHealth Defendants are required to input all leads for new membership into bConnected, their internal software system.  *Id*. at Section 6, Page 92.  All of the employees had their own login to bConnected.  The UnitedHealth Defendants switched to a different system called Salesforce in 2018.

116.  The Training Book explains, "We document our interactions through bConnected to demonstrate how a lead was compliantly received and worked.  This protects the consumer

33

and the agent." *Id*. at Section 6, Page 116.  The Training Book continues, "All interactions must operate within the compliance parameters expressed in the Medicare marketing guidelines." *Id*.

### D. UnitedHealth Policies Regarding Implementing Special Needs Plans at New Nursing Facilities

117.   In addition to clear policies requiring consent to contact potential enrollees, the UnitedHealth Defendants also promulgated clear policies regarding growing business at newly contracted nursing homes.

118.   For example, the Training Book suggests "having a facility perform a routine census review [to] help make certain that the valuable resource of the UHC ISNP is offered to everyone who is eligible." *Id*. at Section 6, Page 100.  However, the Training Book states, "Due to MIPPA regulations, the SNF staff cannot share this information with you but it can help guide them when informing residents and RPs about the availability of our plan." *Id*.

119.   The process typically involves the Business Office of the skilled nursing facility. The Training Book describes how to "turn" the Business Office "into a champion":

> The Business Office can help by identifying UnitedHealthcare members and providing responsible party information. The Business Office Manager is typically the individual who is contacted for help with a quarterly census review.
>
> o  Educate them on the compliant way to conduct a census review
>
> o  Gain commitment to approach this as a process
>
> The Business Office is typically knowledgeable on those that are newly Medicaid approved or in the spend-down process.  If they aren't, it can open the door for a possible education opportunity.

*Id*.  at Section 3, Page 48.

120.   In another section discussing the implementation process, the Training Book states that "[a]ll interactions with potential partners" must be "documented in Salesforce." *Id*. at Section 10, Page 201.

121.   Another document prepared by the UnitedHealth Defendants clearly states that personnel from the skilled nursing facilities may not:

- Compare plans with consumers

- Supply an agent with a list of residents or their contact information (exception is current UnitedHealthcare members)

- Schedule appointments on behalf of an Optum/UnitedHealthcare representative

- Provide fact (sic) sheets

122.   Slide 18 of the September 2015 PowerPoint presentation by Optum also describes the appropriate way for a nursing home to conduct a census review:



**Business Office & Resident/Family Engagement**

- Conduct census review to identify number of eligible residents in the following categories:
  - Dual eligibles & Medicare only
  - UnitedHealthcare® members
  - Private Pay & TriCare
  - ESRD
- Identify UnitedHealthcare members and consider providing responsible party information.
- Communicate participation with program and ways to get information during routine calls to families.
- Provide MIPAA form or BRC to interested residents or families upon request

- Access to a provider advocate team for assistance with billing for all UnitedHealthcare products.
- Consent to contact form is not required for residents currently enrolled in another UnitedHealthcare product.
- CMS approved letter is available to notify a UnitedHealthcare resident/family that another UHC product that may better fit their needs is available.
- Content can be included during regular business calls but can't be used to single out particular families or events.

*E. UnitedHealth Defendants' Illegal Solicitation of Beneficiaries*

123.   Despite these clear policies and the UnitedHealth Defendants' knowledge of the strict Medicare marketing regulations, the UnitedHealth Defendants' sales efforts in practice violated these policies and regulations, leading to the enrollment of Medicare beneficiaries, including Medicaid members, who were illegally solicited by the UnitedHealth Defendants.

124.    But for their illegal marketing, the UnitedHealth Defendants would not have enrolled as many patients in their Special Needs Nursing Home Plans.

125.    When Relator first returned to working for the UnitedHealth Defendants in 2015, the sales practices were consistent with CMS marketing regulations and the UnitedHealth Defendants' policies.

126.    Their primary method of marketing the Special Needs Nursing Home Plans was to sit at a table in a common area of the nursing facility and wait for a potential beneficiary or responsible party to initiate contact.  They were prohibited from marketing the plans directly to potential beneficiaries or responsible parties until the potential beneficiary signed an authorization form or business reply card.

127.    The UnitedHealth Defendants' sales team, however, struggled using this approach.

128.    The atmosphere and sales tactics completely changed in 2016, when James Rodgers took over as the Director of Sales for Georgia, Alabama, and Florida.

129.    Rodgers and other members of the sales management team set such unrealistic sales goals that the salespeople were unable to meet these using legal, appropriate marketing tactics.

130.    In fact, James Rodgers directed his sales team to engage in sales and marketing tactics without regard for the CMS marketing regulations and the Anti-Kickback Statute and to focus only on enrolling as many people as possible into the Special Needs Nursing Home Plans.

131.    In one of his very first meetings with Relator and other members of the sales team, Rodgers declared that he did not care how they made their numbers, "as long as you make me look good."

132.    Rodgers constantly called and texted his sales team, pressuring them about the number of enrollments they had secured.

133.    Rodgers instructed the salespeople to target Medicaid patients because then the individuals would not be required to pay for their premiums.

134.    When Toni Ivey, a sales account manager, did not meet her numbers, Rodgers fired her to set an example to the rest of the staff.

135.    On Mondays, Wednesdays, and Fridays, Rodgers organized "stand-up calls" with the sales team during which he would walk through a PowerPoint presentation and discuss which salespeople were producing and what they planned to do to drive their enrollment numbers. Participants on these calls included Vice President James John Louise in New York, Relator, and the Sales Account Managers.

136.    When a new nursing home was considering contracting with the UnitedHealth Defendants, Rodgers instructed his sales team to set up a meeting with the key decision-makers of the nursing facility.  During the meeting, Rodgers would tell the nursing facility that the UnitedHealth Defendants needed 40% penetration (i.e., enrollments from 40% of the members of the nursing home facility during the first three months) and twenty returned Business Reply Cards, or else the UnitedHealth Defendants would not contract with the nursing facility to provide the Special Needs Nursing Home Plans.

137.    The 40% penetration figure was a well-known sales target for the UnitedHealth Defendants.  At a National Sales Conference on January 11, 2017, SPJ Consulting made a presentation called, "From Commitment to Execution:  Sales Implementation Manager (SIM) Summit Workshop."  The stated objective for the Workshop was to "provide OPTUM SIMs with

a common methodology and tools to have 70% of new homes achieve 40% penetration within 90 days."

138.   Following the meeting with the key decision-makers, Rodgers instructed Relator and/or the Sales Account Manager to meet separately with key personnel at the nursing home, such as the Activities Director, Social Services Director, or Business Office Manager.

139.   Rodgers instructed the sales team to offer food or other items to the key decision-maker at the nursing home.  The sales team would put these charges on their corporate credit cards, and they were always reimbursed without any questions from the corporate office.

140.   In exchange for the food or other items and the possibility of contracting with the UnitedHealth Defendants, Rodgers and other sales personnel would instruct the nursing home to provide a list of Medicare and Medicaid patients at their facility.  This list contained protected health information (PHI) for which, in most instances, the UnitedHealth Defendants did not have the patients' authorization to receive.

141.   In addition, Rodgers and other sales personnel would also request and receive from the nursing homes copies of the patients' face sheets.  The face sheets contained the patients' PHI and most private information, including for example, the patients' name, picture, age, date of birth, social security number, address, room number, Medicare number, Medicaid number, phone number, diagnoses, advanced directive information, admission date, physician(s), insurance carrier, and most importantly for the UnitedHealth Defendants, the patients' responsible party and their contact information.

142.   In most instances, neither the patient nor their responsible party would have any idea that the nursing home had improperly provided this information to the UnitedHealth Defendants in exchange for the opportunity to contract with the UnitedHealth Defendants, secure

additional funding, and obtain the services of a dedicated Optum nurse practitioner and in exchange for the food and other items provided.

143.   Instead, the UnitedHealth Defendants' Sales Account Managers and Sales Implementation Managers would then use this PHI and additional information from the nursing home to improperly directly solicit patients and their responsible parties for its Special Needs Nursing Home Plans without first obtaining their consent.

144.   Once they reached the patients or their family members using these deceptive marketing practices, they would have the patient or responsible party family member fill out the authorization card after the fact.

145.   Authorization cards completed after the deceptive marketing practices have already occurred were knowingly made or caused to be made by UnitedHealth Defendants for the purpose of concealing the deceptive marketing practices, and are material to the resulting false or fraudulent claims.

146.   In certain nursing homes, the UnitedHealth Defendants would deceptively get the nursing home to agree to include an Authorization for Disclosure of Contact Information form permitting the nursing home to share the patient's information to the UnitedHealth Defendants in the packet of materials completed upon admission to the nursing home.  The form does not disclose the financial interest of the nursing home in having its patients enroll in the UnitedHealth Defendants' Special Needs Nursing Plans.

147.   Sometimes, the UnitedHealth Defendants would also ask the nursing home to directly solicit the family members on behalf of the UnitedHealth Defendants in clear violation of the regulations.

148.   Rodgers instructed his sales team to take the information they needed from the face sheets obtained from the nursing homes, and then discard the face sheets.

149.   He instructed them not to use the term "face sheets," and he did not discuss this practice in writing.  Instead, during the sales implementation calls held every Tuesday and the stand-up calls on Mondays, Wednesdays, and Fridays, which involved salespeople from Alabama, Florida, and Georgia, Rodgers would ask his sales personnel whether they obtained the "sales lists."  Participants on these calls, including the Sales Account Managers and Sales Implementation Managers, understood this to be Rodgers' instruction to obtain PHI without the patients' consent and use this information to improperly solicit potential beneficiaries.

150.   The UnitedHealth Defendants' employees were instructed not to mention face sheets in their entries in bConnected.

151.   After Toni Ivey's termination, her emails were forwarded to Rodgers.  Included in these emails were communications between Ivey and the nursing homes, pursuant to Rodgers' sales instructions, that discussed obtaining face sheets.  Rodgers was aware that this practice was occurring at his instruction.

152.   The UnitedHealth Defendants' illegal sales tactics were rampant throughout the state of Georgia.

153.   Relator also has reason to believe the UnitedHealth Defendants' improper solicitation of Medicare and Medicaid patients occurred in areas outside of James Rodgers' sales territory.  James Rodgers' supervisor, James John Louise, put enormous pressure on Rodgers and set unreasonable sales goals that could only be met through improper marketing.  In addition to Rodgers, Louise was the supervisor for Sales Directors in New York and New Jersey.  Relator has reason to believe the UnitedHealth Defendants' sales personnel in New York and New Jersey

also improperly solicited Medicare and Medicaid patients and/or improperly obtained the patients' PHI. Rodgers and Louise replaced much of the sales personnel in Georgia with acquaintances from New York and New Jersey with sales backgrounds, whom they felt were more aggressive at "selling" the UnitedHealth Defendants' Special Needs Nursing Plans.

### F. Specific Examples of UnitedHealth Defendants' Illegal Solicitation of Beneficiaries

#### 1. Oceanside Nursing & Rehab

154.   By way of example, the UnitedHealth Defendants entered into a contract with Oceanside Nursing & Rehab located at 77 Van Horne Avenue, Tybee Island, Georgia 31328.

155.   On November 9, 2017, from 1:00 – 2:30 p.m., Tim Wilkes, the Network Director with UnitedHealthcare, set up a meeting with Oceanside Nursing and Rehab and Savannah Beach Nursing Home, two nursing homes located in close proximity. According to the meeting invitation, present for the meeting from the UnitedHealth Defendants were Tim Wilkes; Rhonda Ligon (UnitedHealthcare Director of Nursing); Jean Fortgang (Optum Nurse Practitioner); James Rodgers; and Sheila Curley (UnitedHealthcare Network Manager). According to Wilkes' invitation, the nursing facility's Business Office Manager, Director of Nursing, Social Services Director, MDS, and Admissions staff planned to attend.

156.   In advance of the meeting, both of the nursing homes provided census information and an eligibility analysis showing the number of patients at each nursing home that were eligible for UnitedHealthcare Nursing Home Plans based on their enrollment in Part A and Part B and whether the patients had end stage renal disease.

157.   The calendar invitation specifically references "breakout sessions with the individual team members" as part of the meeting agenda.

158.   During the breakout session, James Rodgers told the nursing homes the UnitedHealth Defendants would need 40% penetration in order to contract with them.  He instructed the nursing home personnel to place a list of patients in the orange folder provided by the UnitedHealth Defendants in order for the UnitedHealth Defendants' employees to improperly target the patients or their responsible parties.

159.   At 2:30, 2:44, 2:46, and 3:18 p.m., on November 9, 2017, shortly following the conclusion of the meeting and at the direction of Rodgers and the sales team, Kurtis Jackson, Director of Clinical Evaluations at Oceanside Nursing and Rehab, provided to the UnitedHealth Defendants' sales team lists of all of the current residents at the facility, including their age, admission date, Medicare numbers, and Medicaid numbers.

160.   Kurtis Jackson was Relator's point of contact at Oceanside Nursing and Rehab.  In exchange for Jackson's and the nursing home's cooperation, Rodgers instructed Relator to take Jackson out to eat.  Jackson chose Olive Garden as the location for the meal.  Relator paid for Jackson's meal, and Relator submitted the receipt for reimbursement.  The UnitedHealth Defendants' reimbursed Relator for this expense without any question.

161.   Following the November 2017 kickoff meeting, the UnitedHealth Defendants illegally and improperly obtained the face sheets for at least 10 residents, which were printed out on February 23, 2018, March 10, 2018, and April 26, 2018, and placed in the orange folder.  The face sheets contained the PHI of these patients, including their pictures, names, dates of birth, social security numbers, phone numbers, Medicare and Medicaid numbers, medical histories, admission dates, diagnoses, and providers.

162.   The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled many of them in the UnitedHealth Special Needs Nursing Home Plans.

163.   According to an internal document, at least 16 patients at Oceanside Nursing & Rehab enrolled in the UnitedHealth Defendants' Special Needs Nursing Home Plans.   The UnitedHealth Defendants wrongfully obtained the face sheets for many of these patients.

164.   The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these patients' care.

165.   The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 2. Green Acres Health & Rehab

166.   By way of further example, the UnitedHealth Defendants entered into a contract with Green Acres Health & Rehab located at 313 Allen Memorial Drive SW, Milledgeville, Georgia 31061.

167.   Employees of the UnitedHealth Defendants, including James Rodgers, instructed Green Acres Health & Rehab to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants in order for the UnitedHealth Defendants' employees to improperly target the patients or their responsible parties.

168.   Pursuant to these instructions, employees of Green Acres Health & Rehab provided the UnitedHealth Defendants' employees with Active Resident Reimbursement Tables, which contain the patients' names, Medicare enrollment, Medicare and Medicaid numbers, insurance information, and admission date.

169.   Pursuant to these instructions, employees of Green Acres Health & Rehab also provided the UnitedHealth Defendants' employees with a list of Clients by Location, which contains the patients' names, bed number, gender, and admission date.

170.   Pursuant to these instructions, employees of Green Acres Health & Rehab also provided the UnitedHealth Defendants' employees with the face sheet for at least one patient, patient B.H.  The face sheet contains the patient's name, date of birth, social security number, Medicare and Medicaid number, other insurance information, responsible party information, contact information, and information about the patient's admission.

171.   The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth Special Needs Nursing Home Plans.

172.   The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these patients' care.

173.   The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 3. Bolingreen Health & Rehabilitation

174.   By way of further example, the UnitedHealth Defendants entered into a contract with Bolingreen Health & Rehabilitation located at 529 Bolingreen Drive, Macon, Georgia 31210.

175.   Employees of the UnitedHealth Defendants, including James Rodgers, instructed Bolingreen Health & Rehabilitation to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants in order for the UnitedHealth Defendants' employees to improperly target the patients or their responsible parties.

176.   Pursuant to these instructions, employees of Bolingreen Health & Rehabilitation provided the UnitedHealth Defendants' employees with the PHI of its residents.

177.   The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth Special Needs Nursing Home Plans.

178.   The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these patients' care.

179.   The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 4. Westbury Health & Rehab

180.   By way of further example, the UnitedHealth Defendants entered into a contract with Westbury Health & Rehab located at 1420 Milstead Road, Conyers, Georgia 30012.

181.   Employees of the UnitedHealth Defendants, including James Rodgers, instructed Westbury Health & Rehab to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants in order for the UnitedHealth Defendants' employees to improperly target the patients or their responsible parties.

182.   Pursuant to these instructions, employees of Westbury Health & Rehab provided the UnitedHealth Defendants' employees with screenshots from the face sheets of its patients, including their insurance information, social security number, Medicare and Medicaid numbers, date of birth, and pharmacy.

183.   Pursuant to these instructions, employees of Westbury Health & Rehab also provided the UnitedHealth Defendants' employees with a Patient Information Summary document for patient L.W. that contains PHI, including his address, admission date, insurance

45

information, social security number, Medicare number, date of birth, diagnosis, hospital admission dates, physician's name, responsible party, and their contact information.

184.    The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth Special Needs Nursing Home Plans.

185.    The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these patients' care.

186.    The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 5. Riverview Health and Rehabilitation Center

187.    By way of further example, the UnitedHealth Defendants entered into a contract with Riverview Health and Rehabilitation Center located at 6711 La Roche Avenue, Savannah, Georgia 31406.

188.    Employees of the UnitedHealth Defendants, including James Rodgers, instructed Stan Adams, Jr., the Resident Services Coordinator, and others at Riverview Health and Rehabilitation Center to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants in order for the UnitedHealth Defendants' employees to improperly target the patients or their responsible parties.

189.    Employees of the UnitedHealth Defendants, including James Rodgers, also convinced Riverview Health and Rehabilitation Center to include the authorization form as part of the packet of information provided to the residents upon admission.  Employees of Riverview Health and Rehabilitation Center did not explain to the residents what they were signing or how

they were authorizing plans, such as the UnitedHealth Defendants, to target them for direct solicitation.

190.    Relator was instructed to provide employees of Riverview Health and Rehabilitation Center, including Stan Adams, Admissions Director Cheryl Godwin, and Social Workers Wanda Hobson and Maurice Jones, with food and Starbucks coffee in exchange for their cooperation.  Relator also took them offsite to provide them meals.  The UnitedHealth Defendants reimbursed Relator for all of these expenses without any question.

191.    Pursuant to these instructions, employees of Riverview Health and Rehabilitation Center provided the UnitedHealth Defendants' employees with face sheets of its patients, including each patient's name, date of birth, admission date, other information related to the admission, social security number, Medicare and Medicaid numbers, responsible party information, their contact information, attending physician, pharmacy, and insurance information.  The face sheets were printed out on the following dates and left in the orange folder:  March 8, 2018; March 28, 2018; April 12, 2018; and May 18, 2018.

192.    The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth Special Needs Nursing Home Plans.

193.    The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these patients' care.

194.    The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

*6. Northeast Atlanta Health & Rehab*

195.   By way of further example, the UnitedHealth Defendants entered into a contract with Northeast Atlanta Health & Rehab located at 1500 S. Johnson Ferry Road NE, Atlanta, Georgia 30319.

196.   Employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at Northeast Atlanta Health & Rehab to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants in order for the UnitedHealth Defendants' employees to improperly target the patients or their responsible parties.

197.   Pursuant to these instructions, employees of Northeast Atlanta Health & Rehab provided the UnitedHealth Defendants' employees with face sheets of its patients, including each patient's name, picture (in some instances), date of birth, admission date, other information related to the admission, social security number, Medicare and Medicaid numbers, responsible party information, their contact information, attending physician, pharmacy, insurance information, and diagnoses.  The face sheets were printed out on February 14, 2017, and February 18, 2017, and left in the orange folder.

198.   The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth Special Needs Nursing Home Plans.

199.   The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these patients' care.

200.   The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

*7. The Place at Martinez*

48

201.   By way of further example, the UnitedHealth Defendants entered into a contract with The Place at Martinez located at 409 Pleasant Home Road, Augusta, Georgia 30907.

202.   Employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at The Place at Martinez to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants in order for the UnitedHealth Defendants' employees to improperly target the patients or their responsible parties.

203.   Pursuant to these instructions, employees at the Place at Martinez provided a print out of the list of patients in the A Station and the B station.  The list contains the names of the nursing home patients.

204.   Pursuant to these instructions, an employee at The Place at Martinez also drafted a list of the nursing home's patients by hand.  This list contains the following for each patient: name, room number, Medicare and Medicaid numbers, responsible parties, and their contact information.   Certain patients are assigned to employees of the UnitedHealth Defendants including "John", which refers to UnitedHealth Sales Account Manager John King, and "Toni", which refers to former UnitedHealth Sales Account Manager Toni Ivey.

205.   Pursuant to these instructions, an employee at The Place at Martinez also drafted other lists of the nursing home's patients by hand and dated June 23, 2017, and July 17, 2017. These lists contain the following for each patient:  name, date of birth, Medicare and Medicaid numbers, responsible parties, and their contact information.  The July 17, 2017 list also contains admission date information.  Certain patients are assigned to employees of the UnitedHealth Defendants including "John", which refers to UnitedHealth Sales Account Manager John King, "Toni", which refers to former UnitedHealth Sales Account Manager Toni Ivey, and "Lori", which refers to UnitedHealth Sales Account Manager Lori Glover.

206.   One of the patients included on this list is patient A.H.  Her responsible party signed a Scope of Sales Appointment Confirmation Form and an Authorization for Disclosure of Health Information form for her on July 31, 2017.  However, her PHI was provided on both the June 23, 2017 and July 17, 2017 lists, weeks before her responsible party authorized her information to be shared by the nursing home to the UnitedHealth Defendants.

207.   The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth Special Needs Nursing Home Plans.

208.   The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these patients' care.

209.   The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 8. The Place at Pooler

210.   By way of further example, the UnitedHealth Defendants entered into a contract with The Place at Pooler located at 508 S. Rodgers Street, Pooler, Georgia 31322.

211.   Employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at The Place at Pooler to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants in order for the UnitedHealth Defendants' employees to improperly target the patients or their responsible parties.

212.   Pursuant to these instructions, an employee at The Place at Pooler also drafted a document entitled "Optum Care Referral List."  This list contains three groups of nursing home residents: "Resident's (sic) that can sign with no representative"; "Resident with No POA

however, family contact required and recommended"; and "Resident with POA or Responsible Party required." The lists include the patients' names and bed numbers.

213. At the bottom of the document, the employee writes, "The face sheets with demographic information (diagnoses, responsible party as well [] billing) are attached. Please contact the responsible party for all resident[] prior to signing any resident up for services."

214. The UnitedHealth Defendants used the information provided to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth Special Needs Nursing Home Plans.

215. The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these patients' care.

216. The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 9. Etowah Landing Care and Rehabilitation Center

217. By way of further example, the UnitedHealth Defendants entered into a contract with Etowah Landing Care and Rehabilitation Center located at 809 S. Broad Street, Rome, Georgia 30161.

218. Employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at Etowah Landing Care and Rehabilitation Center to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants in order for the UnitedHealth Defendants' employees to improperly target the patients or their responsible parties.

219. Pursuant to these instructions, employees of Etowah Landing Care and Rehabilitation Center provided the UnitedHealth Defendants' employees with face sheets of its

patients, including each patient's name, picture, date of birth, admission date, other information related to the admission, social security number, Medicare and Medicaid numbers, responsible party information, their contact information, attending physician, pharmacy, insurance information, and diagnoses.

220. Pursuant to these instructions, employees of Etowah Landing Care and Rehabilitation Center also provided the UnitedHealth Defendants' employees with at least two patient lists, printed on February 6, 2018, and February 7, 2018. These lists include the patients' names, room number, hospice status, and some of their insurance information.

221. The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth Special Needs Nursing Home Plans.

222. The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these patients' care.

223. The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 10. Fairburn Health Care Center

224. By way of further example, the UnitedHealth Defendants entered into a contract with Fairburn Health Care Center located at 178 W. Campbellton Street, Fairburn, Georgia 30213.

225. Employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at Fairburn Health Care Center to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants in order for the UnitedHealth Defendants' employees to improperly target the patients or their responsible parties.

226.    Sarah West, the Business Officer Manager at Fairburn Health Care Center, and Amatulah Ibraahiym, a social worker, were Relator's point of contact at the facility.  In exchange for their cooperation, Rodgers instructed Relator to provide food, coffee, and other items for the staff at Fairburn Health Care Center.  The UnitedHealth Defendants also sponsored balloons and other items for the Event Coordinator.  Relator submitted receipts for these reimbursements.  The UnitedHealth Defendants' reimbursed Relator for these expenses without any question.

227.    Pursuant to these instructions, Sarah West printed out at least two Resident Information Reports.  The reports contain lists of all of the patients and the following for each of the patients: room number, admission date, insurance, social security number, Medicare and Medicaid numbers, and date of birth.

228.    Pursuant to these instructions, employees of Fairburn Health Care Center also provided the UnitedHealth Defendants' employees with face sheets of its patients, including each patient's name, picture (in some instances), date of birth, admission date, other information related to the admission, social security number, Medicare and Medicaid numbers, allergies, advanced directives, power of attorney information, responsible party information, their contact information, attending physician, pharmacy, insurance information, and diagnoses.

229.    The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth Special Needs Nursing Home Plans.

230.    The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these patients' care.

231.    The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 11. *East Lake Arbor*

232.   By way of further example, the UnitedHealth Defendants entered into a contract with East Lake Arbor located at 304 5th Avenue, Decatur, Georgia 30030.

233.   Employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at East Lake Arbor to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants in order for the UnitedHealth Defendants' employees to improperly target the patients or their responsible parties.

234.   Pursuant to these instructions, employees of East Lake Arbor also provided the UnitedHealth Defendants' employees with face sheets of its patients, including each patient's name, picture, date of birth, admission date, other information related to the admission, information about qualifying hospital stays, social security number, Medicare and Medicaid numbers, allergies, advanced directives, power of attorney information, responsible party information, their contact information, attending physician, insurance information, and diagnoses.

235.   The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth Special Needs Nursing Home Plans.

236.   The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these patients' care.

237.   The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

*12. Amara Healthcare*

238.    By way of further example, the UnitedHealth Defendants entered into a contract with Amara Healthcare located at 2021 Scott Road, Augusta, Georgia 30906.

239.    Employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at Amara Healthcare to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants in order for the UnitedHealth Defendants' employees to improperly target the patients or their responsible parties.

240.    Pursuant to these instructions, employees of Amara Healthcare also provided the UnitedHealth Defendants' employees with face sheets of its patients, including each patient's name, admission date, a code for "admitted from", address, date of birth, social security number, height, weight, primary physician, diagnoses, hospital stay(s), rehab potential, immunization record, insurance information, other service providers including their pharmacy, dentist, hospital, podiatrist, responsible party, and their contact information.  These were printed on June 19, 2017.

241.    The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth Special Needs Nursing Home Plans.

242.    The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these patients' care.

243.    The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### *13. Jonesboro Nursing and Rehabilitation Center LLC*

244.   By way of further example, the UnitedHealth Defendants entered into a contract with Jonesboro Nursing and Rehabilitation Center LLC located at 2650 GA-138, Jonesboro, Georgia 30236.

245.   Employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at Jonesboro Nursing and Rehabilitation Center LLC to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants in order for the UnitedHealth Defendants' employees to improperly target the patients or their responsible parties.

246.   Pursuant to these instructions, employees of Jonesboro Nursing and Rehabilitation Center LLC provided at least two census lists printed on December 19, 2017.  These include each patient's name, room number, and other abbreviated information, including whether they were Medicaid patients.

247.   Pursuant to these instructions, employees of Jonesboro Nursing and Rehabilitation Center LLC also provided the UnitedHealth Defendants' employees with face sheets of its patients, including each patient's name, admission date, a code for "admitted from", date of birth, primary physician, diagnoses, hospital stay(s), vaccination records, billing information, including Medicare and Medicaid numbers, responsible party, and their contact information. These were printed on December 29, 2017, January 12, 2018, and January 26, 2018.

248.   For example, the responsible party for patient L.T. signed a Business Reply Card on February 1, 2018.  However, the nursing home pursuant to these instructions provided her

face sheet on January 26, 2018, prior to obtaining the Business Reply Card giving consent for the nursing home to share this information with the UnitedHealth Defendants.

249.    The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth Special Needs Nursing Home Plans.

250.    The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these patients' care.

251.    The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 14. Abercorn Rehabilitation Center

252.    By way of further example, the UnitedHealth Defendants entered into a contract with Abercorn Rehabilitation Center located at 11800 Abercorn Street, Savannah, Georgia 31419.

253.    Employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at Abercorn Rehabilitation Center to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants in order for the UnitedHealth Defendants' employees to improperly target the patients or their responsible parties.

254.    Pursuant to these instructions, employees of Abercorn Rehabilitation Center provided census lists dated March 21, 2018, April 9, 2018, April 19, 2018, June 7, 2018, and June 27, 2018.  These include each patient's name, room number, and payor.

255.    Pursuant to these instructions, employees of Abercorn Rehabilitation Center also provided the UnitedHealth Defendants' employees with face sheets of its patients, including each patient's picture, name, admission date, "admitted from" information, date of birth, primary

physician, diagnoses, hospital stay(s), Medicare and Medicaid numbers, responsible party, their contact information, and advanced directive information.  These were printed out throughout March, April, May, and June 2018.

256.   The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth Special Needs Nursing Home Plans.

257.   For example, the responsible party for patient D.G. signed an authorization form and a scope of sales appointment confirmation form both dated March 22, 2018.  However, the nursing home, pursuant to the UnitedHealth Defendants' instructions, printed out her face sheet on March 7, 2018, prior to obtaining her responsible party's consent.

258.   According to the OptumCare UnitedHealthcare Nursing Home Plan Active Members List, the UnitedHealth Defendants enrolled at least twenty patients at this facility in the UnitedHealth Special Needs Nursing Home Plans, including at least seventeen patients whose face sheets they improperly obtained.

259.   The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these patients' care.

260.   The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 15. Rosemont at Stone Mountain

261.   By way of further example, the UnitedHealth Defendants entered into a contract with Rosemont at Stone Mountain located at 5160 Springview Avenue, Stone Mountain, Georgia 30083.

262.    Employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at Jonesboro Nursing and Rehabilitation Center LLC to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants in order for the UnitedHealth Defendants' employees to improperly target the patients or their responsible parties.

263.    Pursuant to these instructions, Debra Watkins, Business Office Manager, provided a Resident Information Report printed on January 26, 2017.  The Resident Information Report contains PHI, including each patient's name, room number, admission date, insurance information (including Medicaid enrollment and hospice status), social security number, Medicare and Medicaid numbers, and date of birth.

264.    Further pursuant to these instructions, Jeffrey Williams, Admissions Coordinator, provided Midnight Census Worksheets printed on August 31, 2017, and October 26, 2017.  These worksheets include each patient's name, bed number, and Medicaid enrollment.

265.    Further pursuant to these instructions, employees of Rosemont at Stone Mountain provided the UnitedHealth Defendants' employees with face sheets of patients, including each patient's picture, room number, name, admission date, "admitted from" information, date of birth, social security number, attending physician, diagnoses, insurance information, including Medicare and Medicaid numbers, pharmacy, address, responsible party, and their contact information.

266.    Jeffrey Williams was Relator's primary point of contact at this facility.   In exchange for his cooperation, Rodgers instructed Relator to provide food, coffee, and other items to Mr. Williams.   Relator submitted receipts for these reimbursements.   The UnitedHealth Defendants reimbursed Relator for these expenses without any question.   Not only did Mr.

Williams and Rosemont at Stone Mountain provide the UnitedHealth Defendants with face sheets for its patients, but Mr. Williams also improperly made phone calls to residents and responsible parties on behalf of the UnitedHealth Defendants marketing their Special Needs Nursing Home Plans.

267.    The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth Special Needs Nursing Home Plans.

268.    The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these patients' care.

269.    The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 16. Traditions Health and Rehabilitation Center

270.    By way of further example, the UnitedHealth Defendants entered into a contract with Traditions Health and Rehabilitation Center located at 2816 Evans Mill Road, Lithonia, Georgia 30058.

271.    Employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at Traditions Health and Rehabilitation Center to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants in order for the UnitedHealth Defendants' employees to improperly target the patients or their responsible parties.

272.    Pursuant to these instructions, employees of Traditions Health and Rehabilitation Center provided a Resident Directory list printed on May 23, 2018.  The Resident Directory list includes each patient's name and room number.

273.    Pursuant to these instructions, employees of Traditions Health and Rehabilitation Center also provided the UnitedHealth Defendants' employees with face sheets of its patients, many of which included each patient's name, picture, address, date of birth, social security number, "admitted from" information, admission date, responsible party information and their contact information, attending physician, diagnoses, and insurance information.  These were printed on May 23, 2018, June 14, 2018, and June 19, 2018.

274.    The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth Special Needs Nursing Home Plans.

275.    The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these patients' care.

276.    The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### E. UnitedHealth Defendants' Anti-Kickback Violations

277.    When a Medicare Advantage plan follows the Medicare Marketing Guidelines, there is no offer of remuneration and no offer of referrals, and thus there is no violation of the Anti-Kickback Statute.

278.    At his initial meeting with the SNF decision-makers, Rodgers, however, would educate them as to how they could maximize reimbursements from UnitedHealth Defendants' Medicare Advantage Special Needs Nursing Home Plan, including emphasizing that the more residents that were signed up, the more money the SNF could be paid by the UnitedHealth Defendants.

279.    Moreover, the UnitedHealth Defendants not only openly promoted the financial benefits of its services to the SNFs—including gifts, the benefit of a free NP or PA (resulting in fewer hospitalizations, and thus lower costs to the SNF), payment of healthcare costs normally borne by the SNF, the opportunity to bill UnitedHealth for services that are not reimbursed by traditional Medicare, and a capitated monthly payment for each enrollee—but it also made those benefits contingent upon the SNF meeting a quota of enrollees, which was expressly presented to the SNF decision-makers by Rodgers at their initial meeting.

280.    In addition, the UnitedHealth Defendants' scheduled the NP to be available based on the number of residents enrolled at the facility – for example, if 40 residents at the SNF enrolled in the UnitedHealth Defendants' Medicare Advantage Special Needs Nursing Home Plan, the UnitedHealth Defendants would agree to have the NP available half of the time, but if 80 residents at the SNF enrolled, the NP would be there full-time.

281.    The SNFs, in turn, incentivized to meet the quota and reap the rewards of having a contract with UnitedHealth, and at UnitedHealth's request, gave UnitedHealth access to its residents' PHI, including specifically identifying which residents were Medicare and/or Medicaid beneficiaries, and allowed UnitedHealth to make direct contact with those residents, in excess of what is allowable under the Medicare Marketing Guidelines.

282.    This *quid pro quo* of the UnitedHealth Defendants offering remuneration in exchange for referrals by the SNFs constitutes a violation of the Anti-Kickback Statute.

283.    Any claims resulting from these unlawful kickbacks are tainted, and thus false, including claims to Medicare for capitated payments for patients enrolled under a tainted referral, and claims to Medicaid for those patients' Medicare Advantage premiums.

## COUNT ONE
## SCHEME TO SUBMIT FRAUDULENT CLAIMS
### (31 U.S.C. § 3729(a)(1)(A))

284.   All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

285.   By virtue of the acts alleged herein, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A), by submitting claims for Medicare Part C payments for beneficiaries enrolled as the result of illegal marketing tactics and whose PHI was wrongfully obtained.

286.   Compliance with HIPAA, regulations, and marketing guidelines are material to the United States' decision to pay capitated Medicare Part C payments for enrolled members' care.

287.   By virtue of the acts alleged herein, ill-gotten gains from the aforementioned presentation of false or fraudulent claims for payment or approval have been distributed to the UnitedHealth Defendants.

288.   As a result of UnitedHealth Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to penalties for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT TWO
## FALSE RECORDS FOR PAYMENT
### (31 U.S.C. § 3729(a)(1)(B))

289.   All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

290.   By virtue of the acts alleged herein, Defendants made or used false records or statements representing that Defendants were compliant with the regulations related to the marketing of Medicare Advantage plans and HIPAA.  All such false records or statements were

knowingly made and material to the false or fraudulent claims paid or approved by the Government.

291.   Defendants thus knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the Government.

292.   As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to penalties for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT THREE
## FALSE CLAIMS CONSPIRACY
### (31 U.S.C. § 3729(a)(1)(C))

293.   All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

294.   Defendants entered into a conspiracy or conspiracies through their employees and others to defraud the United States by submitting and obtaining approval and payment for false and fraudulent claims for Medicare Part C payments.

295.   As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to penalties for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT FOUR
## GEORGIA FALSE MEDICAID CLAIMS ACT
### (O.C.G.A. §§ 49-4-168, *et seq.*)

296.   All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

297.   By virtue of the acts alleged herein, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Georgia Medicaid Program for payment or approval of Medicare Part C premiums for members improperly solicited by the UnitedHealth Defendants and whose PHI was wrongfully obtained.

298.   By virtue of the acts alleged herein, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Georgia Medicaid Program to approve and pay such false and fraudulent claims.

299.   By virtue of the acts alleged herein, Defendants conspired to violate the Georgia FMCA and to defraud the Georgia Medicaid Program by getting a false or fraudulent claim allowed or paid.

300.   The Georgia Medicaid Program, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used, or presented by Defendants, paid and continues to pay Medicare Part C premiums for its members enrolled in the UnitedHealth Defendants' Special Needs Nursing Home Plans that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

301.   By reason of Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.  Pursuant to O.C.G.A. § 49-4-168.1(a), the State of Georgia is entitled to three times the amount of actual damages plus civil penalties for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, on each of these claims, Relator prays for judgment against Defendants:

(a)     Awarding the United States treble damages sustained by it for each of the false claims and statements;

(b)     Awarding the United States a maximum civil penalty for each of the false claims and statements;

(c)     Awarding the State of Georgia treble damages sustained by it for each of the false claims and statements;

(d)     Awarding the State of Georgia civil penalties for each of the false claims and statements;

(e)     Awarding Relator the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act and O.C.G.A. § 49-4-168.2 of the Georgia False Medicaid Claims Act of the proceeds of this action or any alternate remedy or the settlement of any such claim;

(f)     Awarding Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3730(d), O.C.G.A. § 49-4-168.2, and any other applicable provision of the law;

(g)     Awarding the plaintiffs pre- and post-judgment interest on the awards ordered herein; and

(h)     Granting such other and further relief as the Court may deem to be just and proper.


## <u>DEMAND FOR JURY TRIAL</u>

Relator hereby demands a trial by jury as to all issues so triable.

Respectfully submitted this 19th day of June, 2019.

*/s/ Jason Marcus*
JASON MARCUS
Georgia Bar No. 949698
JULIE BRACKER
Georgia Bar No. 073803

Bracker & Marcus LLC
3225 Shallowford Road, Suite 1120
Marietta, Georgia 30062
(770) 988-5035
Jason@fcacounsel.com
Julie@fcacounsel.com

*/s/ Michael J. Moore*
MICHAEL J. MOORE
Georgia Bar No. 520109
CHARLES W. BYRD
Georgia Bar No. 100850
JAY F. HIRSCH
Georgia Bar No. 357185
ELIZABETH S. WHITE
Georgia Bar No. 258844
COURTNEY L. MOHAMMADI
Georgia Bar No. 566460

POPE, MCGLAMRY, KILPATRICK,
MORRISON & NORWOOD, P.C.
3391 Peachtree Road, NE, Suite 300
P.O. Box 191625 (31119-1625)
Atlanta, GA  30326
(404) 523-7706
efile@pmkm.com

*Attorneys for Plaintiff-Relator*