# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF GEORGIA, *ex rel.* BROOK GONITE,<br><br>　　　Plaintiff,<br><br>　　v.<br><br>UNITEDHEALTHCARE OF GEORGIA, INC.; UNITEDHEALTH GROUP, INC.; UNITED HEALTHCARE SERVICES, INC.; UNITEDHEALTHCARE, INC.; OPTUM, INC.; and OPTUM, SERVICES, INC.,<br><br>　　　Defendants. | Civil Action No.:<br><br>5:19-cv-00246-MTT<br><br>**JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

COMES NOW Plaintiff Brook Gonite ("Relator"), on behalf of the United States of America and the State of Georgia, and files this amended *qui tam* action against Defendants UnitedHealthcare of Georgia, Inc., UnitedHealth Group, Inc., United Healthcare Services, Inc., UnitedHealthcare, Inc., Optum, Inc., and Optum Services, Inc. (collectively, "UnitedHealth Defendants") to recover all damages, penalties, and other remedies under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA") and the Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168 *et seq.* ("Georgia FMCA").

## INTRODUCTION

1.　　The Medicare Program consists of four parts: Part A covers inpatient care, Part B covers outpatient care, Part C is the Medicare Advantage Program, and Part D covers prescription drugs. If a Medicare beneficiary chooses to be covered under what is commonly referred to as "traditional" Medicare (Parts A and B), then the Centers for Medicare and Medicaid Services

("CMS") reimburse healthcare providers for services rendered to the beneficiary via submission of claims, which is known as a fee-for-service payment system. If instead, a Medicare beneficiary chooses to enroll in a Medicare Advantage Plan managed by a private insurance company under Part C, CMS pays the Medicare Advantage Plan a set capitation payment for the complete care of the beneficiary, starting as soon as the beneficiary enrolls in the Medicare Advantage Plan, and the beneficiary, depending on his income level and Medicaid status, pays a monthly premium and copayment. *See* Subchapter XVIII of the Social Security Act, 42 U.S.C. §§ 1395w-21 to 1395w-28. This case is about the UnitedHealth Defendants' direct fraud on Medicare Part C and the Georgia Medicaid program.

2.      The UnitedHealth Defendants, the largest Medicare Advantage provider in the country, generated fraudulent Medicare Part C business at the Government's expense and to the detriment of its competitors in Georgia and in numerous other states by using improper and illegal means to solicit vulnerable, elderly patients for its Medicare Advantage Institutional Special Needs Plans ("ISNPs") and by paying kickbacks to Skilled Nursing Facilities ("SNFs") to obtain illegal referrals of their residents to the ISNPs.

3.      The kickbacks took various forms, including, for example, requiring the SNFs to refer their residents for enrollment in the ISNPs as a condition of participation in the UnitedHealth Defendants' provider network and offering to pay and paying additional fees through incentive programs and implementation payments.

4.      The UnitedHealth Defendants also required the SNFs that participated in the ISNPs to engage in unlawful and improper marketing efforts on the UnitedHealth Defendants' behalf to illegally steer their residents to the ISNP.

5.      Medicare was not the only Government program harmed by these illegal marketing practices and kickbacks. The UnitedHealth Defendants' improper and illegal marketing tactics also harmed the Georgia Medicaid program since the Medicaid program paid the Medicare Advantage Plan premiums for illegally targeted Medicaid members, who met certain income-level requirements.

6.      The UnitedHealth Defendants' improper and illegal solicitation of vulnerable, elderly patients violated the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Medicare regulations regarding marketing, and Georgia Medicaid policies that prohibit obtaining a list of Medicaid patients.

7.      The UnitedHealth Defendants' offering and payment of kickbacks violated the Anti-Kickback Statute. The Anti-Kickback Statute plays an essential role in ensuring Medicare, Medicaid, and other federal healthcare programs pay only for goods and services selected specifically to meet a patient's individual medical needs and not for goods or services ordered by parties seeking to enrich themselves at taxpayers' expense. The Anti-Kickback Statute ("AKS") also protects the federal healthcare programs from patient steering and unfair competition among providers, such as the Medicare Advantage Organizations ("MAOs") that sell these Part C plans.

8.      One purpose of the UnitedHealth Defendants' offering and provision of kickbacks to the SNFs was to induce the SNFs to provide referrals, or leads, of its residents to the UnitedHealth Defendants' ISNPs in violation of the AKS, 42 U.S.C. §1320a-7b(b)(2). The UnitedHealth Defendants even required the SNFs' referral of patients to the ISNPs in order for the contracts with the SNFs to go into effect.

9.      UnitedHealth Defendants' improper marketing and the kickbacks fundamentally deprived vulnerable, elderly patients from a choice about their medical care. If the Government

had known these vulnerable patients had enrolled in the ISNPs as a result of the UnitedHealth Defendants' improper marketing and the kickbacks, the Medicare program would not have paid the monthly capitated payments for these members to the UnitedHealth Defendants, and the Medicaid program would not have paid the illegally solicited beneficiaries' premiums. Compliance with the applicable legal requirements, including the AKS and marketing regulations, was material to the government's decision to pay the UnitedHealth Defendants the monthly capitated payments for the enrolled beneficiaries' care.

10.     Soliciting vulnerable, elderly patients for Medicare Advantage ISNPs through HIPAA violations and otherwise employing improper marketing tactics including paying kickbacks go to the very essence of the bargain between the Government and the Medicare Advantage Plans -- Medicare pays the capitated payments and Medicaid pays certain members' premiums to Medicare Advantage Plans to benefit eligible beneficiaries, not to subject their vulnerable, elderly beneficiaries to exploitation, illegal conduct, and abusive marketing practices and kickbacks.

11.     As a result of Defendants' fraudulent scheme, patients are steered to Defendants' ISNPs not based on what is best for the patient and not as a result of the free market of competition among Medicare Part C providers, but instead based on what is best for enriching the UnitedHealth Defendants and the SNFs involved in the fraudulent scheme at the expense of taxpayers.

12.     Once the UnitedHealth Defendants had enrolled patients in the ISNPs based on its illegal marketing activity and kickbacks, the UnitedHealth Defendants began submitting monthly claims to the Medicare Advantage program for these beneficiaries.  Therefore, evidence of an enrollment in an ISNP constitutes evidence that Defendants submitted a claim for the beneficiary's care under the FCA.

13.     The UnitedHealth Defendants have actual knowledge that they are engaging in illegal misconduct, including knowledge that their marketing practices were illegal under Medicare regulations, Medicaid policies, and HIPAA, or recklessly disregarded these legal requirements.  Defendants also knowingly and willfully violated the AKS.  Defendants have chosen to profit by committing this fraud against the Government Programs instead of following legal practices for marketing its Medicare Advantage ISNPs.

14.     Furthermore, if the government had known the UnitedHealth Defendants' certifications and promises that it would comply with the FCA, the AKS, and Medicare's marketing regulations were false, the government would not have agreed to the contract with the UnitedHealth Defendants to provide the ISNP and would not have paid UnitedHealth Defendants pursuant to that contract.  Thus, the UnitedHealth Defendants' yearly contract with CMS was a result of fraudulent inducement.

15.     Therefore, as a direct and foreseeable result of its illegal marketing conduct and illegal kickback scheme, the UnitedHealth Defendants have knowingly submitted and caused to be submitted numerous false claims to the Medicare Advantage program and the Georgia Medicaid program.

## JURISDICTION AND VENUE

16.     This action arises under the FCA, as amended, 31 U.S.C. §§ 3729 *et seq*., and the Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168 *et seq*.

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). In addition, the False Claims Act specifically confers jurisdiction upon the United States District Court.  *See* 31 U.S.C. § 3732(a).

18.     Supplemental jurisdiction for counts related to the Georgia False Medicaid Claims Act arises under 28 U.S.C. § 1367, since these claims are so related to the federal claims that they

form part of the same case or controversy under Article III of the United States Constitution. In addition, 31 U.S.C. § 3732(b) provides jurisdiction for "any action brought under the laws of any state for the recovery of funds paid by a State or local government if the action arises from the same transaction or occurrence as an action brought under section 3730." The state claims at issue here arise out of the same transaction or occurrence as the federal claims.

19.    Additionally, Defendants are subject to personal jurisdiction and venue in this Court where "one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." 31 U.S.C. § 3732(a). Accordingly, jurisdiction and venue are appropriate because, among other reasons, Defendants can be found, maintain offices, transact business, and reside in the Middle District of Georgia. In addition, acts proscribed by 31 U.S.C. § 3729 occurred in the Middle District of Georgia. Furthermore, venue is proper in this District under 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a).

20.    Relator has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided disclosure of the allegations of this Complaint to the United States of America and the State of Georgia prior to filing, as required by the relevant statutes. None of the allegations set forth in this Complaint are based on a public disclosure of allegations or transactions as defined in 31 U.S.C. §3730(e)(4)(A). Furthermore, if there has been a public disclosure of any of the allegations underlying this action, Relator qualifies as an original source of such information, pursuant to 31 U.S.C. §3730(e)(4)(B).

## PARTIES

21.    Plaintiff Relator is an individual and citizen of the United States of America and the State of Georgia, currently residing in Marietta, Georgia. He was previously a Georgia-licensed insurance agent (License Number 816549). Relator began his career in the health

insurance industry as an Enrollment Counselor, Medicare Inside Sales Representative, and Supervisor for Inside Sales for PacificCare, which the UnitedHealth Defendants later acquired, and Ovations, which sold the UnitedHealth Defendants' Medicare products.  After starting in data entry, Relator worked his way up within the company over his ten-year career.  He left the company in 2013, because he did not want to relocate.  In June 2015, Relator returned to the UnitedHealth Defendants, working in a part-time position in telesales for three months until being offered a full-time job as a Sales Implementation Manager out of their office in Norcross, Georgia. As a Sales Implementation Manager, Relator was responsible for executing new facility implementation plans to sell ISNPs in skilled nursing facilities throughout Georgia, and he received a Champion of Excellence Award in 2015, 2016, and 2017.  Relator was paid by Optum Services, Inc.  The UnitedHealth Defendants terminated his employment in August 2018.

22.    Relator's direct and firsthand knowledge of the fraudulent activity discussed herein began in 2016, when James Rodgers became the Director of Sales across several states including Georgia.  To Relator's knowledge and belief, Defendants' fraudulent conduct continued after he left and expanded beyond Georgia to other states where the UnitedHealth Defendants marketed ISNPs.

23.    During his time working for the UnitedHealth Defendants, Relator personally witnessed and gained direct and independent knowledge of the information on which the below allegations are based, and Relator herein voluntarily discloses such information to the Government pursuant to 31 U.S.C. § 3730(e)(4)(B)(i).  To the extent any of Relator's allegations have been publicly disclosed as contemplated by 31 U.S.C. § 3730(e)(4)(A), Relator's knowledge is independent of and materially adds to those allegations pursuant to 31 U.S.C. § 3730(e)(4)(B)(ii).

24. Defendant UnitedHealthcare of Georgia, Inc. is a Georgia for-profit corporation with its main office located at 2100 Riveredge Parkway, Suite 400, Atlanta, Georgia 30328. Defendant UnitedHealthcare of Georgia, Inc. transacts business in the Middle District of Georgia and the state of Georgia by offering and providing Medicare Advantage ISNPs and other Medicare Advantage plans. Defendant UnitedHealthcare of Georgia, Inc. can be served through its registered agent, C T Corporation System, located at 289 S. Culver Street, Lawrenceville, Georgia 30046.

25. Defendant UnitedHealth Group, Inc. is a publicly traded Delaware corporation. It is the parent company of the other Defendants in this action. Defendant UnitedHealth Group, Inc., the other Defendants, and their affiliates have offices in various locations throughout the United States, including in the Middle District of Georgia. Defendant UnitedHealth Group, Inc. offers a broad spectrum of products and services through two distinct primary direct corporate subsidiaries (each of which has numerous direct and indirect subsidiaries of its own): (1) UnitedHealthcare, Inc., a health benefits (i.e., insurance) company; and (2) Optum, Inc., a health services company. Accordingly, Defendant UnitedHealth Group, Inc.'s healthcare insurance products, including those under Parts C of the Medicare Program, are offered by, and Defendant UnitedHealth Group, Inc.'s Medicare Advantage Plans are managed by, various entities that are Defendant UnitedHealth Group, Inc.'s direct or indirect subsidiaries, including, but not limited to, the other Defendants identified herein. Defendant UnitedHealth Group, Inc. controls these entities. Defendant UnitedHealth Group, Inc. can be served through its registered agent, The Corporation Trust Company, located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

26. Defendant United Healthcare Services, Inc. is a for-profit Minnesota corporation and a direct or indirect subsidiary of Defendant UnitedHealth Group, Inc. United Healthcare

Services, Inc.'s main office is located at UnitedHealth Group Center, 9900 Bren Road East, Minnetonka, MN 55343.  Defendant United Healthcare Services, Inc. transacts business in the Middle District of Georgia and the state of Georgia by offering and providing Medicare Advantage ISNPs.  Defendant United Healthcare Services, Inc. can be served through its registered agent, C T Corporation System, 289 S Culver Street, Lawrenceville, Georgia 30046.

27.    Defendant UnitedHealthcare, Inc. is a for-profit corporation registered in Delaware. Defendant UnitedHealthcare, Inc. transacts business in the Middle District of Georgia and the state of Georgia by offering and providing Medicare Advantage ISNPs and other Medicare Advantage plans to Medicare beneficiaries located in the Middle District and State of Georgia. UnitedHealthcare, Inc. directly or indirectly owns the Medicare Advantage Organizations ("MAOs") that offer Defendants' ISNPs and other MA plans throughout the United States. UnitedHealthcare Inc. manages these MAOs.  Defendant UnitedHealthcare, Inc. can be served through its registered agent, The Corporation Trust Company, located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

28.    Defendant Optum, Inc. is a health services company registered in Delaware.  It is a direct or indirect subsidiary of Defendant UnitedHealth Group, Inc.  Defendant Optum, Inc. provides services in the Middle District of Georgia and the state of Georgia related to the Medicare Advantage ISNPs offered by Defendant UnitedHealth Group and its affiliates, including UnitedHealthcare of Georgia, Inc.  Defendant UnitedHealth Group, Inc. can be served through its registered agent, The Corporation Trust Company, located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

29.    Defendant Optum Services, Inc. is another direct or indirect subsidiary of UnitedHealth Group, Inc.  Defendant Optum, Inc. provides services in the Middle District of

Georgia and the state of Georgia related to the Medicare Advantage ISNPs offered by Defendant UnitedHealth Group and its affiliates, including UnitedHealthcare of Georgia, Inc.  Relator Gonite was paid by Defendant Optum Services, Inc.  Defendant Optum Services, Inc.'s principal address is 11000 Optum Circle, Eden Prairie, Minnesota 55344.  Defendant Optum Services, Inc. can be served through its registered agent C. T. Corporation System located at 289 S. Culver Street, Lawrenceville, Georgia 30046.

30.    The UnitedHealth Defendants are directly and vicariously liable for the actions and omissions of its executives, employees, and agents, including but not limited to any of its subsidiaries such as Optum, Inc.

31.    The UnitedHealth Defendants are also vicariously liable for the acts and omission of Defendant Optum, Inc., which the UnitedHealth Defendants control as its sole corporate member.  The UnitedHealth Defendants exercise a controlling influence over the operations, policies, compliance programs, and leadership and staff of Optum, Inc.

## THE LAW

### A. *The False Claims Act*

32.    During all times relevant to the facts of this case, the FCA  provides in pertinent part that:

> (a) any person who - - (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
>
> * * * *

is liable to the United States Government for a civil penalty of not less than $5,500.00 and not more than $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410), plus three times the amount of damages which the Government sustains because of the act of that person.

\* \* \* \*

(b) . . . For purposes of this section (1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud; (2) the term "claim" (A) means any request or demand, whether under contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; . . . (3) the term "obligation" means an established duty, whether or not fixed, arising from an expressed or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and (4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

31 U.S.C. § 3729 (2009).

33.    A claim submitted to the government for a Medicare Part C capitated payment is a claim submitted to the United States.

34.    Section 6402(a) of the Patient Protection and Affordable Care Act of 2010 (Enhanced Medicare and Medicaid Program Integrity Provisions), Pub. L. No. 111-148, 124 Stat. 119, 753-56 (2010), amended the Social Security Act to add a new provision that addresses what constitutes an overpayment under the FCA in the context of a federal healthcare program, like the

Medicare Advantage Program at issue in this case. 42 U.S.C. § 1320a-7k(d). Under this provision, an overpayment is defined as "any funds that a person receives or retains under Title XVIII or XIX to which the person, after applicable reconciliation is not entitled." 42 U.S.C. § 1320a-7k(d)(4)(B).

35.    Overpayments must be reported and returned within 60 days after the date on which the overpayment was identified. 42 U.S.C. § 1320a-7k(d)(2).  An overpayment retained more than 60 days becomes an "obligation" for purposes of the FCA. 42 U.S.C. § 1320a-7k(d)(3).

### B. The Georgia False Medicaid Claims Act

36.    The Georgia False Medicaid Claims Act, O.C.G.A. §§ 49-4-168, *et seq.*, imposes liability on any person who:

> (1) Knowingly presents or causes to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval;
>
> (2) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;
>
> (3)  Conspires to commit a violation of paragraph (1), (2), (4), (5), (6), or (7) of this subsection;
>
> (7) Knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit property or money to the Georgia Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit property or money to the Georgia Medicaid program.

O.C.G.A. § 49-4-168.l.

37.    The civil penalties for violating the statute are:

> consistent with the civil penalties provision of the federal False Claims Act, 31 U.S.C. 3729(a), as adjusted by the federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461; Public law 101-410), and as further amended by the federal Civil Penalties Inflation Adjustment Improvements Act of 2015 (Sec. 701 of Public Law 114-74), plus three times the amount of damages which the

> Georgia Medicaid program sustains because of the act of such person.

*Id*.

38.     Under O.C.G.A. § 49-4-168, "knowing" and "knowingly" require no proof of specific intent to defraud and mean that a person, with respect to information:

> **(A)** Has actual knowledge of the information;
> **(B)** Acts in deliberate ignorance of the truth or falsity of the information; or
> **(C)** Acts in reckless disregard of the truth or falsity of the information.

39.     The statute defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  O.C.G.A. § 49-4-168(3).

40.     The statute defines "claim" as:

> any request or demand, whether under a contract or otherwise, for money, property, or services, which is made to the Georgia Medicaid program, or to any officer, employee, fiscal intermediary, grantee or contractor of the Georgia Medicaid program, or to other persons or entities if it results in payments by the Georgia Medicaid program, if the Georgia Medicaid program provides or will provide any portion of the money or property requested or demanded, or if the Georgia Medicaid program will reimburse the contractor, grantee, or other recipient for any portion of the money or property requested or demanded. A claim includes a request or demand made orally, in writing, electronically, or magnetically. Each claim may be treated as a separate claim. O.C.G.A. § 49-4-168(1).

### C. The Federal Anti-Kickback Statute

41.     Congress enacted the AKS, 42 U.S.C. § 1320a-7b(b), under the Social Security Act in 1972 and has amended it many times since.  To protect the integrity of government healthcare programs, Congress enacted this prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.  One purpose of the AKS is to combat the corrupting influence of personal financial gain on the decision of healthcare providers about what medical services are right for their patients and what providers should furnish those services.

13

42.     The AKS prohibits any person or entity from offering or paying and soliciting or accepting "any remuneration" to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded health care program. 42 U.S.C. § 1320a-7b(b).  The statute provides, in pertinent part:

(b) Illegal remuneration

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or part under a Federal health care program, or
>
> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

42 U.S.C. § 1320a-7b(b).

43.     Congress enacted the AKS to ensure that decisions about medical care are based on the best interests of patients, rather than on the influence of payments or other "remuneration." Congress also was concerned that kickbacks distort medical decision-making, create unfair competition in the healthcare market, drive honest companies out of the market, and lead to the overutilization of services and increased costs to federal healthcare programs, all to the detriment of patients and the federal healthcare programs.  *See* 65 Fed. Reg. 59,434, 59,440 (Oct. 5, 2000).

44.     For purposes of the AKS, "remuneration" is broadly defined to include anything of value, "directly or indirectly, overtly or covertly, in cash or in kind."  42 U.S.C. § 1320a-7b(b)(1).

45.     Underscoring the breadth of the statutory definition, the United States Department of Health and Human Services, Office of Inspector General ("HHS OIG") Anti-Kickback

Provisions, 56 Fed. Reg. 35952, 35958 (1991), broadly define the term "remuneration" as "anything of value in any form or manner whatsoever." *See* HHS-OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991); *accord United States ex rel. Heller v. Guardian Pharmacy of Atlanta, LLC*, Civil Action No. 1:18-cv-03728-SDG, 2023 U.S. Dist. LEXIS 207629, at *67 (N.D. Ga. Sep. 30, 2023) (citing HHS OIG commentary); *United States ex rel. Fry v. The Health Alliance of Greater Cincinnati*, 2008 U.S. Dist. LEXIS 102411, at *17 (S.D. Ohio Dec. 18, 2008).

46.    As such, unlawful remuneration includes payments for patient referrals, including payments through complex incentive programs or implementation payments.

47.    The AKS prohibits any arrangement in which at least one purpose of the remuneration is to induce referrals of patients for items or services paid for by federal health care programs. *United States v. Borrasi*, 639 F.3d 774 (7th Cir. 2011); *United States v. McClatchey*, 217 F.3d 823 (10th Cir. 2000); *United States v. Davis*, 132 F.3d 1092 (5th Cir. 1998); *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985); *see also United States ex rel. Heller v. Guardian Pharmacy of Atlanta LLC,* 2023 U.S. Dist. LEXIS 207629, at *72  (N.D. Ga. Sept. 30, 2023) ("[W]here Heller has marshalled evidence of an improper purpose for Guardian's provision of one or more of the Services, Guardian's argument that its Services 'promote patient and medication safety, reduce drug utilization, are integrally related to Guardian's products, and benefit Guardian's own patients and the Medicare program,' even if true, do not entitle it to summary judgment.").

48.    The knowing and willful offering or payment of remuneration to a SNF violates the AKS when even one purpose of the transaction is to induce the referral of federal healthcare program-related business, including Medicare Part C business.

49.     The definition of "referral" is also broad.  "The applicable lesson is … the definition of a referral under the [AKS] is broad, encapsulating both direct and indirect means of connecting a patient with a provider.  It goes beyond explicit recommendations to include more subtle arrangements.  And the inquiry is a practical one that focuses on substance, not form." *Stop Illinois Health Care Fraud, LLC v. Sayeed*, 957 F.3d 743, 750 (7th Cir. 2020).

50.     The UnitedHealth Defendants' payments to the SNFs (in the form of the offering of the ISNP contract, implementation payments, and more favorable incentive plans) in exchange for access to the SNFs' patients' protected health information and the SNFs' participation in the illegal recruiting scheme constitutes the payment of remuneration in exchange for referrals in violation of the AKS.  *See Stop Illinois Health Care Fraud, LLC v. Sayeed*, No. 22-3295, 2024 WL 1916749 (7th Cir. May 2, 2024) (affirming AKS violations when a defendant paid a health care consortium $5,000 per month in order to access the consortium's clients' healthcare data so that the defendant's company could mine this private healthcare data for potential solicitation opportunities).

51.     No exceptions or safe harbors to the AKS apply to the kickbacks provided by the UnitedHealth Defendants to the SNFs to induce the SNFs to refer their residents for enrollment in the UnitedHealth Defendants' ISNPs.

52.     In 2010, Congress strengthened the AKS by adding a provision to establish that a claim for payment submitted to a federal program such as Medicare, Medicaid, or TRICARE that includes "items or services resulting from" a kickback scheme "constitutes a false or fraudulent claim" in violation of the FCA. *See* 42 U.S.C. § 1320a-7b(g).

53.    Accordingly, a claim for payment under the Medicare Advantage program or to Medicaid for the corresponding premium for the Part C ISNP that results from a kickback scheme is a false claim as a matter of law.  *Id.*

54.    Compliance with the AKS thus is a material condition of payment for claims submitted to the Medicare Advantage Program and the Medicaid Program as a matter of law.  *See United States ex rel. Heller v. Guardian Pharmacy, LLC*, 521 F. Supp. 3d 1254, 1278 (N.D. Ga. 2021) (collecting cases including *Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019)); *see also United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 313 (3rd Cir. 2011) ("Compliance with the AKS is clearly a condition of payment under Parts C and D of Medicare.")

55.    Separately, the long-standing law of the Eleventh Circuit is that a claim for payment for an item or service covered by a federal healthcare program is a false claim when it is tainted by an underlying violation of the AKS. *See*, *e.g., United States ex rel. McNutt v. Haleyville Medical Supplies, Inc.*, 423 F.3d 1256, 1260 (11th Cir. 2015); *United States ex rel. Heller v. Guardian Pharmacy of Atlanta, LLC*, Civil Action No. 1:18-cv-03728-SDG, 2024 U.S. Dist. LEXIS 4157, at *8 (N.D. Ga. Jan. 9, 2024) (holding the implied-certification theory of falsity under *McNutt* "remains binding").

56.    Therefore, the AKS violations alleged herein are material as a matter of law.  *See United States ex rel. Heller v. Guardian Pharmacy of Atlanta, LLC*, Civil Action No. 1:18-cv-03728-SDG at 82 (N.D. Ga. Sept. 30, 2023).

57.    Pursuant to the Medicare Advantage insurer's contract with CMS, the Medicare Advantage insurers enroll beneficiaries in their plans and present claims to CMS for reimbursement based on the number of enrollees.  CMS pays the Medicare Advantage insurers based on the number of enrollees.  Violations of the AKS, therefore, can render these claims false,

in violation of the FCA.  *See United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 314 (3rd Cir. 2011).

58.    Furthermore, MAOs enter into contracts with CMS to offer Medicare Advantage plans, including ISNPs, to Medicare beneficiaries.  Pursuant to those contracts, all MAOs, such as the UnitedHealth Defendants, agree to comply with the AKS and the FCA.  *See* 42 C.F.R. § 422.504(h).  Thus, when the claimant fails to disclose a violation of these statutes, the claim is false and not eligible for payment.  *See McNutt*, 423 F.3d at 1257-59; *United States ex rel. Kester v. Novartis Pharms. Corp.*, 43 F. Supp. 3d 332, 364 (S.D.N.Y. 2014) ("the act of submitting a claim for reimbursement itself implies compliance with" the Anti-Kickback Statute) (cit. omitted); *see generally Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2000 (2016).

59.    Not only is compliance with the AKS material to payment in the Eleventh Circuit, but also violations of the marketing regulations and legal requirements related to marketing ISNPs further described are also material to the government's payment decision.  These regulations and legal requirements go to the very essence of the Medicare bargain – safeguarding vulnerable patients from being illegally recruited into Part C plan in the first place is essential; otherwise, these illegal marketing practices directly lead to the enrollment of patients in the ISNPs, triggering the automatic payment of monthly claims to the UnitedHealth Defendants in the form of capitated payment for the enrolled beneficiaries' care.

60.    The MAO's contractual, statutory, and regulatory obligations are binding on all related and delegated entities.  Therefore, the UnitedHealth Defendants' obligations are binding on all of the UnitedHealth Defendant's direct and subsidiaries named as Defendants in this action,

including but not limited to Optum, Inc. and Optum Services, Inc., and the UnitedHealth Defendants may be held liable for the actions of all of these direct and indirect subsidiaries.

## FEDERAL HEALTHCARE PROGRAMS

### A. *The Medicare Advantage Program: Medicare Part C*

61.     The Medicare Program is a federal government-funded medical assistance program, primarily benefiting the elderly and disabled, which was created in 1965 when Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* (hereinafter, "Medicare"). Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a division of the United States Department of Health and Human Services ("HHS"), and is funded by taxpayer revenue. Medicare was designed to be a health insurance program and to provide for the payment of hospital services, medical services, and durable medical equipment to persons older than 65 years of age and others who qualify under its terms.

62.     Parts A and B of the Medicare Program are known as "traditional" Medicare. Part A covers inpatient and institutional care. Part B covers physician, hospital, outpatient, and ancillary services and durable medical equipment. Under Medicare Parts A and B, CMS reimburses healthcare providers using the fee-for-service system, in which providers submit claims to CMS for healthcare services actually rendered. CMS then pays the providers directly for each service based on payment rates pre-determined by the Government.

63.     Under Medicare Part C, Medicare beneficiaries may opt out of "traditional" Medicare and instead may enroll in Medicare Advantage Plans to receive healthcare services managed by those Plans. The Medicare Advantage Plans are run by MAOs, which are often private insurers such as the UnitedHealth Defendants. *See* 42 C.F.R. §§ 422.2, 422.503(b)(2).

64.     Medicare Advantage Plans must provide Medicare beneficiaries all of the services that they are entitled to receive from the traditional Medicare Program.

65.     Under Medicare Part C, the Government pays each MAO a predetermined base monthly capitated amount for each Medicare beneficiary enrolled in its Medicare Advantage Plans. This monthly payment is known as a "per-member, per-month" or capitated payment. The MAO, in turn, uses these funds to provide Medicare-covered services and benefits to beneficiaries enrolled in its plan.

66.     As discussed above, under Medicare Part C, MAOs may offer ISNPs, which are special needs plans for disabled beneficiaries or other sick beneficiaries residing in a skilled nursing facility, or SNF.

67.     For ISNPs, CMS pays the MAO, such as the UnitedHealth Defendants, and the MAO, in turn, pays the SNFs for providing skilled nursing and rehabilitative care to the Medicare beneficiaries at the SNF enrolled in the ISNP.

68.     Under Medicare Part D, Medicare beneficiaries can elect to enroll in either a Prescription Drug plan (known as a "PD Plan") or a Medicare Advantage Plan that provides prescription drug coverage in addition to the physician office visit and hospital outpatient and inpatient coverage provided under Part C (known as a "Medicare Advantage Prescription Drug Plan"). For simplicity, in this Complaint, Relator refers to Parts C and D collectively as the "Medicare Advantage Program" and refers collectively to Medicare Advantage Plans, Prescription Drug Plans, and Medicare Advantage Prescription Drug Plans as "Plans."

69.     MAOs are "risk-bearing" entities that must be licensed by the State in which they are located. 42 C.F.R. §§ 422.2 & 422.503(b)(2). Each MAO agrees to bear the risk that the amount that it pays providers for the health services rendered to a particular beneficiary enrolled

in one of its Plans may exceed the amount that it was paid by the Government to insure the beneficiary.

70.     Medicare beneficiaries who enroll in a Medicare Advantage, Prescription Drug, or Medicare Advantage Prescription Drug Plan are considered members of and enrollees in that Plan. In this Complaint, the terms "beneficiaries," "members," and "enrollees" are used interchangeably, but mean the same thing, that is individuals enrolled in Plans.

71.     MAOs' obligations to the Medicare Advantage Program and the requirements for them to participate in the Program are set forth in federal regulations.  Each year, the MAOs must agree in writing to comply with those regulations and to other terms and conditions in order to participate in the Medicare Advantage Program.  42 C.F.R. §§ 422.504 & 422.505 (Part C); 42 C.F.R. §§ 423.504 & 423.505 (Part D).  42 U.S.C. § 1320a-7k(d).

72.     In addition, MAOs sign certifications that they will comply with requirements set forth in statutes, such as the FCA and the AKS, and other requirements, such as those found in the Medicare Managed Care Manual, the Medicare Prescription Drug Benefit Manual, Medicare Communications and Marketing Guidelines (now incorporated into federal regulations), the Risk Adjustment Participant Guides, and Medicare Advantage operating instructions.

73.     As a condition for receiving monthly payments from CMS, a MAO must, via its top executive or individuals authorized to sign on their behalf, request payment under the contract on a document that attests to the accuracy, completeness, and truthfulness of relevant data that CMS requests.  Specifically, the signatory must attest to the fact that each enrollee for whom the organization is requesting payment is validly enrolled in a Medicare Advantage plan offered by the MAO and that the information relied upon by CMS in determining payment is accurate, complete, and truthful.  42 C.F.R. § 422.504(l).

74.     Pursuant to Medicare regulations, a related entity "means any entity that is related to the Medicare Advantage organization by common ownership or control and (1) [p]erforms some of the Medicare Advantage organization's management functions under contract or delegation; [or] (2) [f]urnishes services to Medicare enrollees under an oral or written agreement …." *Id.* Related entities such as Defendant Optum, Inc. or Defendant Optum Services, Inc. must, among other things: perform their services in a manner that complies with the Medicare Advantage organization's contractual obligations to the Government, *id*. at § 422.504(i)(3)(iii); agree to "comply with all applicable Medicare laws, regulations, and CMS instructions," *id.* at §422.504(i)(4)(v); and receive effective compliance training and education relating to preventing fraud, waste, and abuse, *id*. at § 422.504(l)(3).

75.     A MAO "maintains ultimate responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS."  42 C.F.R. § 422.504(*i*)(1). Thus, a MAO cannot delegate away its ultimate responsibility for its obligations to the Government.

### B. ISNP Enrollment Process and Resulting Submission of Claims to Medicare

76.     Medicare beneficiaries admitted to a SNF, or the beneficiaries' responsible parties, may elect to enroll in an ISNP if (a) the SNF has a contract with a MAO; and (b) the beneficiary requires or is expected to need institutional long-term care for 90 days or more.  *See* Section 20.3.1 of Chapter 16-B of CMS's Medicare Managed Care Manual.

77.     To enroll, a Medicare beneficiary, or his legal representative, submits an enrollment request to a Medicare Advantage insurer, and the Medicare Advantage insurer is required to submit the information necessary for CMS to add the beneficiary to its records as an enrollee of the insurer's plan within 7 calendar days of receipt of the completed enrollment request.  *See* Chapter

2, Section 20.3 and Section 40.3 of CMS's Medicare Managed Care Manual, https://www.cms
.gov/files/document/cy-2024-ma-enrollment-and-disenrollment-guidance.pdf.

78.    The beneficiary is then enrolled in the ISNP, and the MAO will begin receiving
monthly payments for each enrolled beneficiary.  Evidence of an enrollment, therefore, constitutes
evidence a claim was submitted to the government on that beneficiary's behalf.

79.    The MAO is paid "based on the plan's enrollment and the risk adjustment
methodology."  *See* Chapter 16-B, Sec.10.3 of CMS's Medicare Managed Care Manual.  https://
www.cms.gov/regulations-and-guidance/guidance/manuals/downloads/mc86c16b.pdf.

80.    As a condition of receiving these monthly capitated payments for each beneficiary
enrolled in the ISNP, the Medicare Advantage insurer must certify that all enrollment data it has
provided to CMS is accurate.  42 C.F.R. § 422.504(l)(1).

81.    Therefore, unlike traditional fee for service Medicare where claims are not
submitted until providers perform services and bill those services to the Medicare program as
claims, for Part C, and specifically for ISNPs, the act of the MAO enrolling the beneficiary in the
ISNP and CMS accepting this enrollment thus triggers the submission and payment of claims by
the government.

82.    The MAO is not entitled to those payments from CMS if the beneficiary's
enrollment and claims submitted for payment for that beneficiary resulted from an AKS violation
or some other material violation of the MAO's requirements.  *Wilkins*, 659 F.3d at 313-314.

### C.  *Medicare Regulations Regarding Marketing of Medicare Advantage Plans*

83.    MAOs, such as the UnitedHealth Defendants, and their delegated entities, such as
Defendant Optum, Inc. and Optum Services, Inc., are required to "follow existing MA program

rules, including MA regulations at 42 C.F.R. 422, as interpreted by guidance." Chapter 16-B, Sec. 10.3 of CMS's Medicare Managed Care Manual.

84.     Federal regulations further outline the legal requirements of Medicare Advantage Organizations. These requirements extend to "related entities" which are defined by regulation to include "any entity that is related to the MA organization by common ownership or control and— (1) Performs some of the MA organization's management functions . . . ; [or] (2) Furnishes services to Medicare enrollees . . ." 42 C.F.R. § 422.500. Despite delegating responsibilities to the related entities, the Medicare Advantage Organization "maintains ultimate responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS." 42 C.F.R. § 422.504(i)(1).

85.     MAOs must enter into a contract with CMS. 42 C.F.R. § 422.503. The contract must include provisions under which the MAO agrees to comply with:

> (1) Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. 3729 et. seq.), and the anti-kickback statute (section 1128B(b)) of the Act); and

> (2) HIPAA administrative simplification rules at 45 CFR parts 160, 162, and 164.

42 C.F.R. § 422.504.

86.     Further, all contracts or written arrangements entered into by the MAO "must specify that the related entity, contractor, or subcontractor must comply with all applicable Medicare laws, regulations, and CMS instructions." 42 C.F.R. § 422.504(i)(4)(v).

87.     Federal regulations strictly limit the marketing of Medicare Advantage Plans, including ISNPs, to protect vulnerable Medicare beneficiaries. These limitations on marketing Medicare Advantage Plans were previously contained in the Medicare Communications and Marketing Guidelines. In January 2021, CMS issued a final rule to codify this guidance in the

federal regulations. 86 Fed. Reg. 5864 (Jan. 19, 2021). The current regulations do not include any substantive changes that have any bearing on the matters addressed in the Amended Complaint.

88. Medicare regulations define "marketing" as "communications materials and activities that meet both the following standards for intent and conduct:

(1) Intended, as determined under paragraph (1)(ii) of this definition, to do any of the following:

(i)

(A) Draw a beneficiary's attention to a MA plan or plans.

(B) Influence a beneficiary's decision-making process when making a MA plan selection.

(C) Influence a beneficiary's decision to stay enrolled in a plan (that is, retention-based marketing).

(ii) In evaluating the intent of an activity or material, CMS will consider objective information including, but not limited to, the audience of the activity or material, other information communicated by the activity or material, timing, and other context of the activity or material and is not limited to the MA organization's stated intent.

(2) Include or address content regarding any of the following:

(i) The plan's benefits, benefits structure, premiums, or cost sharing.

(ii) Measuring or ranking standards (for example, Star Ratings or plan comparisons).

(iii) Rewards and incentives as defined under § 422.134(a).

42 C.F.R. § 422.2260.

89. 42 C.F.R. § 422.2262(a)(1)(i) and 422.2262(a)(1)(iii) expressly prohibit MAOs from providing "information that is inaccurate or misleading" and prohibit "[e]ngag[ing] in activities that could mislead or confuse Medicare beneficiaries, or misrepresent the MA organization."

90. 42 C.F.R. § 422.2263(b)(7) prohibits MAOs from "[k]nowingly target[ing] or send[ing] unsolicited marketing materials to any MA enrollee during the Open Enrollment Period."

91.    42 C.F.R. § 422.2264 contains explicit restrictions on the MAO's unsolicited contact of vulnerable Medicare beneficiaries.  42 C.F.R. § 422.2264(a)(2)(i) prohibits "door to door solicitation."

92.    42 C.F.R. § 422.2264(a)(2)(iv) prohibits "us[ing] telephone solicitation (that is, cold calling) … including, but not limited to: (A) Calls based on referrals; … and (C) Calls to beneficiaries who attended a sales event, unless the beneficiary gave express permission to conduct."  In order for calls to not be considered "unsolicited", the "beneficiary… [must] provide[s] consent or intiate[] contact with the plan."  42 C.F.R. § 422.2264(a)(3).

93.    In order to meet in person or virtually with a Medicare beneficiary (or his representative), the beneficiary must make the request ("If a resident did not request an appointment, any visit by an agent or broker is prohibited as unsolicited door-to-door marketing.")  42 C.F.R. § 422.2264(c)(1)(iv).  Forty-eight hours before the appointment, the Medicare Advantage Organization must "agree upon and record the Scope of Appointment with the beneficiary(ies)," and during the appointment, the MAO must not market any products beyond the agreed-upon scope of the appointment.  42 C.F.R. § 422.2264(c)(3)(i).

94.    CMS imposes even stricter requirements on Medicare Advantage Plan-Initiated Provider Activities in the Healthcare Setting.  42 C.F.R. § 422.2266(a)(2)-(3) prohibits marketing activities in hospital patient rooms or treatment areas where patients interact with providers.

95.    The regulations define "plan-initiated provider activities" as "activities conduct by a provider at the request of an MA organization."  This covers, for example, marketing activities the UnitedHealth Defendants requested of the SNFs.

96.    The regulations state that the MAO "must ensure that the provider does not…:

(i) Accept or collect Scope of Appointment forms.

(ii) Accept Medicare enrollment applications.

(iii) Make phone calls or direct, urge, or attempt to persuade their patients to enroll in a specific plan based on financial or any other interests of the provider.

…

(v) Offer inducements to persuade patients to enrolled in a particular MA plan….

(vii) Distribute marketing materials or enrollment forms in areas where care is being delivered.

(viii) Offer anything of value to induce enrollees to select the provider.

(ix) Accept compensation from the MA organization for any marketing or enrollment activities performed on behalf of the MA organization.

42 C.F.R. § 422.2266(d)(1).

97.    Underscoring the importance of prohibiting providers (such as SNFs) from accepting compensation for marketing or enrollment activities performed on MAO's' behalf, 86 Fed. Reg. 5992 states, "The steps taken by CMS to restrict compensation to providers for marketing activities are rooted in ensuring the provider is a neutral party who is offering guidance to patients based solely on what is best for the patient.  We note that the decision to preclude plans from compensating providers for marketing activities predates this rulemaking and has been in section 60.2 of the MCMG since it was first released on July 20, 2018."

98.    Not only is compliance with the AKS material to payment in the Eleventh Circuit, but also violations of the marketing regulations and legal requirements related to marketing ISNPs are also material to the government's payment decision.  These regulations and legal requirements go to the very essence of the Medicare bargain – safeguarding vulnerable patients from being illegally recruited into Part C plan in the first place is essential; otherwise, these illegal marketing practices directly lead to the deceptive enrollment of patients in the ISNPs, triggering the automatic payment of monthly claims to the UnitedHealth Defendants in the form of capitated payment for the enrolled beneficiaries' care.

99.     The MAO's contractual, statutory, and regulatory obligations are binding on all related and delegated entities.  Therefore, the UnitedHealth Defendants' obligations are binding on all of the UnitedHealth Defendant's direct and subsidiaries named as Defendants in this action, including but not limited to Optum, Inc. and Optum Services, Inc., and the UnitedHealth Defendants may be held liable for the actions of all of these direct and indirect subsidiaries.

### D.  Medicare Requirements Related to Physician Incentive Plans

100.     Chapter 6 of CMS's Medicare Managed Care Manual governs Medicare Advantage Organizations' relationship with physician providers.

101.     Section 80.1 of Chapter 6 relates to Physician Incentive Plans, defined as "any compensation arrangement to pay a physician or physician group that may directly or indirectly have the effect of reducing or limiting the services provided to any plan enrollee."

102.     The Manual prohibits "specific payment[s], directly or indirectly, to a physician or the physician group as an inducement to reduce or limit medically necessary services furnished to any particular enrollee." *Id.*

103.     Section 80.2 requires the MAO to disclose information to CMS to ensure the physician incentive plan requirements are met.  Each MAO must also provide information to any Medicare beneficiary who requests information regarding whether they use a physician incentive plan, the type of arrangement, and whether stop-loss protection is provided.

### E.  Federal Protection of Patient Health Information

104.     The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d-6(a), makes it illegal to knowingly:

    (1)    use[] or cause[] to be used a unique health identifier;

    (2)    obtain[] individually identifiable health information relating to an individual; or

(3)    disclose[] individually identifiable health information to another person."

105.    HIPAA contains stiff penalties:

(b) PENALTIES.  A person described in subsection (a) shall—

(1) be fined not more than $50,000, imprisoned not more than 1 year, or both;

(2) if the offense is committed under false pretenses, be fined not more than $100,000, imprisoned not more than 5 years, or both; and

(3) if the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm, be fined not more than $250,000, imprisoned not more than 10 years, or both.

42 U.S.C. § 1320d-6(b).

106.    The Government also imposes civil penalties for improper disclosures of protected health information.  See 42 U.S.C. § 1320d-5(a)(1).

107.    The UnitedHealth Defendants and the SNFs with which they contracted were covered entities under HIPAA.

108.    45 C.F.R. § 164.502 prohibits covered entities or business associates from "us[ing] or disclos[ing] protected health information" unless otherwise permitted in the regulations.

109.    45 C.F.R. § 164.502(a)(5)(ii)(A) prohibits covered entities from selling protected health information.

110.    45 C.F.R. § 164.502(a)(5)(ii)(B)(1) defines "sale" as any disclosure where "the covered entity or business associate directly or indirectly receives remuneration from or on behalf of the recipient of the protected health information in exchange for the protected health information."

111.    Further, regulations make clear that the patient's authorization is required prior to sharing his protected health information.  "Except as otherwise permitted or required by this

subchapter, a covered entity may not use or disclose protected health information without an authorization that is valid under this section." 45 C.F.R. § 164.508(a)(1).

112.    In addition, the regulations state:

**(3)** *Authorization required: Marketing.*

(i) Notwithstanding any provision of this subpart, other than the transition provisions in § 164.532, a covered entity must obtain an authorization for any use or disclosure of protected health information for marketing, except if the communication is in the form of:

(A)  A face-to-face communication made by a covered entity to an individual; or

(B)  A promotional gift of nominal value provided by the covered entity.

(ii) If the marketing involves financial remuneration, as defined in paragraph (3) of the definition of marketing at § 164.501, to the covered entity from a third party, the authorization must state that such remuneration is involved.

45 C.F.R. § 164.508(a)(3).

113.    Compliance with HIPAA is a condition for payment since failing to do so can give rise to criminal liability and since the government does not knowingly pay claims to providers who violate HIPAA.

114.    At least one Court has held that HIPAA violations may give rise to liability.  In *United States ex rel. O'Donnell v. Am. at Home Healthcare & Nursing Servs., Ltd.*, Case No. 14-cv-1098, 14 (N.D. Ill. Jan. 8, 2018), a whistleblower alleged that a home health company had violated the False Claims Act by "search[ing] the confidential medical charts at different facilities to collect the names of patients they could solicit for home health services."  The whistleblower argued that illegally using this protected health information for solicitation violated Defendants' implied certifications that they had complied with the law.  The Court held, "If 'information that a hospital has purchased patients by paying kickbacks has a good probability' of affecting a

payment decision, *id.,* then information that a home health agency has pilfered protected health data to solicit patients has a good probability of affecting a payment decision too." *Id*. at 16.

### F. *Georgia Medicaid Program*

115.    The Medicaid Program was created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income, blind, or disabled persons, or to members of families with dependent children or qualified pregnant women or children.  The Medicaid Program is a jointly funded federal-state program and is administered by CMS at the federal level.  Within broad federal rules, each state determines eligibility requirements for Medicaid, the services covered, payment levels for services, and administrative and operational procedures.

116.    In order to qualify for federal funds, the Georgia Medicaid program is required to implement a State Plan containing certain specific minimum criteria for coverage and payment of claims, as set forth by the federal Medicaid statute.  See 42 U.S.C. § 1396a.

117.    The Georgia Department of Community Health ("DCH") is responsible for the administration and supervision of the Medicaid program.  Georgia law authorizes DCH "to establish such rules and regulations as may be necessary or desirable in order to execute the [S]tate [P]lan and to receive the maximum amount of federal financial participation available in expenditures made pursuant to the [S]tate [P]lan . . . ." O.C.G.A. § 49-4-142(a). Georgia law also authorizes and requires DCH to "publish the terms and conditions for receipt of medical assistance in Policies and Procedures manuals for each of the categories of services authorized under the State Plan." Ga. Comp. R. & Regs. R. 350-1-.02(3). These manuals are disseminated to providers enrolled in the applicable category of service, and amendments thereto are effective "as specified by the Department at the time of dissemination." *Id*.  Thus, DCH sets the rules for the provision

of medical services to Georgia Medicaid recipients, the circumstances in which providers can become enrolled in Georgia Medicaid, and how Georgia Medicaid reimburses providers for these claims.

118.    According to the Medicaid Secondary Claims User Guide, Georgia Medicaid will pay Medicare Part C coinsurance and deductible payments up to the Medicaid maximum allowable amount for certain beneficiaries.  Georgia Department of Community Health (DCH), Part II Medicaid Secondary Claims User Guide (April 1, 2019).

119.    Beneficiaries who receive assistance include dual eligible Medicare and Medicaid beneficiaries who are part of one of the following Medicare Savings Programs:

| Coverage Group | Criteria | Benefits |
| --- | --- | --- |
| Qualified Medicare Beneficiary | Individual is entitled to Medicare Part A, has income that does not exceed 100% of the Federal Poverty Level, and whose resources do not exceed twice the Supplemental Security Income limit | Medicaid payment of Medicare premiums, deductibles, and co-insurance and co-pays (except for Part D) |
| QMB Plus | Individual is entitled to Medicare Part A, has income that does not exceed 100% of the Federal Poverty Level, whose resources do not exceed twice the Supplemental Security Income limit, and also meets the financial criteria for full Medicaid coverage | Medicaid payment of Medicare premiums, deductibles, co-insurance and co-pays (except for Part D), and all benefits available under the State Plan to a fully eligible Medicaid recipient |

| Coverage Group | Criteria | Benefits |
|---|---|---|
| Specified Low-income Medicare Beneficiary | Individual is entitled to Medicare Part A, has income that exceeds 100% of the Federal Poverty Level but is less than 120%, and whose resources do not exceed twice the Supplemental Security Income limit | Medicaid payment of Medicare Part B premium |
| Qualifying Individual | Individual is entitled to Medicare Part A, has income that exceeds 120% of the Federal Poverty Level but is less than 135%, and whose resources do not exceed twice the Supplemental Security Income limit | Medicaid payment of Medicare Part B premium |

### G. Georgia Medicaid Policies

120.   All Georgia Medicaid providers that submit claims electronically must complete an

Electronic Funds Transfer Agreement and agree to the following:

> Legal Compliance. Provider shall abide by all federal and state laws governing the Medicaid program.

> * * * *

> Provider further acknowledges and agrees that only Payees who have agreed in writing to: 1) comply with all Department policies regarding the payment of medical assistance; and 2) be subject to the recoupment policies outlined in the Provider's Statement of Participation and as set forth in the Power of Attorney for Electronic Claims Submission, shall be deemed acceptable Payees.

> * * * *

> Provider certifies by such acceptance [of funds] that Provider presented the claims for the services . . . and that the services were rendered by or under the supervision of Provider. Provider understands that payment will be from federal and state funds and

that any falsification, or concealment of a material fact, may be prosecuted under federal and state laws.

Georgia Department of Community Health Electronic Funds Transfer Agreement.

121.    At all times relevant to the Complaint, in order to receive payment for Medicaid services, a provider must first enroll in the Georgia Medicaid program and enter into a provider agreement with the State called a "Statement of Participation."  Among the express understandings in the Statement of Participation include the following:

> Provider shall comply with all of the Department's requirements applicable to the category(ies) of service in which Provider participates under this Statement of Participation, including Part I, Part II, and the applicable Part III manuals.

> \* \* \* \*

> <u>Claims Submissions: Certification of Claims</u>. Provider shall submit claims for Covered Services rendered to eligible Medicaid recipients in the form and format designated by the Department. For each claim submitted by or on behalf of Provider, Provider shall certify each claim for truth, accuracy and completeness . . . .

> \* \* \* \*

> Provider shall maintain in an orderly manner and ensure the confidentiality of all original source documents, medical records, identifying recipient data, and any copies thereof, as may be necessary to fully substantiate the nature and extent of all services provided.

> \* \* \* \*

> Provider shall render Covered Services, as defined in the Department's Policies and Procedures manuals, to eligible Medicaid recipients that are medically necessary as defined by the Department, within the parameters permitted by Provider's license or certification, and within the category(ies) of services indicated in the Provider Enrollment documents. By submitting claims for reimbursement, Provider certifies that Covered Services were rendered in the amount, duration, scope and frequency indicated on the claims.

> \* \* \* \*

Payment shall be made in conformity with the provisions of the Medicaid program, applicable federal and state laws, rules and regulations promulgated by the U.S. Department of Health and Human Services and the State of Georgia, and the Department's Policies and Procedures manuals in effect on the date the service was rendered. . . . Provider agrees that the Department shall not reimburse any claim, or portion thereof, for services rendered . . . for which federal financial participation is not available.

* * * *

Provider acknowledges that payment of claims submitted by or on behalf of Provider will be from federal and state funds, and the Department may withhold, recoup, or recover payments as a result of Provider's failure to abide by the Department's requirements.

Department of Community Health Division of Medical Assistance, Statement of Participation, DMA-002 (Rev. 04/03).

122.    Therefore, the UnitedHealth Defendants understood that Georgia Medicaid may withhold payment for claims submitted in violation of the Policies and Procedures manuals, incomplete or untruthful claims, unsubstantiated claims, inaccurate claims, claims submitted in violation of law, and claims submitted for which federal financial participation is not available.

123.    The Part I Medicaid/PeachCare for Kids Manual is applicable to all providers enrolled in the Georgia Medicaid program. In addition, such providers are also bound by the terms of the Part II Manual that are applicable to the services provided.

124.    The Part I Manual, "[a]long with the Statement of Participation, . . . encompasses the terms and conditions for receipt of reimbursement." Georgia Department of Community Health (DCH), Part I Policies and Procedures for Medicaid/PeachCare for Kids, at "Preface" (April 1, 2019). The Part I Manual reiterates and reemphasizes the importance the State of Georgia places on compliance and further delineates the specific conditions placed on providers submitting claims. For example, according to the Part I Manual, each enrolled provider must:

B)  Comply with all State and Federal laws and regulations related to furnishing Medicaid/PeachCare for Kids services.

\* \* \* \*

E)  Not contact, provide gratuities or advertise "free" services to Medicaid… members for the purpose of soliciting members' requests for services.  **Any activity such as obtaining a list of Medicaid or PeachCare for Kids Members** or canvassing neighborhoods for direct contact with Medicaid or PeachCare for Kids members **is prohibited.  Any offer or payment of remuneration, whether direct, indirect, overt, covert, in cash or in kind, in return for the referral of a Medicaid or PeachCare for Kids member is also prohibited.**

\* \* \* \*

G)  Not engage in any act or omission that constitutes or results in over utilization of services.

\* \* \* \*

J)  Neither bill the Division for any services not performed or delivered in accordance with all applicable policies . . . .

*Id.* at R. 106, p. I-43-44 (Emphasis added).

## FACTUAL ALLEGATIONS

### A. *Background on the UnitedHealth Defendants' Institutional Special Needs Nursing Home Plans*

125.    In 2023, UnitedHealthcare accounted for 29% of all Medicare Advantage enrollment, or 8.9 million enrollees across the United States.  Nancy Ochieng et al., Medicare Advantage in 2023:  Enrollment Update and Key Trends, KFF, *available at* https://www.kff.org/medicare/issue-brief/medicare-advantage-in-2023-enrollment-update-and-key-trends/.

126.    According to Optum's website, through its ISNPs, the Defendants serve over 1,800 SNFs and over 70,000 beneficiaries nationwide.  *See* https://www.optum.com/en/business/health-plans/members/on-site-senior-care/care-model.html.

127.    The UnitedHealth Defendants currently sell two Medicare Advantage ISNPs in Georgia and across the United States, both of which the UnitedHealth Defendants generally refer to collectively as its Nursing Home Plan.

128.    In order to offer these ISNPs, the Defendants' Chief Executive Officer, Chief Financial Officer, or someone with delegated authority to sign on their behalf would have had to certify "that each enrollee for whom the organization is requesting payment is validly enrolled in an MA plan offered by the organization and the information relied upon by CMS in determining payment … is accurate, complete, and truthful." *See* 42 C.F.R. § 422.504(l).

129.    The UnitedHealth Defendants' ISNP is for patients who: (1) are eligible for Medicare Part A; (2) are enrolled in Medicare Part B; (3) require a level of care that is usually provided in a nursing home; (4) are currently living in a nursing home that has a contract with the UnitedHealth Defendants; (5) have no active discharge plans; and (6) do not have End-Stage Renal Disease at the time of enrollment.

130.    Beneficiaries of the ISNPs receive their Medicare Part A and Part B services in addition to Medicare Part D coverage through the ISNPs.

131.    In 2019, the monthly premium for the ISNP was $25.70.  Beneficiaries of the plans must also pay Medicare Part B premiums unless they are eligible for reduced premiums. In 2024, the monthly premium for the UHC Nursing Home Plan EX-F005 (PPO ISNP) is $20, and the monthly premium for the UHC Nursing Home Plan GA-F001(PPO ISNP) is $34.90.

132.    As of early 2018, according to Section 2, page 37 of Optum's ISNP and IESNP Agent Training Book, approximately 93% of the UnitedHealth Defendants' members enrolled in the ISNP were eligible for both Medicare and Medicaid.  Medicaid, therefore, covers some or all

of the premiums for almost all of the enrollees in the UnitedHealth Defendants' Special Needs Nursing Home Plans.

**B. UnitedHealth Defendants' Model of Care**

133.    Defendant Optum, Inc.'s Complex Care Management team is responsible for selling and operating the UnitedHealth Defendants' ISNPs.  *See* Optum ISNP and IESNP Agent Training Book ("the Training Book"), page 12.  The Training Book summarizes the "Value of the CarePlus Care Model" to the nursing home as:

- o    We provide an added level of care and facility education and support.

- o    On-call for evening, holidays and weekends available.

- o    Increased efficiency:  skilled benefit without the CMS required 3-day qualifying hospitalization.

- o    Better communication and enhanced documentation:  facilitates communication among care team members and physicians. Supports state survey process and corrective action plans.

- o    Improved reimbursement:  reimbursement for 4 CPT codes not currently covered by Medicare.

- o    Maintain resident satisfaction: care model helps supplement physician visits and avoid unnecessary transfers to the hospital

*Id.* at Section 4, Page 74.

134.    When a SNF contracts with the UnitedHealth Defendants, Optum, Inc. provides the SNF with on-call Nurse Practitioners and Physician Assistants to care for their enrollees.  *Id.* at Section 4, Page 74.

135.    Optum, Inc. advertised that the care provided by the Nurse Practitioners and Physician Assistants benefits both the UnitedHealth Defendants and the nursing facilities.  As explained in the Training Book:

The UnitedHealthcare Nursing Home Plan supports census stability for the long term population with a treat-in-place care model because members receive skilled

care without leaving the SNF.  The care model reduces unnecessary transfers to the emergency room or hospital admissions, resulting in the reduction of empty beds or the potential to lose residents to other SNFs once they are discharged from the hospital.

*Id.* at Section 3, Page 47.

136.   Contracting with the UnitedHealth Defendants provides potential additional revenue streams for the SNF than the facility would receive from traditional Medicare.   As the UnitedHealth Defendants explain in the Training Book, the contracts "provide the SNF with the ability to receive revenue above and beyond what they would get with Traditional Medicare. A SNF can bill for additional items in Part A and Part B and get reimbursed by UnitedHealthcare." *Id.* at Section 9, Page 188.

137.   Traditional Medicare Part A covers skilled nursing care provided in a skilled nursing facility under certain conditions for a limited time.  The patients must have a qualifying hospital stay, defined as a three-day inpatient midnight stay in an acute care hospital.  Once the patient qualifies, the Part A services are reimbursed under a prospective payment system that pays the skilled nursing facility a daily rate and a daily room charge based on the resource utilization group (RUG) for which the patient is classified.  The more skilled the services the patient needs, the higher the RUG, and the greater the reimbursement.  If a patient leaves the hospital after only two days, the patient would not qualify for Medicare Part A skilled nursing services.  If the patient leaves the skilled nursing facility or refuses daily skilled care resulting in a break of more than 30 days, the patient would need a new 3-day acute care hospital stay to qualify for additional skilled nursing facility care reimbursed under Part A.

138.   Traditional Medicare Part B services are paid on a fee-for-service basis.

139.   By comparison, under an ISNP, the UnitedHealth Defendants contract with CMS to provide the primary care, skilled care, hospital care, and referral services for each enrolled

beneficiary.  The UnitedHealth Defendants receive a per-member, per-month capitated payment from the government that is supposed to cover the enrolled beneficiary's care.  The UnitedHealth Defendants then, in turn, pay the Skilled Nursing Facilities pursuant to the contract terms it negotiates with each facility.

140.    As the Training Book explains, the Medicare Advantage ISNP "results in payment options & financial incentives that are not usually offered to facilities."  *Id*. at Section 9, Page 186. For example, the Training Book lists the following types of payment options and incentives:

- Payment of fees for delivering on-site care when hospitalization can be avoided

- Reimbursement for skilled days and intensive service days as medically necessary without the required 3-day hospital stay

- Additional programs in which facilities can participate

*Id.* at Section 9, Pages 186-87.

141.    The UnitedHealth Defendants can reimburse the SNF in either a fee-for-service or capitated manner, but either way, the contracts permit the skilled nursing facility to receive reimbursement from the UnitedHealth Defendants for additional items in Part A and Part B than Traditional Medicare would provide.  *Id*. at Section 9, Page 188.

142.    In addition, the UnitedHealth Defendants have different incentive plans at their disposal to offer the SNFs depending on the facility's level of cooperation and engagement with the scheme.  As the UnitedHealth Defendants explain, "Contracts include an incentive component to promote collaboration with our clinical model by striving toward metrics that they are already held accountable with state surveys and other entities by communicating with our APCs.  Different incentive plans are offered based on the contract."  *Id.* at page 189.  In essence, the UnitedHealth Defendants developed a variety of incentive plans to sweeten the deal for the SNFs and promote the SNFs' cooperation in the scheme and in the model of care.

143.   For example, under the Dividend Savings Program, the UnitedHealth Defendants would pay the facility on a quarterly basis based on how many patients per thousand were admitted to the hospital ("Admits/K") and based on the percentage of patients for whom the facility met quality measures such as flu shots, weight loss, or restraints.  *Id.*  The quarterly incentive payment earned was then multiplied by the number of the facility's enrollments.  *Id.* at 190.

144.   Under the Clinical Administrative Fee, the UnitedHealth Defendants would pay the facility monthly based on a "per member per month" fee that supposedly covered the cost of administrative functions associated with the Optum Care Model such as delivering Medicare letters, calling the APC when the beneficiary's condition changed, and advanced care planning. *Id.*

145.   In order to increase the incentive payments paid to the facilities for their participation in the scheme, the UnitedHealth Defendants developed a newer incentive plan called the Premium Dividend Plan that "allows for [the] SNF to still achieve incentive dollars if they hit within a range of the target."  Rather than the all or nothing approach in the Dividend Savings Program, the Premium Dividend Plan gave UnitedHealth the flexibility to pay out incentive dollars when the facility hit some, but not all, measures.  *Id.* at 190.  Under this plan, if the facility refers fewer patients to the hospital, bringing down its Admits/K (and thus, decreasing UnitedHealth's costs), the UnitedHealth Defendants would pay the facility higher incentive payments.  "The PMPM increases exponentially based on the admits/K tier level achieved."  Similarly, even if the facility sends too many patients to the hospital (i.e., its Admits/K is too high), the facility can still earn payments for separately hitting quality measures.  *Id.* at 191.

146.   Under the examples provided in the Training Book, these incentive payments were sizable – up to $17,550 per quarter under the Dividend Savings Plan and up to $6,340 per quarter under the example Premium Dividend Plan.  *Id.* at 190.

147.   Finally, for its most important facilities, the UnitedHealth Defendants offered a Shared Savings incentive plan under which Defendants would share the profit it made (which it defines as the Premium (i.e., the amount received from the government) – Medical Expense (i.e., the amount of money UnitedHealth spends caring for the patient) with the SNF at a level (based on a set percentage) negotiated with the SNF.  In the example provided in the Training Book, the shared savings payout was $90,584 or 40% of all profits.  *Id*. at 195-96.

148.   The Training Book makes clear that although there are many financial incentives for a nursing home to want its members to sign up for the UnitedHealth Defendants' ISNPs as outlined above, "[i]t is important that we never say or imply that a SNF be guaranteed to make more money with Optum." *Id.* at Section 5, Page 45.

### C. UnitedHealth Defendants' Policies Regarding Soliciting Potential Beneficiaries

149.   Since the Medicare Advantage Plans supplant traditional Medicare, CMS places strict guidelines regarding the marketing of these plans, particularly to these vulnerable elderly seniors and their responsible parties.

150.   At all times relevant to this Complaint, the UnitedHealth Defendants were aware of the requirements found in the CMS regulations and promulgated policies consistent with these regulations by requiring potential beneficiaries' consent prior to marketing the ISNPs to them.

151.   For example, slide 12 of a September 2015 PowerPoint presentation by Optum clearly states that CMS requires consent to contact potential enrollees:

**How Enrollment Occurs**

- CMS regulations
  - Requires consent to contact

- Family engagement
  - Facility plays a role
    - CMS approved letters, family nights, displays, materials available
  - Facility does not sell, but educates families on new option
  - Consent forms received
  - Provide responsible parties information upon request
  - Other agreed upon and approved activities
  - Drops Consent forms in drop boxes

152.    In addition, Section 8, page 178 of the Training Book makes clear that "[c]ompliance with the Medicare Marketing Guidelines" (which are now codified in the regulations outlined above) is required.  The Training Book states that the UnitedHealth Nursing Home Plan "is filed as a Medicare Advantage Plan with the Centers for Medicare and Medicaid Services, and is thus subject to all provisions included in the guidance."  *Id*.  It continues, "Compliance with these requirements is non-negotiable; failure to comply will result in disciplinary action up to, and including, termination."  *Id*.  The Training Book claims that the Medicare Marketing Guidelines (now codified in the regulations) were "created to ensure that aggressive, misleading or fraudulent activities do not occur with this vulnerable population" and are "direct and prescriptive in terms of what can and can't be done…."  *Id*. at Section 8, page 178.

153.    The UnitedHealth Defendants' Training Book also specifically underscores the importance of "educat[ing] [the Business Department of the nursing facility] on personal health information (PHI) regulations (i.e. ensure they understand the difference between providing information on UHC members vs. non-members.)."  *Id*. at Section 3, Page 48.

154.   Over and over again, the Training Book clearly explains the required consent needed in order for its employees to market the INSPs to potential beneficiaries not currently enrolled in another UnitedHealth plan.

155.   For example, the Training Book cites Sections 70.2 through 70.5.2A of the Medicare Marketing Guidelines and Policy SAO – 105 as the applicable consent to contact requirements. The Training Book mandates:

> A resident or their responsible party's (RP) written consent to contact is required **_prior_** to any outreach.  No conversations about the plan can occur without one of the following:
>
> - The resident or RP approaches the sales professional (SAM, SIM, SAC, etc.) or places a call to the plan or one of the individuals operating in a sales capacity.  In these cases, the e-outreach should be documented in bConnected (the date, venue and circumstances around the contact.)
>
> - The resident or RP completes a business reply card (BRC), Authorization for Disclosure of Contact Information (ADCI or former MIPPA) or other CMS approved consent to contact form.
>
> - The resident is confirmed to be a member of a UnitedHealthcare product.
>   - In these cases, the member and RP information should be collected and sent to sales operations, for entry into the bConnected system.  Notification of the availability of the UHCNHP will be down (sic) through a central location, and outreach may be made by the sales professional.

_Id._ at Section 8, Page 179.

156.   The Training Book also states, "It is important to note that SNF staff can't 'give' the plan leads or in any way collect [consent to contact forms] with the intent to distribute to the plan." _Id._  at Section 8, Page 181.

157.   The Training Book acknowledges that "[w]ithout leads, there can be no enrollments." _Id._ at Section 6, Page 92.  It further encourages the sales personnel to develop strong

relationships with the facility staffs as "[t]he level of lead generation can indicate the status of the relationship." *Id*. at Section 7, page 166.

158.    The Training Book further explains:

> Every interaction we have with potential members and their RPs is guided by CMS regulations known as MIPPA.    MIPPA is the Medicare Improvement Act for Patients and Providers Act of 2008.  It determines how we are able to communicate with a potential member or their RP.
>
> Medicare recipients are considered to be a vulnerable population and CMS regulations restrict us from soliciting without consent.  Many of these guidelines are designed to protect seniors.
>
> It is not permitted to walk up to someone, introduce ourselves and ask them if they'd like to hear about our plan. In order for us to speak about the plan, we require authorization or consent to contact.  There are multiple ways for us to obtain this consent.

*Id.* at Section 6, Page 94.

159.    Again and again, the Training Book describes the four permissible ways to obtain consent: (1) the resident or responsible party can complete a business reply card ("BRC") expressing interest; (2) the interested party may complete an Authorization for Disclosure of Contact Information ("ADCI") form; (3) the resident or responsible party can reach out directly to the account manager; and (4) agents may contact residents who are already UnitedHealthcare members to cross-sell the Special Needs Plans.  *Id.* at Section 6, Page 95.

160.    The Training Book later repeats these compliant ways to obtain leads:

- Leads are released compliantly by:
  - MIPPA/ADCI forms
  - Lead card/BRC
  - Cross sell/member
  - Call in/inbound call

*Id*. at Section 6, Pages 116-17.

161.    Employees of the UnitedHealth Defendants were required to input all leads for new membership into bConnected, their internal software system.  *Id.* at Section 6, Page 92.  All of the

employees had their own login to bConnected. The UnitedHealth Defendants switched to a different system called Salesforce in 2018.

162.    The Training Book explains, "We document our interactions through bConnected to demonstrate how a lead was compliantly received and worked. This protects the consumer and the agent." *Id*. at Section 6, Page 116. The Training Book continues, "All interactions must operate within the compliance parameters expressed in the Medicare marketing guidelines." *Id*.

### D.  *UnitedHealth Policies Regarding Implementing ISNPs at Facilities*

163.    In addition to clear policies requiring consent to contact potential enrollees, the UnitedHealth Defendants also promulgated clear policies regarding growing business at newly contracted nursing homes.

164.    For example, the Training Book suggests "having a facility perform a routine census review [to] help make certain that the valuable resource of the UHC ISNP is offered to everyone who is eligible." *Id*. at Section 6, Page 100. However, the Training Book states, "Due to MIPPA regulations, the SNF staff cannot share this information with you but it can help guide them when informing residents and RPs about the availability of our plan." *Id*.

165.    The Training Book also acknowledges the limitations on what the SNFs could do on the plan's behalf, including the prohibition on "steer[ing] an undecided resident or RP into a particular plan by recommending the plan." *Id.* at Section 8, Page 182. Similarly, in the Did You Know Campaign? training materials from September 2015, Defendants state, "Facility does not sell, but educates families on new option."

166.    The census review process typically involves the Business Office of the skilled nursing facility. The Training Book describes how to "turn" the Business Office "into a champion":

> The Business Office can help by identifying UnitedHealthcare members and providing responsible party information. The Business Office Manager is typically the individual who is contacted for help with a quarterly census review.
>
> o Educate them on the compliant way to conduct a census review
>
> o Gain commitment to approach this as a process
>
> The Business Office is typically knowledgeable on those that are newly Medicaid approved or in the spend-down process. If they aren't, it can open the door for a possible education opportunity.

*Id.* at Section 3, Page 48.

167.   Slide 18 of the September 2015 PowerPoint presentation by Optum also describes the appropriate way for a nursing home to conduct a census review:



**Business Office & Resident/Family Engagement**

- Conduct census review to identify number of eligible residents in the following categories:
  - Dual eligibles & Medicare only
  - UnitedHealthcare® members
  - Private Pay & TriCare
  - ESRD
- Identify UnitedHealthcare members and consider providing responsible party information.
- Communicate participation with program and ways to get information during routine calls to families.
- Provide MIPAA form or BRC to interested residents or families upon request

- Access to a provider advocate team for assistance with billing for all UnitedHealthcare products.
- Consent to contact form is not required for residents currently enrolled in another UnitedHealthcare product.
- CMS approved letter is available to notify a UnitedHealthcare resident/family that another UHC product that may better fit their needs is available.
- Content can be included during regular business calls but can't be used to single out particular families or events.

168.   In another section discussing the implementation process, the Training Book states that "[a]ll interactions with potential partners" must be "documented in Salesforce." *Id*. at Section 10, Page 201.

169.    Another document prepared by the UnitedHealth Defendants clearly states:



**CMS acknowledges families may look to providers for more information.**

Family Response may:
- Inform a consumer about original Medicare, Medicare Advantage plans and Part D plans in an unbiased way that does not attempt to steer
- Make available and distribute materials for all plans with whom the provider participates
- Provide objective factual information, including content from the CMS website
- Provide information on the appropriate mechanism to receive additional information

For the Participant, may not:
- Compare plans with consumers
- Supply an agent with a list of residents or their contact information (exception is current UnitedHealthcare members)
- Schedule appointments on behalf of an Optum/UnitedHealthcare representative
- Provide fact sheets

### E. UnitedHealth Defendants' Illegal Marketing and Solicitation of Beneficiaries

170.    Despite these clear policies and the UnitedHealth Defendants' knowledge of the strict Medicare marketing regulations and prohibitions in the AKS, the UnitedHealth Defendants' sales efforts in practice violated these policies and regulations, leading to the enrollment of Medicare beneficiaries, including Medicaid members, who were illegally solicited by the UnitedHealth Defendants.

171.    When Relator first returned to working for the UnitedHealth Defendants in 2015, the sales practices were consistent with CMS marketing regulations and the UnitedHealth Defendants' policies.

172.    Their primary method of marketing the ISNPs was to sit at a table in a common area of the nursing facility and wait for a potential beneficiary or responsible party to initiate contact. They were prohibited from marketing the plans directly to potential beneficiaries or responsible parties until the potential beneficiary signed an authorization form or business reply card.

173.    The UnitedHealth Defendants' sales team, however, struggled using this approach.

174.    The atmosphere and sales tactics completely changed in 2016, when James Rodgers took over as the Director of Sales for Georgia, Alabama, and Florida.

175.    Rodgers and other members of the sales management team set such unrealistic sales goals that the salespeople were unable to meet these using legal, appropriate marketing tactics.

176.    Instead, James Rodgers directed his sales team to engage in sales and marketing tactics without regard for the CMS marketing regulations and the AKS and to focus only on enrolling as many people as possible into the ISNPs.

177.    In one of his very first meetings with Relator and other members of the sales team, Rodgers declared that he did not care how they made their numbers, "as long as you make me look good."

178.    Rodgers constantly called and texted his sales team, pressuring them about the number of enrollments they had secured.

179.    Rodgers instructed the salespeople to target Medicaid patients because then the individuals would not be required to pay for their premiums.

180.    When Toni Ivey, a former Optum sales account manager, did not meet her numbers, Rodgers fired her in November 2017, to set an example to the rest of the staff.

181.    On Mondays, Wednesdays, and Fridays, Rodgers organized "stand-up calls" with the sales team during which he would walk through a PowerPoint presentation and discuss which salespeople were producing and what they planned to do to drive their enrollment numbers. Participants on these calls included Vice President James John Louise in New York, Relator, and the Sales Account Managers.

182.    When a new nursing home was considering contracting with the UnitedHealth Defendants, Rodgers instructed his sales team to set up a meeting with the key decision-makers of the nursing facility.  During the meeting, Rodgers would tell senior leadership at the nursing facility that the UnitedHealth Defendants needed 40% penetration (i.e., enrollments from 40% of

the members of the nursing home facility during the first three months) and twenty returned Business Reply Cards, or else the UnitedHealth Defendants would not contract with the nursing facility to provide the ISNP.

183.   The terminology used by Rodgers and other sales personnel working on behalf of Defendants was that the Defendants would not "go live" with the facility's contract without the facility providing the requisite number of referrals.  Thus, the UnitedHealth Defendants expressly conditioned something of value – the opportunity to be part of the UnitedHealth ISNP provider network and obtain additional payments such as incentive payments and implementation payments – in exchange for the SNFs' referral of their residents to the UnitedHealth Defendants.

184.   The 40% penetration figure was a well-known sales target for the UnitedHealth Defendants.  At a National Sales Conference on January 11, 2017, SPJ Consulting made a presentation called, "From Commitment to Execution:  Sales Implementation Manager (SIM) Summit Workshop."  The stated objective for the Workshop was to "provide OPTUM SIMs with a common methodology and tools to have 70% of new homes achieve 40% penetration within 90 days."

185.   The Training Book reiterates this expectation, "Implementation strives to enroll 40% of the membership within the first 3 months."  Training Book, Section 10, Page 206.

186.   Thus, Defendants conditioned the opportunity for the facility to participate in the ISNP and obtain the additional revenue and incentive payments (which constitutes a form of remuneration) on the facility's willingness to engage in marketing and referral activities on Defendants' behalf.

187.   Following the meeting with the key decision-makers, Rodgers instructed Relator and/or the Sales Account Manager to meet separately with key personnel at the nursing home, such

as the Activities Director, Social Services Director, or Business Office Manager, to obtain referrals.

188.    Rodgers instructed the sales team to offer free food or other items of value to the key decision-maker at the nursing home.  This free food and other items of value constituted improper remuneration under the AKS.  The sales team would put these charges on their corporate credit cards, and they were always reimbursed without any questions from the corporate office.

189.    In exchange for the free food or other free items and the possibility of contracting with the UnitedHealth Defendants, Rodgers and other sales personnel would instruct the nursing home to provide a list of Medicare and Medicaid patients at their facility.  This list contained protected health information (PHI) for which, in most instances, the UnitedHealth Defendants did not have the patients' authorization to receive.

190.    In addition, Rodgers and other sales personnel would also request and receive from the nursing homes copies of the patients' face sheets.  The face sheets contained the patients' PHI and most private information, including for example, the patients' name, picture, age, date of birth, social security number, address, room number, Medicare number, Medicaid number, phone number, diagnoses, advanced directive information, admission date, physician(s), insurance carrier, and most importantly for the UnitedHealth Defendants, the patients' responsible party and their contact information.

191.    In most instances, neither the patient nor their responsible party would have any idea that the nursing home had improperly provided this information to the UnitedHealth Defendants in exchange for the opportunity to contract with the UnitedHealth Defendants, secure additional funding, and obtain the services of a dedicated Optum nurse practitioner and also in exchange for the free food and other items provided.

192.   Instead, the UnitedHealth Defendants' Sales Account Managers and Sales Implementation Managers would then use this PHI and additional information from the nursing home to improperly directly solicit patients and their responsible parties for its ISNP without first obtaining their consent.

193.   Once they reached the patients or their family members using these deceptive marketing practices, they would have the patient or responsible party family member fill out the authorization card after the fact.   Rodgers and others instructed Relators and other sales personnel responsible for obtaining these signed cards to direct the patients or their responsible parties to leave the date section of the forms blank since oftentimes these were obtained after Defendants had illegally made unsolicited contact to market the ISNPs.   Relator has examples of undated authorization forms consistent with Rodgers' direction.

194.   Authorization cards completed after the deceptive marketing practices already occurred were knowingly made or caused to be made by UnitedHealth Defendants for the purpose of concealing the deceptive marketing practices and are material to the resulting false or fraudulent claims.

195.   In certain nursing homes, the UnitedHealth Defendants would deceptively instruct the nursing home to agree to include an Authorization for Disclosure of Contact Information form permitting the nursing home to share the patient's information to the UnitedHealth Defendants in the packet of materials completed upon admission to the nursing home.   The form does not disclose the financial interest of the nursing home in having its patients enroll in the UnitedHealth Defendants' Special Needs Nursing Plans.

196.   Even more, in certain situations, the UnitedHealth Defendants directed the SNFs to do their bidding instead – having the SNFs themselves market UnitedHealth's ISNP in direct

violation of federal regulations and the UnitedHealth Defendants' own policies prohibiting provider steerage.

197.   Rodgers instructed his sales team to take the information they needed from the face sheets obtained from the nursing homes and then discard the face sheets.

198.   Cognizant of the illegal nature of their conduct, Rodgers instructed his team not to use the term "face sheets," and he did not discuss this practice in writing.  Instead, during the sales implementation calls held every Tuesday and the stand-up calls on Mondays, Wednesdays, and Fridays, which involved salespeople from Alabama, Florida, and Georgia, Rodgers would ask his sales personnel whether they obtained the "sales lists."  Participants on these calls, including the Sales Account Managers and Sales Implementation Managers, understood this to be Rodgers' instruction to obtain PHI without the patients' consent and use this information to improperly solicit potential beneficiaries.

199.   The UnitedHealth Defendants' employees were instructed not to mention face sheets in their entries in bConnected.

200.   After Toni Ivey's termination in November 2017, her emails were forwarded to Rodgers.  Included in these emails were communications between Ivey and the nursing homes, pursuant to Rodgers' sales instructions, that discussed obtaining face sheets.  Rodgers was aware that this practice was occurring at his instruction.  Thus, the UnitedHealth Defendants were aware in November 2017 (at the latest) that it violated its contract with CMS and had an obligation to report such violations and return funds that constituted an overpayment.

201.   The UnitedHealth Defendants' illegal sales tactics were rampant throughout the state of Georgia.

202.    Relator also has reason to believe the UnitedHealth Defendants' improper solicitation of Medicare and Medicaid patients occurred in areas outside of James Rodgers' sales territory.  James Rodgers' supervisor, James John Louise, put enormous pressure on Rodgers and set unreasonable sales goals that could only be met through improper marketing.  In addition to Rodgers, Louise was the supervisor for Sales Directors in New York and New Jersey.  Relator has reason to believe the UnitedHealth Defendants' sales personnel in New York and New Jersey also improperly solicited Medicare and Medicaid patients and/or improperly obtained the patients' PHI.  Rodgers and Louise replaced much of the sales personnel in Georgia with acquaintances from New York and New Jersey with sales backgrounds, whom they felt were more aggressive at "selling" the UnitedHealth Defendants' ISNPs.

### F.  UnitedHealth Defendants' Anti-Kickback Violations

203.    When a Medicare Advantage plan follows the Medicare regulations governing marketing, there is no offer of remuneration and no requirement for referrals, and thus there is no violation of the AKS.

204.    At his initial meeting with the SNF decision-makers, Rodgers, however, would educate the facilities as to how they could maximize reimbursements from UnitedHealth Defendants' ISNPs, including emphasizing that the more residents that were signed up, the more money the SNF could be paid by the UnitedHealth Defendants.

205.    Moreover, the UnitedHealth Defendants not only openly promoted the financial benefits of its services to the SNFs—including free gifts, free food, the benefit of a free NP or PA (resulting in fewer hospitalizations, and thus lower costs to the SNF), payment of healthcare costs normally borne by the SNF, the opportunity to bill UnitedHealth for services that are not reimbursed by traditional Medicare, a capitated monthly payment for each enrollee, and the UnitedHealth Defendants' various incentive payments outlined above—but the Defendants also

made those benefits contingent upon the SNF participating in the UnitedHealth Defendants' illegal marketing efforts and meeting a quota of enrollees, which was expressly presented to the SNF decision-makers by Rodgers at their initial meeting.

206.    Thus, Defendants offered to provide and provided remuneration, that is, the opportunity to participate in the UnitedHealth Defendants' provider network, to induce the Skilled Nursing Facilities to steer and refer their Medicare residents to the ISNPs.

207.    Relator personally observed Rodgers communicating this requirement and the 40% penetration target to Skilled Nursing Facilities.

208.    Moreover, Relator was aware of facilities at which the UnitedHealth Defendants either refused to "go live" i.e., refused to go forward with the contract, or delayed "going live" after the facility did not provide the requisite number of referrals.

209.    Relator was also aware of facilities that refused to engage in this illegal enrollment scheme and thus did not have the opportunity to join the UnitedHealth provider network.

210.    The SNFs, incentivized to meet the quota and reap the rewards of having an ISNP contract with UnitedHealth, and at UnitedHealth's request, gave UnitedHealth access to its residents' PHI, including specifically identifying which residents were Medicare and/or Medicaid beneficiaries, thereby giving the UnitedHealth Defendants the opportunity to mine this PHI for potential referrals and make direct contact with those residents, in  violation of the Medicare regulations and the AKS.

211.    Furthermore, at times, the SNFs themselves directly solicited the patients and steered them to the UnitedHealth Defendants' ISNP, thereby increasing the payments received by the SNF.

212.    A second type of kickback took the form of implementation payments.  The UnitedHealth Defendants paid many SNFs implementation payments if the facilities successfully completed the UnitedHealth Defendants' referral expectations, including assisting with the illegal marketing of the ISNPs and engaging in lead generation activities.

213.    At the direction of Rodgers and Network Director Tim Wilkes, Relator personally delivered checks worth between $1,200 - $3,500, which Rodgers and Wilkes told Relator were bonus payments to the facilities that went above and beyond to help UnitedHealth meet their goals in terms of ISNP enrollments.  Relator witnessed how this occurred after Rodgers and Wilkes had communicated to the facilities their clear expectations about the number of leads and enrollments that needed to be completed within a set period of time.

214.    Relator understood these bonuses were approved by Laura Thomas, Rodgers' supervisor.

215.    By way of example, Relator personally delivered one of these bonus checks to Riverview Health & Rehabilitation Center in Savannah, Georgia since the facility was too far away for Rodgers or Wilkes to travel to deliver the check themselves.    This payment constituted a kickback from the UnitedHealth Defendants in exchange for the referral of patients that were covered under Medicare Part C.

216.    Relator also personally observed Vice President James John Louise in New York, Rodgers, and Wilkes discussing facilities that were not providing enough referrals and discussing ways to provide the facilities with implementation payments or other payments to convince them to refer more patients.

217.    A third category of kickbacks involved incentive payments to the facilities in exchange for referrals.  To further sweeten the ISNP deal, the UnitedHealth Defendants also made

incentive payments "to promote collaboration" or work the Optum model through which the UnitedHealth Defendants "rewarded" high-performing facilities by making payments on a per member per month "PMPM" basis.

218.   These incentive payments, described in detail above in paragraphs 142 – 148, took the form of the Clinical Administrative Fee, Dividend Savings Plan, Premium Dividend Plan, and the Shared Savings Plan.

219.   Relator overheard Optum sales personnel talk about rewarding facilities that referred more patients or worked the Optum model (i.e., kept medical costs low by not sending patients to the hospital), with more advantageous contract terms such as increasing the components of these incentive plans.

220.   This *quid pro quo* of the UnitedHealth Defendants offering remuneration including the capitated payments and opportunity to contract, the free meals, the implementation payments, and the incentive payments in exchange for referrals by the SNFs constitutes violations of the AKS.

221.   All claims resulting from these unlawful kickbacks are tainted, and thus false, including claims to Medicare for capitated payments for patients enrolled under a tainted referral, and claims to Medicaid for those patients' Medicare Advantage premiums.

### G.  Specific Examples of UnitedHealth Defendants' Illegal Conduct

#### 1. Oceanside Nursing & Rehab

222.   By way of representative example, the UnitedHealth Defendants entered into a contract with Oceanside Nursing & Rehab located at 77 Van Horne Avenue, Tybee Island, Georgia 31328.

223.   On November 9, 2017, from 1:00 – 2:30 p.m., Tim Wilkes, the Network Director with UnitedHealthcare, set up a meeting with Oceanside Nursing and Rehab and Savannah Beach

Nursing Home, two nursing homes located in close proximity. According to the meeting invitation, present for the meeting from the UnitedHealth Defendants were Tim Wilkes; Rhonda Ligon (UnitedHealthcare Director of Nursing); Jean Fortgang (Optum Nurse Practitioner); James Rodgers; and Sheila Curley (UnitedHealthcare Network Manager). According to Wilkes' invitation, the nursing facility's Business Office Manager, Director of Nursing, Social Services Director, MDS, and Admissions staff planned to attend.

224.   In advance of the meeting, both of the nursing homes provided census information and an eligibility analysis showing the number of patients at each nursing home that were eligible for UnitedHealthcare Nursing Home Plans based on their enrollment in Part A and Part B and whether the patients had end stage renal disease.

225.   The calendar invitation specifically references "breakout sessions with the individual team members" as part of the meeting agenda.

226.   During the breakout session, Relator heard James Rodgers tell the nursing homes the UnitedHealth Defendants would need 40% penetration in order to obtain the contract UnitedHealth was offering them, including the incentive payments and other remuneration contained therein. In other words, the SNF would only obtain the lucrative contract and other incentive payments from the UnitedHealth Defendants if it could deliver on the 40% target. Rodgers instructed the nursing home personnel to place a list of patients in the orange folder provided by the UnitedHealth Defendants in order for the UnitedHealth Defendants' employees to improperly target the patients or their responsible parties.

227.   At 2:30, 2:44, 2:46, and 3:18 p.m., on November 9, 2017, shortly following the conclusion of the meeting at 2:30 p.m. and at the direction of Rodgers and the sales team, Kurtis Jackson, Director of Clinical Evaluations at Oceanside Nursing and Rehab, provided to the

UnitedHealth Defendants' sales team lists of all of the current residents at the facility, including HIPAA-protected information such as their age, admission date, Medicare numbers, and Medicaid numbers.

228.    Kurtis Jackson was Relator's point of contact at Oceanside Nursing and Rehab.  In exchange for Jackson's and the nursing home's cooperation, Rodgers instructed Relator to take Jackson out to eat.  Jackson chose Olive Garden as the location for the free meal.  Relator paid for Jackson's meal, and Relator submitted the receipt for reimbursement.  The UnitedHealth Defendants' reimbursed Relator for this expense without any question.

229.    Following the November 2017 kickoff meeting, the UnitedHealth Defendants illegally and improperly obtained the face sheets for at least 10 residents, which were printed out on February 23, 2018, March 10, 2018, and April 26, 2018, and placed in the orange folder.  The face sheets contained the HIPAA-protected PHI of these patients, including their pictures, names, dates of birth, social security numbers, phone numbers, Medicare and Medicaid numbers, medical histories, admission dates, diagnoses, and providers.

230.    The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled many of these patients in the UnitedHealth ISNP.

231.    According to an internal document seen by Relator, at least 16 patients at Oceanside Nursing & Rehab enrolled in the UnitedHealth Defendants' ISNP following the UnitedHealth Defendants' illegal marketing and solicitation scheme.  The UnitedHealth Defendants had wrongfully obtained the face sheets for many of these patients.  *See* Exhibit 1.

232.    Relator has firsthand knowledge that these 16 patients were illegally recruited and enrolled into the UnitedHealth ISNP as a result of the UnitedHealth Defendants' illegal conduct.

The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these 16 patients' care starting between the months of February – March 2018.

233.    Once the UnitedHealth Defendants improperly enrolled these patients in the ISNPs, the UnitedHealth Defendants received monthly capitated payments for these patients:  Patient Q.A. (East Wing Room 102-1); Patient K.S. (East Wing Room 102-2); Patient P. W. (East Wing Room 104-2); Patient K.H. (East Wing Room 105-1); Patient J.H. (East Wing Room 106-1); Patient J.A. (East Wing Room 114-2); Patient B.H. (East Wing Room 115-1); Patient S.K. (East Wing Room 115-2); Patient H.B. Jr. (West Wing Room 205-2); Patient C.G. (West Wing Room 207-1); Patient W.C.W. (West Wing Room 208-1); Patient D.P. (West Wing Room 208-2); Patient C.W. (West Wing Room 209-2); Patient D.F. (West Wing Room 214-2); Patient F.T. (West Wing Room 220-1); and Patient J.B. (West Wing Room 221-1).

234.    Relator also has documentary proof that the following Medicare patients were also illegally enrolled in the UnitedHealth ISNP:  Patient P.B. (West Wing Room 220-2) starting in or around May 2018) and Patient C.B. (East Wing Room 111-1) starting in or around May 2018). *See* Exhibit 2.

235.    The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums who were illegally enrolled.

### 2. Green Acres Health & Rehab

236.    By way of further example, the UnitedHealth Defendants entered into a contract with Green Acres Health & Rehab located at 313 Allen Memorial Drive SW, Milledgeville, Georgia 31061.

237.    In order to obtain the opportunity to contract with the UnitedHealth Defendants, employees of the UnitedHealth Defendants, including James Rodgers, instructed Green Acres

Health & Rehab to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants so that the UnitedHealth Defendants' employees could improperly target the patients or their responsible parties.

238.    Pursuant to these instructions, employees of Green Acres Health & Rehab provided the UnitedHealth Defendants' employees with Active Resident Reimbursement Tables, which contain the HIPAA-protected patients' names, Medicare enrollment, Medicare and Medicaid numbers, insurance information, and admission date.

239.    Pursuant to these instructions, employees of Green Acres Health & Rehab also provided the UnitedHealth Defendants' employees with a list of Clients by Location, which contains the HIPAA-protected patients' names, bed number, gender, and admission date.

240.    Pursuant to these instructions, employees of Green Acres Health & Rehab also provided the UnitedHealth Defendants' employees with the face sheet for at least one patient, patient B.H.  The face sheet contains the HIPAA-protected patient's name, date of birth, social security number, Medicare and Medicaid number, other insurance information, responsible party information, contact information, and information about the patient's admission.

241.    The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth Special Needs Nursing Home Plans.

242.    Relator has firsthand knowledge of a representative example of a patient illegally enrolled into the ISNP at Green Acres – Patient B.H. from Room No. GA M107A was illegally enrolled in or around January 2018. *See* Exhibit 3.

243.    The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these illegally enrolled patients' care.

244. The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 3. Bolingreen Health & Rehabilitation

245. By way of further example, the UnitedHealth Defendants entered into a contract with Bolingreen Health & Rehabilitation located at 529 Bolingreen Drive, Macon, Georgia 31210.

246. In order to obtain the opportunity to contract with the UnitedHealth Defendants, employees of the UnitedHealth Defendants, including James Rodgers, instructed Bolingreen Health & Rehabilitation to provide patient lists and patients' HIPAA-protected PHI in the orange folder provided by the UnitedHealth Defendants so that the UnitedHealth Defendants' employees could improperly target the patients or their responsible parties.

247. Pursuant to these instructions, employees of Bolingreen Health & Rehabilitation provided the UnitedHealth Defendants' employees with the HIPAA-protected PHI of its residents.

248. The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth ISNP..

249. The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these illegally enrolled patients' care.

250. The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 4. Westbury Health & Rehab

251. By way of further example, the UnitedHealth Defendants entered into a contract with Westbury Health & Rehab located at 1420 Milstead Road, Conyers, Georgia 30012.

252. In order to obtain the opportunity to contract with the UnitedHealth Defendants, employees of the UnitedHealth Defendants, including James Rodgers, instructed Westbury Health

& Rehab to provide patient lists and patients' HIPAA-protected PHI in the orange folder provided by the UnitedHealth Defendants so that the UnitedHealth Defendants' employees could improperly target the patients or their responsible parties.

253.  Pursuant to these instructions, employees of Westbury Health & Rehab provided the UnitedHealth Defendants' employees with screenshots from the face sheets of its patients, including their HIPAA-protected insurance information, social security number, Medicare and Medicaid numbers, date of birth, and pharmacy.

254.  Pursuant to these instructions, employees of Westbury Health & Rehab also provided the UnitedHealth Defendants' employees with a Patient Information Summary document for Patient L.W. that contains PHI, including his HIPAA-protected address, admission date, insurance information, social security number, Medicare number, date of birth, diagnosis, hospital admission dates, physician's name, responsible party, and their contact information.

255.  The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, illegally enrolled patients in the UnitedHealth Special Needs Nursing Home Plans.

256.  The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these illegally enrolled patients' care.

257.  The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 5. Riverview Health and Rehabilitation Center

258.  By way of further example, the UnitedHealth Defendants entered into a contract with Riverview Health and Rehabilitation Center located at 6711 La Roche Avenue, Savannah, Georgia 31406.

259.   In order to obtain the opportunity to contract with the UnitedHealth Defendants, employees of the UnitedHealth Defendants, including James Rodgers, instructed Stan Adams, Jr., the Resident Services Coordinator, and others at Riverview Health and Rehabilitation Center to provide patient lists and patients' HIPAA-protected PHI in the orange folder provided by the UnitedHealth Defendants so that the UnitedHealth Defendants' employees could improperly target the patients or their responsible parties.

260.   Employees of the UnitedHealth Defendants, including James Rodgers, also convinced Riverview Health and Rehabilitation Center to include the authorization form as part of the packet of information provided to the residents upon admission.  Employees of Riverview Health and Rehabilitation Center did not explain to the residents what they were signing or how they were authorizing plans, such as the UnitedHealth Defendants, to target them for direct solicitation.

261.   Relator was instructed to provide employees of Riverview Health and Rehabilitation Center, including Stan Adams, Admissions Director Cheryl Godwin, and Social Workers Wanda Hobson and Maurice Jones, with free food and free Starbucks coffee in exchange for their cooperation.  Relator also took them offsite to provide them free meals.  The UnitedHealth Defendants reimbursed Relator for all of these expenses without any question.

262.   Pursuant to these instructions, employees of Riverview Health and Rehabilitation Center provided the UnitedHealth Defendants' employees with face sheets of its patients, including each patient's HIPAA-protected name, date of birth, admission date, other information related to the admission, social security number, Medicare and Medicaid numbers, responsible party information, their contact information, attending physician, pharmacy, and insurance

information.  The face sheets were printed out on the following dates and left in the orange folder: March 8, 2018; March 28, 2018; April 12, 2018; and May 18, 2018.

263.   The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth ISNP.

264.   The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these illegally enrolled patients' care.

265.   The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 6. Northeast Atlanta Health & Rehab

266.   By way of further example, the UnitedHealth Defendants entered into a contract with Northeast Atlanta Health & Rehab located at 1500 S. Johnson Ferry Road NE, Atlanta, Georgia 30319.

267.   In order to obtain the opportunity to contract with the UnitedHealth Defendants, employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at Northeast Atlanta Health & Rehab to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants so that the UnitedHealth Defendants' employees could improperly target the patients or their responsible parties.

268.   Pursuant to these instructions, employees of Northeast Atlanta Health & Rehab provided the UnitedHealth Defendants' employees with face sheets of its patients, including each patient's HIPAA-protected name, picture (in some instances), date of birth, admission date, other information related to the admission, social security number, Medicare and Medicaid numbers, responsible party information, their contact information, attending physician, pharmacy, insurance

information, and diagnoses. The face sheets were printed out on February 14, 2017, and February 18, 2017, and left in the orange folder.

269.  The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth Special Needs Nursing Home Plans.

270.  The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these illegally enrolled patients' care.

271.  The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 7. The Place at Martinez

272.  By way of further example, the UnitedHealth Defendants entered into a contract with The Place at Martinez located at 409 Pleasant Home Road, Augusta, Georgia 30907.

273.  In order to obtain the opportunity to contract with the UnitedHealth Defendants, employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at The Place at Martinez to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants so that the UnitedHealth Defendants' employees could improperly target the patients or their responsible parties.

274.  Pursuant to these instructions, employees at the Place at Martinez provided a print out of the list of patients in the A Station and the B Station. The list contains the names of the nursing home patients.

275.  Pursuant to these instructions, an employee at The Place at Martinez also drafted a list of the nursing home's patients by hand. This list contains the following HIPAA-protected information for each patient:  name, room number, Medicare and Medicaid numbers, responsible

parties, and their contact information. Certain patients are assigned to employees of the UnitedHealth Defendants including "John", which refers to UnitedHealth Sales Account Manager John King, and "Toni", which refers to former UnitedHealth Sales Account Manager Toni Ivey.

276. Pursuant to these instructions, an employee at The Place at Martinez also drafted other lists of the nursing home's patients by hand and dated June 23, 2017, and July 17, 2017. These lists contain the following HIPAA-protected information for each patient: name, date of birth, Medicare and Medicaid numbers, responsible parties, and their contact information. The July 17, 2017 list also contains admission date information. Certain patients are assigned to employees of the UnitedHealth Defendants including "John", which refers to UnitedHealth Sales Account Manager John King, "Toni", which refers to former UnitedHealth Sales Account Manager Toni Ivey, and "Lori", which refers to UnitedHealth Sales Account Manager Lori Glover.

277. One of the patients included on this list is Patient A.H. Her responsible party signed a Scope of Sales Appointment Confirmation Form and an Authorization for Disclosure of Health Information form for her on July 31, 2017. However, the SNF provided her HIPAA-protected information on both the June 23, 2017 and July 17, 2017 lists, weeks before her responsible party authorized her information to be shared by the SNF to the UnitedHealth Defendants. Relator has firsthand knowledge that Defendants illegally enrolled Patient A.H. into the ISNP in or around July 2017, causing the government to pay capitated payments to the UnitedHealth Defendants for her care. *See* Exhibit 4.

278. The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth ISNP.

279. The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these illegally enrolled patients' care.

280.    The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 8. The Place at Pooler

281.    By way of further example, the UnitedHealth Defendants entered into a contract with The Place at Pooler located at 508 S. Rodgers Street, Pooler, Georgia 31322.

282.    In order to obtain the opportunity to contract with the UnitedHealth Defendants, employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at The Place at Pooler to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants so that the UnitedHealth Defendants' employees could improperly target the patients or their responsible parties.

283.    Pursuant to these instructions, an employee at The Place at Pooler also drafted a document entitled "Optum Care Referral List."  This list contains three groups of nursing home residents: "Resident's (sic) that can sign with no representative"; "Resident with No POA however, family contact required and recommended"; and "Resident with POA or Responsible Party required."  The lists include the patients' names and bed numbers.

284.    At the bottom of the document, the employee writes, "The face sheets with demographic information (diagnoses, responsible party as well [] billing) are attached.  Please contact the responsible party for all resident[] prior to signing any resident up for services."

285.    The UnitedHealth Defendants used the information provided to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth ISNP .

286.    The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these illegally enrolled patients' care.

287.   The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 9. Etowah Landing Care and Rehabilitation Center

288.   By way of further example, the UnitedHealth Defendants entered into a contract with Etowah Landing Care and Rehabilitation Center located at 809 S. Broad Street, Rome, Georgia 30161.

289.   In order to obtain the opportunity to contract with the UnitedHealth Defendants, employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at Etowah Landing Care and Rehabilitation Center to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants so that the UnitedHealth Defendants' employees could improperly target the patients or their responsible parties.

290.   Pursuant to these instructions, employees of Etowah Landing Care and Rehabilitation Center provided the UnitedHealth Defendants' employees with face sheets of its patients, including each patient's HIPAA-protected name, picture, date of birth, admission date, other information related to the admission, social security number, Medicare and Medicaid numbers, responsible party information, their contact information, attending physician, pharmacy, insurance information, and diagnoses.

291.   Pursuant to these instructions, employees of Etowah Landing Care and Rehabilitation Center also provided the UnitedHealth Defendants' employees with at least two patient lists, printed on February 6, 2018, and February 7, 2018.  These lists include the patients' HIPAA-protected names, room number, hospice status, and some of their insurance information.

292.   The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth ISNP.

293.   The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these illegally enrolled patients' care.

294.   The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 10. Fairburn Health Care Center

295.   By way of further example, the UnitedHealth Defendants entered into a contract with Fairburn Health Care Center located at 178 W. Campbellton Street, Fairburn, Georgia 30213.

296.   In order to obtain the opportunity to contract with the UnitedHealth Defendants, employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at Fairburn Health Care Center to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants so that the UnitedHealth Defendants' employees could improperly target the patients or their responsible parties.

297.   Sarah West, the Business Officer Manager at Fairburn Health Care Center, and Amatulah Ibraahiym, a social worker, were Relator's point of contact at the facility.  In exchange for their cooperation, Rodgers instructed Relator to provide food, coffee, and other items for the staff at Fairburn Health Care Center.  The UnitedHealth Defendants also sponsored balloons and other items for the Event Coordinator.  Relator submitted receipts for these reimbursements.  The UnitedHealth Defendants' reimbursed Relator for these expenses without any question.

298.   Pursuant to these instructions, Sarah West printed out at least two Resident Information Reports.  The reports contain lists of all of the patients and the following HIPAA-protected information for each of the patients: room number, admission date, insurance, social security number, Medicare and Medicaid numbers, and date of birth.

299.   Pursuant to these instructions, employees of Fairburn Health Care Center also provided the UnitedHealth Defendants' employees with face sheets of its patients, including each patient's HIPAA-protected name, picture (in some instances), date of birth, admission date, other information related to the admission, social security number, Medicare and Medicaid numbers, allergies, advanced directives, power of attorney information, responsible party information, their contact information, attending physician, pharmacy, insurance information, and diagnoses.

300.   The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth ISNP.

301.   The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these illegally enrolled patients' care.

302.   The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

## 11. East Lake Arbor

303.   By way of further example, the UnitedHealth Defendants entered into a contract with East Lake Arbor located at 304 5th Avenue, Decatur, Georgia 30030.

304.   In order to obtain the opportunity to contract with the UnitedHealth Defendants, employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at East Lake Arbor to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants so that the UnitedHealth Defendants' employees could improperly target the patients or their responsible parties.

305.   Pursuant to these instructions, employees of East Lake Arbor also provided the UnitedHealth Defendants' employees with face sheets of its patients, including each patient's HIPAA-protected name, picture, date of birth, admission date, other information related to the

admission, information about qualifying hospital stays, social security number, Medicare and Medicaid numbers, allergies, advanced directives, power of attorney information, responsible party information, their contact information, attending physician, insurance information, and diagnoses.

306.    The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth ISNP .

307.    The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these illegally enrolled patients' care.

308.    The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### *12. Amara Healthcare*

309.    By way of further example, the UnitedHealth Defendants entered into a contract with Amara Healthcare located at 2021 Scott Road, Augusta, Georgia 30906.

310.    In order to obtain the opportunity to contract with the UnitedHealth Defendants, employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at Amara Healthcare to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants so that the UnitedHealth Defendants' employees could improperly target the patients or their responsible parties.

311.    Pursuant to these instructions, employees of Amara Healthcare also provided the UnitedHealth Defendants' employees with face sheets of its patients, including each patient's HIPAA-protected name, admission date, a code for "admitted from", address, date of birth, social security number, height, weight, primary physician, diagnoses, hospital stay(s), rehab potential, immunization record, insurance information, other service providers including their pharmacy,

dentist, hospital, podiatrist, responsible party, and their contact information. These were printed on June 19, 2017.

312.  The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth ISNP .

313.  The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these illegally enrolled patients' care.

314.  The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 13. Jonesboro Nursing and Rehabilitation Center LLC

315.  By way of further example, the UnitedHealth Defendants entered into a contract with Jonesboro Nursing and Rehabilitation Center LLC located at 2650 GA-138, Jonesboro, Georgia 30236.

316.  In order to obtain the opportunity to contract with the UnitedHealth Defendants, employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at Jonesboro Nursing and Rehabilitation Center LLC to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants so that the UnitedHealth Defendants' employees could improperly target the patients or their responsible parties.

317.  On December 19, 2017, the UnitedHealth Defendants met with Jonesboro Nursing & Rehab LLC (as it did on a regular basis with all facilities) to discuss the facility's performance. Notably, the facility's enrollments had recently dipped according to the Partner Business Review PowerPoint presentation James Rodgers and Tim Wilkes presented to the facility. Relator was present and observed firsthand this meeting. *See* Exhibit 5.

318.    According to the Partner Business Review, in July 2017, the facility had 31 residents enrolled in the ISNP for which UnitedHealth received monthly capitated payments under the Medicare Part C program.  By October 2017, the number of residents enrolled in the ISNP had dropped to 27 patients.  During the December 19, 2017 meeting, Rodgers and Wilkes pushed the facility to refer more patients to make up this difference.

319.    Relators observed Rodgers and Wilkes stressing how the facility could earn more money for these patients than under traditional Medicare since the ISNP did not require a 3-day qualifying stay in the hospital.

320.    Relator also observed Rodgers and Wilkes stress with the facility that by increasing the membership the facility would better be poised to absorb hospital admissions since the Admits/K would be easier to hit with additional enrolled patients.

321.    Rodgers specifically instructed the facility's leadership that they would need to provide lists of patients that they could refer to the ISNP.

322.    Pursuant to these instructions, employees of Jonesboro Nursing and Rehabilitation Center LLC provided at least two census lists printed on the very same day, December 19, 2017. These include each patient's name, room number, and other abbreviated information, including whether they were Medicaid patients.

323.    Pursuant to these instructions, employees of Jonesboro Nursing and Rehabilitation Center LLC also provided the UnitedHealth Defendants' employees with face sheets of its patients, including each patient's HIPAA-protected name, admission date, a code for "admitted from", date of birth, primary physician, diagnoses, hospital stay(s), vaccination records, billing information, including Medicare and Medicaid numbers, responsible party, and their contact information. These were printed on December 29, 2017, January 12, 2018, and January 26, 2018.

324.    For example, the responsible party for patient L.T. signed a Business Reply Card on February 1, 2018.  However, the nursing home, pursuant to Rodger's instructions, provided her face sheet on January 26, 2018, prior to obtaining the Business Reply Card giving consent for the nursing home to share this information with the UnitedHealth Defendants.  *See* Exhibit 5.

325.    The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth ISNP.

326.    The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these illegally enrolled patients' care.

327.    The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### *14. Abercorn Rehabilitation Center*

328.    By way of further example, the UnitedHealth Defendants entered into a contract with Abercorn Rehabilitation Center located at 11800 Abercorn Street, Savannah, Georgia 31419.

329.    In order to obtain the opportunity to contract with the UnitedHealth Defendants, employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at Abercorn Rehabilitation Center to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants so that the UnitedHealth Defendants' employees could improperly target the patients or their responsible parties.

330.    Pursuant to these instructions, employees of Abercorn Rehabilitation Center provided census lists dated March 21, 2018, April 9, 2018, April 19, 2018, June 7, 2018, and June 27, 2018.  These include each patient's name, room number, and payor.

331.    Pursuant to these instructions, employees of Abercorn Rehabilitation Center also provided the UnitedHealth Defendants' employees with face sheets of its patients, including each

patient's HIPAA-protected picture, name, admission date, "admitted from" information, date of birth, primary physician, diagnoses, hospital stay(s), Medicare and Medicaid numbers, responsible party, their contact information, and advanced directive information.  These were printed out throughout March, April, May, and June 2018.

332.  The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth ISNP .

333.  For example, the responsible party for patient D.G. signed an authorization form and a scope of sales appointment confirmation form both dated March 22, 2018.  However, the nursing home, pursuant to the UnitedHealth Defendants' instructions, printed out her face sheet on March 7, 2018, prior to obtaining her responsible party's consent.

334.  According to the OptumCare UnitedHealthcare Nursing Home Plan Active Members List, the UnitedHealth Defendants enrolled at least twenty patients at this facility in the UnitedHealth Special Needs Nursing Home Plans, including at least seventeen patients whose face sheets they improperly obtained.  Thus, Relator has firsthand knowledge that UnitedHealth submitted monthly claims for capitated payments associated with these patients' care.

335.  Further, Relator has firsthand knowledge and evidence that UnitedHealth illegally enrolled Patient S.G. (Room 011-A) into the ISNP and obtained tainted capitated payments for her care starting in or around April 2018.  *See* Exhibit 6.

336.  Likewise, has firsthand knowledge and evidence that UnitedHealth illegally enrolled Patient D.G. (Room 027-B) into the ISNP and obtained tainted capitated payments for her care starting in or around April 2018.  *See* Exhibit 7.

337.  The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these illegally enrolled patients' care.

338.    The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 15. Rosemont at Stone Mountain

339.    By way of further example, the UnitedHealth Defendants entered into a contract with Rosemont at Stone Mountain located at 5160 Springview Avenue, Stone Mountain, Georgia 30083.

340.    In order to obtain the opportunity to contract with the UnitedHealth Defendants, employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at Jonesboro Nursing and Rehabilitation Center LLC to provide patient lists and patients' PHI in the orange folder provided by the UnitedHealth Defendants so that the UnitedHealth Defendants' employees could improperly target the patients or their responsible parties.

341.    Pursuant to these instructions, Debra Watkins, Business Office Manager, provided a Resident Information Report printed on January 26, 2017.  The Resident Information Report contains HIPAA-protected PHI, including each patient's name, room number, admission date, insurance information (including Medicaid enrollment and hospice status), social security number, Medicare and Medicaid numbers, and date of birth.

342.    Further pursuant to these instructions, Jeffrey Williams, Admissions Coordinator, provided Midnight Census Worksheets printed on August 31, 2017, and October 26, 2017.  These worksheets include each patient's name, bed number, and Medicaid enrollment.

343.    Further pursuant to these instructions, employees of Rosemont at Stone Mountain provided the UnitedHealth Defendants' employees with face sheets of patients, including each patient's HIPAA-protected picture, room number, name, admission date, "admitted from" information, date of birth, social security number, attending physician, diagnoses, insurance

information, including Medicare and Medicaid numbers, pharmacy, address, responsible party, and their contact information.

344.   Jeffrey Williams was Relator's primary point of contact at this facility.  In exchange for his cooperation, Rodgers instructed Relator to provide food, coffee, and other items to Mr. Williams.  Relator submitted receipts for these reimbursements.  The UnitedHealth Defendants reimbursed Relator for these expenses without any question.  Not only did Mr. Williams and Rosemont at Stone Mountain provide the UnitedHealth Defendants with face sheets for its patients, but Mr. Williams also improperly made phone calls to residents and responsible parties on behalf of the UnitedHealth Defendants marketing their ISNP.

345.   The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth ISNP.

346.   The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these illegally enrolled patients' care.

347.   The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### 16. Traditions Health and Rehabilitation Center

348.   By way of further example, the UnitedHealth Defendants entered into a contract with Traditions Health and Rehabilitation Center located at 2816 Evans Mill Road, Lithonia, Georgia 30058.

349.   In order to obtain the opportunity to contract with the UnitedHealth Defendants, employees of the UnitedHealth Defendants, including James Rodgers, instructed employees at Traditions Health and Rehabilitation Center to provide patient lists and patients' PHI in the orange

folder provided by the UnitedHealth Defendants so that the UnitedHealth Defendants' employees could improperly target the patients or their responsible parties.

350.   Pursuant to these instructions, employees of Traditions Health and Rehabilitation Center provided a Resident Directory list printed on May 23, 2018.  The Resident Directory list includes each patient's name and room number.  *See* Exhibit 8.

351.   Pursuant to these instructions, employees of Traditions Health and Rehabilitation Center also provided the UnitedHealth Defendants' employees with face sheets of its patients, many of which included each patient's HIPAA-protected name, picture, address, date of birth, social security number, "admitted from" information, admission date, responsible party information and their contact information, attending physician, diagnoses, and insurance information.  These were printed on May 23, 2018, June 14, 2018, and June 19, 2018.  *See* Exhibits 9, 10, and 11.

352.   The UnitedHealth Defendants used this information to improperly directly solicit nursing home patients and as a result, enrolled patients in the UnitedHealth ISNP.

353.   By way of example, Relator has firsthand knowledge and documentary evidence establishing that the UnitedHealth Defendants enrolled the following patients shortly after their illegal marketing and solicitation efforts in May – June 2018:  Patient J.G. (enrolled in the ISNP effective 6/1/2018); Patient A.J. (enrolled in the ISNP effective June 1, 2018); and patient P.W. (enrolled in the ISNP effective June 1, 2018).  *See* Exhibit 12.

354.   The UnitedHealth Defendants submitted claims to Medicare for the capitated payments associated with these illegally enrolled patients' care.

355.   The UnitedHealth Defendants also submitted claims to Georgia Medicaid for payment of the Medicaid members' premiums.

### H. *Defendants Knew Their Illegal Marketing and Kickback Schemes Were Unlawful*

356.   The UnitedHealth Defendants' own Training Book states, "Due to MIPPA regulations, the SNF cannot share information [from a census review] with you but it can help guide them when informing residents and RPs about the availability of our plan."  ISNP and IESNP Agent Training Book, Sales Account Manager at 100.

357.   The Training Book states, "Lead generation is an essential step in keeping our membership intact.  Without leads, there can be no enrollments."  Training Book at 92.

358.   "Every interaction we have with potential members and their RPs is guided by CMS regulations known as MIPPA.  MIPPA is the Medicare Improvement Act for Patients and Providers Act of 2008.  It determines how we are able to communicate with a potential member or their RP.  Medicare recipients are considered to be a vulnerable population and CMS regulations restrict us from soliciting without consent.  Many of these guidelines are designed to protect seniors."  Training Book at 94.

359.   "The MMGs (Medicare Marketing Guidelines) were created to ensure that aggressive, misleading or fraudulent activities do not occur with this vulnerable population.  The guidelines are direct and prescriptive in terms of what can and can't be done…"  Training Book at 178.

360.   "A resident or their responsible party's (RP) written consent to contact is required **prior** to any outreach.  No conversations about the plan can occur without one of the following:

- The resident or RP approaches the sales professional (SAM, SIM SAC, etc.) or places a call to the plan or one of the individuals operating in a sales capacity. …

- The resident or RP completes a business reply card (BRC).  Authorization for Disclosure of Contact Information (ADCI or former MIPPA) or other CMS approved consent to contact form.

- The resident is confirmed to be a member of a UnitedHealthcare Product.

Training Book at 179.

361.    Thus, Defendants knew their illegal marketing scheme was unlawful.

362.    Furthermore, Defendants' instructions, including James Rodgers' instructions, not to date the consent to contact forms obtained after the unsolicited contact was made and his instruction not to refer to the face sheets illegally obtained by name are further evidence of Defendants' knowledge of the illegality of their scheme.

363.    In addition, the sophisticated healthcare professionals working at the UnitedHealth Defendants also had knowledge of the requirements of the AKS.

364.    This is why the Training Book makes clear that although there are many financial incentives for a SNF to want its members to sign up for the UnitedHealth Defendants' ISNPs, "[i]t is important that we never say or imply that a SNF be guaranteed to make more money with Optum," *id.* at Section 5, Page 45.

### I.    *Claims for Medicare Part C Capitated Payments and Premiums Paid by Medicaid were False*

365.    Defendants submitted and caused the submission of claims for payment to Medicare and Medicaid that were false claims because they were tainted by the foregoing kickback and illegal marketing schemes.

366.    False claims for the capitated payments were submitted and caused to be submitted to Medicare Part C by the UnitedHealth Defendants for illegally enrolled patients, including the representative patients identified by name and facility above, as a direct and proximate result of the marketing violations and kickbacks provided by the UnitedHealth Defendants as alleged herein.

367.    Compliance with the marketing regulations and legal requirements related to marketing ISNPs is material to the government's payment decision.  These regulations and legal

requirements go to the very essence of the Medicare bargain – safeguarding vulnerable patients from being illegally recruited into Part C plan in the first place is essential; what triggers the payment of the capitated payment claim and the corresponding Medicaid premium is the patient's enrollment in the ISNP, an enrollment that would not have occurred without the illegal marketing.

368.    Furthermore, noncompliance with the AKS "'is a bar to the receipt of payments", a violation 'can form the basis of liability under the [FCA] for past Medicare payments attributable to the violations." *United States ex rel. Heller v. Guardian Pharmacy of Atlanta, LLC*, Civil Action No. 1:18-cv-03728-SDG at 82 (N.D. Ga. Sept. 30, 2023) (citing *Bingham v. HCA, Inc.*, 783 F. App'x 868, 871 (11th Cir. 2019). *See also United States ex rel. McNutt v. Haleyville Medical Supplies*, 423 F.3d 1256, 1257-59 (11th Cir. 2015) (holding that an Anti-Kickback Statute violation establishes the falsity of a corresponding claim for government reimbursement).

369.    Additionally, Congress enacted the 2010 amendment to the AKS to establish that claims are false as a matter of law when they include items resulting from a violation of the AKS. *See also* 42 U.S.C. §1320a-7b(g) ("[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim."). The Defendants submitted and caused to be submitted claims that were false because they were tainted by the unlawful marketing and kickback scheme described above, and they included services resulting from violations of the AKS. *See* 42 U.S.C. §1320a-7b(g).

370.    A violation of the FCA also "arises if a defendant 'certifies compliance with laws and regulations concerning proper practices for medical providers… when in fact those claims are for services that were provided in violation of those rules." *Id.* (citing *Barker ex rel. United States v. Columbus Reg'l Healthcare Sys.*, Inc., 977 F. Supp. 2d 1341, 1344 (M.D. Ga. 2013) (citing *McNutt*, 432 F.3d at 1259-60).

371.    The Chief Executive Officers or Chief Financial Officers of the UnitedHealth Defendants, or someone with delegated authority to sign on their behalf, implicitly and expressed certified "that each enrollee for whom the organization is requesting payment is validly enrolled in an MA plan offered by the organization and the information relied upon by CMS in determining payment … is accurate, complete, and truthful."  *See* 42 C.F.R. § 422.504(l).  Furthermore, they certified in their contract with CMS to provide services in compliance with the AKS.

372.    The Medicare Part C program relied on the truth of those certifications when they paid UnitedHealth's claims for capitated payments.  But its certifications were false when the enrollees were illegally marketed to and enrolled in the ISNP and when the UnitedHealth Defendants provided illegal remuneration to the referring Skilled Nursing Facilities in violation of the AKS.

**J. The UnitedHealth Defendants Fraudulently Induced CMS to Enter into Part C Contracts.**

373.    MAOs, like UnitedHealth Defendants, must resubmit their Medicare Advantage bids and complete applications to the government annually to participate in the Part C program. 42 U.S.C. § 422.504(a)(10) (annual); 42 C.F.R. § 422.501(c) (MAO must "fully complete all parts of a certified application").

374.    Thus, every year, the UnitedHealth Defendants were required to submit an application to the government in which the UnitedHealth Defendants made certifications and promises regarding adherence to all marketing regulations and guidance, and compliance with federal laws designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to the FCA and the AKS. *See* 4.5 Part C Application Certification, Section 3 ("I agree that if my organization meets the minimum qualifications, is Medicare-approved, and my organization enters into a Part C contract with CMS, I will abide by the requirements contained in Section 3 of this

Application and provide the services outlined in my application."); *see also* Section 3.10.1 ("Applicant agrees to adhere to all marketing requirements in 422.2260 through 422.2276 and Medicare Communications and Marketing Guidelines.").

375.    The UnitedHealth Defendants had to make such annual certifications in order to qualify for their Part C contract with the government and to begin receiving capitated payments.

376.    The government relied on the information supplied in UnitedHealth Defendants' application in determining whether the UnitedHealth Defendants could participate in the Part C program. 42 C.F.R. § 422.502(a)(1) ("With the exception of evaluations conducted under paragraph (b), of this section, CMS evaluates an application for an MA contract or for a Specialized MA Plan for Special Needs Individuals solely on the basis of information contained in the application itself and any additional information that CMS obtains through other means such as on-site visits").

377.    The UnitedHealth Defendants made false certifications and promises to the government through their annual applications in order participate in Part C. More specifically, as is explained throughout this Amended Complaint, the UnitedHealth Defendants knew its promises and certifications related to compliance with federal laws (including the AKS and FCA) and Medicare's marketing regulations were false and fraudulent.

378.    In reality, the UnitedHealth Defendants knew of its systemic and ongoing violations of these provisions and made these promises and certifications to the government in their annual applications with no present intent to comply with the same.

379.    The UnitedHealth Defendants' false certifications deceived the government into entering into contracts it would not have entered, and into paying claims that the government would not have been paid.

380.    Had the government known of the UnitedHealth Defendant's false certifications and promises that it would comply with the FCA, the AKS, and Medicare's marketing rules and regulations, the government would not have agreed to the contract with the UnitedHealth Defendants and would not have paid UnitedHealth Defendants monies thereunder.  Thus, the UnitedHealth Defendants' yearly contract with CMS was a result of fraudulent inducement.

**COUNT ONE**
**SCHEME TO SUBMIT FRAUDULENT CLAIMS**
**(31 U.S.C. § 3729(a)(1)(A))**

381.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

382.    By virtue of the acts alleged herein, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A), by submitting claims for Medicare Part C payments for beneficiaries enrolled as the result of illegal marketing tactics and whose PHI was wrongfully obtained in exchange for remuneration provided to facilities by Defendants.

383.    By virtue of the acts alleged herein, ill-gotten gains from the aforementioned presentation of false or fraudulent claims for payment or approval have been distributed to the UnitedHealth Defendants.

384.    As a result of UnitedHealth Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to penalties for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

**COUNT TWO**
**FALSE RECORDS FOR PAYMENT**
**(31 U.S.C. § 3729(a)(1)(B))**

385.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

386.    By virtue of the acts alleged herein, Defendants made or used false records or statements representing that Defendants were compliant with the regulations related to the marketing of Medicare Advantage plans, HIPAA, and the AKS.  All such false records or statements were knowingly made and material to the false or fraudulent claims paid or approved by the Government.

387.    Defendants thus knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the Government.

388.    As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to penalties for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT THREE
## FRAUDULENT INDUCEMENT
### (31 U.S.C. § 3729)

389.    All allegations set forth in this Complaint are incorporated in this Count as if fully set forth herein.

390.    The Defendants fraudulently induced the government to enter into annual Part C contracts with the UnitedHealth Defendants.

391.    As set forth herein, the UnitedHealth Defendants made false and fraudulent misrepresentations and promises in its applications starting in 2017 at the latest in order to participate in Medicare Part C. Namely, the UnitedHealth Defendants falsely certified compliance with Medicare's marketing rules and federal law, including, the FCA and AKS. These certifications and promises were false at the time they were made.

392.   The UnitedHealth Defendants knew that it was required to make such certifications and promises in order to participate in Part C and that its annual application would have been rejected by the government if it failed to make such certifications and promises.

393.   Every request for payment submitted by the UnitedHealth Defendants pursuant to these fraudulently induced contracts are false and tainted due to UnitedHealth Defendants' fraud in the inducement.

394.   As a result of the UnitedHealth Defendants' acts. the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to penalties for each and every violation of 31 U.S.C. § 3729 arising from the UnitedHealth Defendants' unlawful conduct as described herein.

## COUNT FOUR
## REVERSE FCA CLAIM
## (31 U.S.C. § 3729(a)(1)(G))

395.   All allegations set forth in this Complaint are incorporated in this Count as if fully set forth herein.

396.   As a Part C Medicare participant, the Defendants had an obligation to report and return Medicare overpayments within 60 days after the overpayments are identified.  42 U.S.C. § 1320a-7k.

397.   The payments that the Defendants received on account of the AKS violations and violations of Medicare's marketing rules described in this Amended Complaint, are overpayments within the meaning of 42 U.S.C. § 1320a-7k.

398.   The Defendants have long had notice with respect to such overpayments and have failed to report and return the same to the government within 60 days.

399.   As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled

to penalties for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

**COUNT FIVE**
**FALSE CLAIMS CONSPIRACY**
**(31 U.S.C. § 3729(a)(1)(C))**

400.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

401.    Defendants entered into a conspiracy or conspiracies through their employees and others to defraud the United States by submitting and obtaining approval and payment for false and fraudulent claims for Medicare Part C payments.

402.    As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to penalties for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

**COUNT SIX**
**GEORGIA FALSE MEDICAID CLAIMS ACT**
**(O.C.G.A. §§ 49-4-168, *et seq.*)**

403.    All of the preceding allegations contained in this Complaint are hereby incorporated by reference as if fully set forth herein.

404.    By virtue of the acts alleged herein, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Georgia Medicaid Program for payment or approval of Medicare Part C premiums for members improperly solicited by the UnitedHealth Defendants and whose PHI was wrongfully obtained and for claims tainted by violations of the AKS.

405.    By virtue of the acts alleged herein, Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Georgia Medicaid Program to approve and pay such false and fraudulent claims.

406.   By virtue of the acts alleged herein, Defendants conspired to violate the Georgia FMCA and to defraud the Georgia Medicaid Program by getting a false or fraudulent claim allowed or paid.

407.   The Georgia Medicaid Program, unaware of the falsity of the records, statements and claims made, used, presented, or caused to be made, used, or presented by Defendants, paid and continues to pay Medicare Part C premiums for its members enrolled in the UnitedHealth Defendants' ISNP that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

408.   By reason of Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.  Pursuant to O.C.G.A. § 49-4-168.1(a), the State of Georgia is entitled to three times the amount of actual damages plus civil penalties for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, on each of these claims, Relator prays for judgment against Defendants:

(a)    Awarding the United States treble damages sustained by it for each violation;

(b)    Awarding the United States a maximum civil penalty for each violation;

(c)    Awarding the State of Georgia treble damages sustained by it for each violation;

(d)    Awarding the State of Georgia civil penalties for each violation;

(e)    Awarding Relator the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act and O.C.G.A. § 49-4-168.2 of the Georgia False Medicaid Claims Act of the proceeds of this action or any alternate remedy or the settlement of any such claim;

(f)     Awarding Relator be awarded all costs and expenses of this action, including

attorneys' fees as provided by 31 U.S.C. § 3730(d), O.C.G.A. § 49-4-168.2, and

any other applicable provision of the law;

(g)     Awarding the plaintiffs pre- and post-judgment interest on the awards ordered

herein; and

(h)     Granting such other and further relief as the Court may deem to be just and

proper.

## **<u>DEMAND FOR JURY TRIAL</u>**

Relator hereby demands a trial by jury as to all issues so triable.

Respectfully submitted this 30th day of July, 2024.

*/s/ Charles W. Byrd*
CHARLES W. BYRD
Georgia Bar No. 100850

*/s/ J. Thomas Clarkson*
J. THOMAS CLARKSON
Georgia Bar No. 656069
PATRICK J. SCHWEDLER
Georgia Bar No. 812312

GRIFFIN DURHAM TANNER & CLARKSON
5400 Riverside Drive, Suite 205
Macon, GA 31210
cbyrd@griffindurham.com
tclarkson@griffindurham.com
pschwedler@griffindurham.com
478-910-2559

*/s/ Elizabeth White*
ELIZABETH S. WHITE
Georgia Bar No. 258844

LAW OFFICE OF ELIZABETH WHITE LLC
3715 Northside Pkwy NW, Bld. 100, Ste. 500
Atlanta GA, 30327
liz@lizwhitelaw.com
404-941-8289

*/s/ Jason Marcus*
JASON MARCUS
Georgia Bar No. 949698
JULIE BRACKER
Georgia Bar No. 073803

BRACKER & MARCUS LLC
3355 Lenox Road, Suite 660
Atlanta, GA 30326
(770) 988-5035
Jason@fcacounsel.com
Julie@fcacounsel.com

*Counsel for Plaintiff-Relator*