**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA and the STATE OF GEORGIA *ex rel.* BROOK GONITE,**<br><br>         **Plaintiffs,**<br><br>    **v.**<br><br>**UNITEDHEALTHCARE OF GEORGIA, INC., et al.,**<br><br>         **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **CIVIL ACTION NO. 5:19-cv-246 (MTT)**<br>)<br>)<br>)<br>)<br>) |

## <u>ORDER</u>

In this action under the False Claims Act ("FCA"), 31 U.S.C. § 3729, and the Georgia False Medicaid Claims Act ("GFMCA"), O.C.G.A. § 49-4-168, Defendants UnitedHealthcare of Georgia, Inc., UnitedHealth Group, Inc., United Healthcare Services, Inc., UnitedHealthcare, Inc., Optum, Inc., and Optum Services, Inc. move to dismiss Relator Brook Gonite's amended complaint (Doc. 52) on the grounds that (1) the FCA is unconstitutional and (2) Gonite fails to state a claim.  Doc. 69-1.  For the following reasons, the defendants' motion (Doc. 69) is **DENIED in part** and **GRANTED in part**.

## I. BACKGROUND

### A. Medicare Part C or "Medicare Advantage"

The Medicare Program consists of four parts: Part A covers inpatient care, Part B covers outpatient care, Part C is the Medicare Advantage Program, and Part D covers prescription drugs.  Doc. 52 ¶ 1.  If a Medicare beneficiary chooses to be covered under what is commonly referred to as "traditional" Medicare (Parts A and B), then the Centers

for Medicare and Medicaid Services ("CMS") reimburse healthcare providers for services rendered to the beneficiary via submission of claims, which is known as a fee-for-service payment system.  *Id*.  If instead, a Medicare beneficiary chooses to enroll in a Medicare Advantage plan managed by a private insurance company operating as a Medicare Advantage Organization ("MAO"), CMS pays the Medicare Advantage plan a set capitation payment for the complete care of the beneficiary, starting as soon as the beneficiary enrolls.  *Id*.  This model is known as "value-based care."  Doc. 69-1 at 11 n.3.  Institutional Special Needs Plans ("ISNPs") are a type of Medicare Advantage plan designed for full-time nursing home residents.  *Id*. at 9.

**B. The Parties**

Defendant UnitedHealth Group, Inc. is the parent company of the other defendants in this action.  Doc. 52 ¶ 25.  UnitedHealth Group offers a broad spectrum of products and services through two distinct primary direct corporate subsidiaries: (1) UnitedHealthcare, Inc., a health benefits (i.e., insurance) company; and (2) Optum, Inc., a health services company.  *Id*.  Both companies have direct and indirect subsidiaries of their own.  *Id*.  Accordingly, UnitedHealth Group's direct or indirect subsidiaries, including the other defendants in this action, offer its healthcare insurance products (including those under Medicare Part C) and manage its Medicare Advantage plans.  *Id*. ¶¶ 25-29.  The Court refers to the defendants collectively as "United."

The relator, Brook Gonite, is a former Georgia-licensed insurance agent and Sales Implementation Manager.  Doc. 52 ¶ 21.  Gonite was employed by United from approximately June 2015 to August 2018.  *Id*.  During his employment, Gonite was responsible for executing new facility implementation plans to sell United's ISNP in

skilled nursing facilities ("SNFs") throughout Georgia.  *Id*.  Gonite alleges that from

2016, when he began reporting to former Director of Sales James Rodgers, until his

termination in August 2018, he personally witnessed and gained direct and independent

knowledge forming the basis of the allegations in the complaint.  *Id*. ¶¶ 21, 23, 174.

## C. Gonite's Allegations

Gonite alleges that United generated fraudulent Medicare Part C business at the

Government's expense by using illegal means to solicit and enroll vulnerable, elderly

patients for its INSP and by paying kickbacks to SNFs to obtain illegal referrals of their

residents to the ISNP.  Doc. 52 ¶ 2.  Gonite asserts two closely related fraudulent

schemes under the FCA: (1) to enroll SNF patients in its ISNP, United engaged in

marketing activities that violated Medicare marketing regulations and HIPAA; and (2)

United offered or paid kickbacks to SNFs for the purpose of inducing referrals to

United's ISNP in violation of the Anti-Kickback Statute ("AKS").  *Id*. ¶¶ 381-388.  Gonite

also asserts a reverse false claim, a fraudulent inducement claim, a state law claim, and

a conspiracy claim based on the same fraudulent schemes.  *Id*. ¶¶ 389-408.

## D. Procedural Summary

On June 19, 2019, Gonite filed a complaint under seal.  Docs. 1–3.  The United

States ("Government") and the State of Georgia declined to intervene.  Docs. 44; 45.

On April 1, 2024, the complaint was unsealed and ordered to be served on the

defendants.  Doc. 46.  On June 7, 2024, Gonite moved to file an amended complaint.

Doc. 48.  The Court granted the request.  Doc. 51.  United moved to dismiss the

amended complaint in its entirety, arguing that the *qui tam* provision of the FCA violates

the United States Constitution and the amended complaint fails to state a claim.  Doc.

69-1.  The Government filed a Statement of Interest and response brief opposing the motion to dismiss.  Docs. 76; 77.

## II. STANDARD

The Federal Rules of Civil Procedure require that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  To avoid dismissal pursuant to Rule 12(b)(6), a complaint must contain sufficient factual matter to "'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  A claim is facially plausible when "the court [can] draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  "Factual allegations that are merely consistent with a defendant's liability fall short of being facially plausible."  *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (internal quotation marks and citations omitted).

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."  *FindWhat Inv'r Grp. v. FindWhat.com.*, 658 F.3d 1282, 1296 (11th Cir. 2011) (internal quotation marks and citations omitted).  But "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal."  *Wiersum v. U.S. Bank, N.A.,* 785 F.3d 483, 485 (11th Cir. 2015) (internal quotation marks and citation omitted).  The complaint must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 555 (internal quotation marks and citation omitted).  Where there are dispositive issues of law, a court may dismiss a claim regardless of the alleged facts.  *Patel v.*

*Specialized Loan Servicing, LLC*, 904 F.3d 1314, 1321 (11th Cir. 2018) (citations omitted).

"The FCA is designed to protect the Government from fraud by imposing civil liability and penalties upon those who seek federal funds under false pretenses." *United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 600 (11th Cir. 2014). "As an enforcement mechanism, the FCA includes a *qui tam* provision under which private individuals, known as relators, can sue 'in the name of the Government' to recover money obtained in violation of § 3729." *United States ex rel. Bibby v. Mortg. Invs. Corp.,* 987 F.3d 1340, 1343 (11th Cir. 2021), *cert. denied sub nom. Mortg. Invs. Corp. v. United States ex rel. Bibby*, 141 S. Ct. 2632 (2021). "In an action under the False Claims Act, Rule 8's pleading standard is supplemented but not supplanted by Federal Rule of Civil Procedure 9(b)." *Urquilla-Diaz v. Kaplan Uni.*, 780 F.3d 1039, 1051 (11th Cir. 2015).

Rule 9(b) requires that the relator "must state with particularity the circumstances constituting fraud" but may generally allege scienter. *Id. See* Fed. R. Civ. P. 9(b); *United States ex rel. Clausen v. Lab. Corp. of Am*., 290 F.3d 1301, 1308 (11th Cir. 2002). To meet Rule 9(b)'s particularity requirements, a relator must plead "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants allegedly fraudulent acts, when they occurred, and who engaged in them." *U.S. ex rel. Clausen v. Lab'y Corp. of America, Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002) (cleaned up). "Liability under the False Claims Act arises from the submission of a fraudulent claim to the [G]overnment, not the disregard of government regulations or failure to maintain proper internal policies." *Corsello v. Lincare, Inc.,* 428 F.3d 1008,

1012 (11th Cir. 2005) (citation omitted).  "Indeed, the 'central question' regarding whether a relator's allegations state a claim under [§ 3729(a)(1)] is, did the defendant present (or caused to be presented) to the government a false or fraudulent claim for payment?"  *Urquilla-Diaz*, 780 F.3d at 1052 (quoting *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1326 (11th Cir. 2009)).

### III. DISCUSSION

**A. Constitutionality of the *qui tam* provision of the FCA**

*1. The* qui tam *provision does not violate the Appointments Clause*

United asserts that "an 'Officer of the United States' is an 'appointee [of the President] [who] exercise[es] significant authority pursuant to the laws of the United States' and who occupies a 'continuing position established by law.'"  Doc. 69-1 at 17-18 (citing *Buckley v. Valeo*, 424 U.S. 1, 126 (1976)).  United argues that an FCA relator "is an 'Officer of the United States' under this test because he or she (1) exercises significant authority due to the possession of 'civil enforcement authority on behalf of the United States'; and (2) occupies a continuing position due to the relator's 'statutory duties, powers, and emoluments [prescribed by the FCA].'"  *Id.*  Thus, United concludes, Gonite cannot proceed in this suit because he is not an "Officer" of the United States.[1] *Id.*

*Qui tam* relators are not officers under the Appointments Clause.  Supreme Court precedent requires an "officer" to have "tenure, duration, emolument, and duties [that

---

[1] United urges the Court to follow the Middle District of Florida's recent decision in *United States ex rel. Zafirov v. Fla. Med. Assocs., LLC,* 751 F. Supp. 3d 1293 (M.D. Fla. Sept. 30, 2024), which dismissed a *qui tam* action on the ground that the relator was an improperly appointed officer of the United States.  Doc. 83 at 6.  *Zafirov* is currently on appeal at the Eleventh Circuit.  *United States ex rel. Zafirov*, Case No. 24-13581 (11th Cir.).

are] continuing and permanent, not occasional or temporary." *United States v. Germaine*, 99 U.S. 508, 511-12 (1878); *see Auffmordt v. Hedden*, 137 U.S. 310, 327 (1890) ("His position is without tenure, duration, continuing emolument, or continuous duties, and he acts only occasionally and temporarily.  Therefore, he is not an 'officer' within the meaning of the clause of the constitution referred to.").  United's extensive briefing overlooks this precedent.[2]

Gonite's duties are temporary and not continuous.  His authorization to litigate under the FCA is not permanent and his position only exists for the duration of the lawsuit.  *See Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757-58 (5th Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994).  He wields no governmental power and enjoys no governmental benefits.  *Id*.  "Instead, the Government restricts [his] power as [a] civil litigant[]: the Government can intervene, monitor and limit discovery, and settle the action without relator['s] consent."  *United States ex rel. Wallace v. Exactech, Inc.*, 703 F. Supp. 3d 1356, 1364 (N.D. Ala. 2023) (citing 31 U.S.C. § 3730).  The Eleventh Circuit has recognized that a *qui tam* relator "in effect, su[es] as a partial assignee of the United States."  *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1086 (11th Cir. 2018) (citing *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 n.4 (2000)) (emphasis omitted).  Thus, Gonite is not an "officer" and the *qui tam* provision does not violate the Appointments Clause.

---

[2] Moreover, while United purports to argue that *Buckley* establishes a more expansive definition of "officer," the United States Supreme Court in *Buckley* expressly relied on both *Auffmordt* and *Germaine* and made clear that its holdings should be read in conformity with those prior decisions.  *Buckley*, 424 U.S. at 126 n.162.  Thus, *Buckley* did not overrule *Auffmordt* and *Germaine*.

*2. The* qui tam *provision does not violate the Take Care Clause*

United maintains that the Take Care Clause "grants the President the 'exclusive authority' to determine whether to commence civil action on the government's behalf." Doc. 69-1 at 19 (citing *United States v. Nixon,* 418 U.S. 683, 693 (1974)).  Thus, "'[t]he President must exercise 'sufficient control' over the government's litigation.'"  *Id*. (citing *Morrison v. Olson*, 487 U.S. 654, 696 (1988).  United argues that "[b]ecause the FCA's *qui tam* provision permits relators to maintain primary control over litigation on the government's behalf, the *qui tam* provision violates the Take Care Clause."  *Id*.

First, the Take Care Clause does not unequivocally convey to the President exclusive authority to initiate any type of litigation against the United States.  *See Riley,* 252 F.3d at 753.  United relies on dicta in *Nixon* for this proposition.  418 U.S. at 693. Rather, the Take Care Clause directs the President to "take Care that the Laws be faithfully executed."  U.S. Const., art. II, § 3.  And on the matter of control, the Eleventh Circuit has recognized that the United States possesses "substantial control" over non-intervened FCA *qui tam* actions.  *See Yates v. Pinellas Hematology & Oncology P.A.*, 21 F.4th 1288, 1310-11 (11th Cir. 2021) (citing *Riley,* 252 F.3d at 753); *Hunt,* 887 F.3d at 1086 (describing the control mechanisms at the government's disposal when a relator brings an FCA action); 31 U.S.C. § 3730.  The *qui tam* provision does not violate the Take Care Clause.

In sum, while the Eleventh Circuit has not yet weighed in on the constitutionality of the *qui tam* provision, the current state of the law compels the conclusion that the *qui tam* provision is constitutional.

**B. Gonite plausibly pleads violations of 31 U.S.C. § 3729(a)(1)(A), (B)**

Gonite's primary FCA claims are set forth in Counts I and II.  Doc. 52 ¶¶ 381-388.

Count I alleges that United "knowingly presented or caused to be presented false or

fraudulent claims for payment or approval … by submitting claims for Medicare Part C

payments on behalf of beneficiaries enrolled as the result of illegal marketing tactics

[and AKS violations] [3] and whose personal health information (PHI) was wrongfully

obtained in exchange for remuneration provided to facilities by [United]."  *Id.* ¶¶ 381-384

(citing 31 U.S.C. § 3729(a)(1)(A)).  Count II alleges that United "knowingly made or

used a false record or statements representing that [United was] compliant with the

regulations related to the marketing of Medicare Advantage plans, HIPAA, and the

AKS."  *Id*. ¶¶ 385-388 (citing 31 U.S.C. § 3729(a)(1)(B)).

United argues that Gonite fails to state a claim on Counts I and II because he

fails to plead with particularity: (1) presentment of a claim; (2) falsity; (3) materiality; and

(4) scienter.  *See generally* Doc. 69-1.  United further argues that, regarding the AKS-

based FCA claims in Counts I and II, Gonite fails to plead an AKS violation because he

does not sufficiently allege (1) remuneration to induce referrals; (2) referrals; (3) claims

that resulted from the alleged kickbacks; and (4) that United acted knowingly and

willfully.  *Id*.  Because those claims fail, United argues that Gonite's remaining FCA and

FCA-based claims fail.  *Id*.

*1. Gonite plausibly pleads presentment of a claim*

United argues that Gonite fails to plead sufficient facts to support his allegation

that "[United] submitted claims to Medicare."  Doc. 69-1 at 13-14.  Under Rule 9(b), a

---

[3] Count I does not mention the AKS, but the complaint read as a whole makes clear that AKS violations are part of Gonite's claim under § 3729(a)(1)(A).  Counsel confirmed this at the motion hearing.

Relator must have "some indicia of reliability … to support the allegation of an actual false claim for payment being made to the Government." *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002); *see United States ex rel. 84Partners, LLC v. Nuflo, Inc.*, 79 F.4th 1353, 1360 (11th Cir. 2023) ("Standing alone, a fraudulent scheme, no matter how egregious, is not enough; there must be an actual false claim."). A court evaluates whether a relator has sufficiently alleged presentment of a false claim on a "case-by-case basis." *Atkins v. McInteer,* 470 F.3d 1350, 1358 (11th Cir. 2006).

Here, Gonite relies on his alleged direct, first-hand knowledge of United's submission of false claims gained through his employment. Specifically, Gonite alleges that on November 9, 2017, he personally observed Director of Sales James Rodgers instruct Oceanside Nursing & Rehab[4] personnel to provide a list of current residents and their HIPAA-protected information. Doc. 52 ¶¶ 226, 227. Gonite further alleges that, based on his first-hand knowledge, United "used this information to improperly solicit nursing home patients" and "at least 16 patients at Oceanside enrolled." *Id*. ¶¶ 230, 231.

United contends that these allegations do not provide a sufficient indicia of reliability to establish presentment, arguing that Gonite's failure to provide a "'copy of a [] bill'" or "'policies about billing or even second-hand information about billing practices'" warrants dismissal of his claim. Doc. 69-1 at 22 (citing *United States ex rel. 84Partners, LLC v. Nuflo, Inc.,* 79 F.4th 1353, 1361 (11th Cir. 2023) (internal citations omitted)). But "Rule 9(b) does not always require documentary proof at the pleading stage. A relator

---

[4] Oceanside is one of sixteen SNFs cited by Gonite as specific examples of United's fraudulent schemes.

can satisfy the rule by other means—so long as he still pleads the submission of a claim with 'sufficient indicia of reliability.'" *Vargas ex rel. Alvarez v. Lincare, Inc.,* 2025 WL 1122196 at *4 (11th Cir. 2025) (citing *Atkins*, 470 F.3d at 1357-58).  And this argument ignores the structure of Medicare Part C and Gonite's allegations based on first-hand knowledge of billing practices.

In the typical healthcare FCA case, the scheme involves a fraudulent service for which a bill, or claim, is later presented.  *See, e.g., United States ex rel. Atkins v. McInteer,* 470 F.3d 1350, 1354 (11th Cir. 2006); *Corsello v. Lincare, Inc.,* 428 F.3d 1008, 1011 (11th Cir. 2005); *United States ex. rel. Sanchez v. Lymphatx, Inc.,* 596 F.3d 1300, 1302 (11th Cir. 2010) (claims seeking reimbursement for medical services never rendered to the patient).  Those cases often have "presentment" issues because the relator has firsthand knowledge of the service, and thus knows of the fraud, but he has no knowledge of the billing for that service.  In this typical scenario, which also arises outside the healthcare context as illustrated in *84Partners*, there are multiple steps in the scheme between the fraudulent service and the presentment of a claim for that service.  *84Partners*, 79 F.4th at 1361-62 (explaining that "underlying improper practices, even if fraudulent and so widespread as to constitute standard operating procedure, are not enough; a complaint must allege with particularity a *connection* between those practices and one or more actual claims.") (emphasis added).

Claims presented under Medicare Part C are different.  "Unlike traditional Medicare, where a patient could be enrolled in Medicare but not receive any services [and thus no bill is presented], … once a patient is enrolled in a Medicare Part C plan and the MAO provider (such as United) certifies that the enrollee is validly enrolled, the

Government begins paying monthly capitated payments to the MAO for the enrolled beneficiary." Doc. 74 at 10. Thus, each enrollment triggers an automatic capitated payment from CMS. In short, enrollment constitutes presentment of a claim. *See United States v. Health Mgmt. Assocs*., 591 Fed. App'x. 693, 708 (11th Cir. 2014) ("[T]he type of fraud alleged here does not depend as much on the particularized medical or billing content of any given claim form…. [T]he type of medical service rendered and described in that interim claim, the billing code, or what was charged for that service are not the underlying fraudulent acts.").

Here, Gonite essentially alleges a fraudulent bill, not a fraudulent service for which a bill was later presented. He alleges personal involvement with and knowledge of fraudulent conduct to concoct that bill, i.e., an enrollment. *See* Doc. 52 ¶¶ 226-233. As a practical matter, Gonite alleges that he helped put the bills together for SNF residents whose HIPAA-protected information United improperly obtained—he personally participated in meetings where Rodgers asked SNF personnel to provide residents' protected information, and the SNFs complied, to facilitate enrollments. *Id*. ¶ 226-27. He alleges that he knows the bills he helped concoct were presented because the patients were enrolled, and thus the bills were paid. *Id*. ¶¶ 230-233. There are no steps of consequence, and therefore no "gaps," between what Gonite knows and the presentment of a claim. *Compare 84Partners*, 79 F.4th at 1362. Gonite has sufficiently alleged the "time, place, and substance of the alleged fraud, specifically the details of the defendants allegedly fraudulent acts, when they occurred, and who engaged in them." *Clausen,* 290 F.3d at 1310.

The same reasoning applies to claims tainted by AKS violations.  Putting the actual AKS violations at Oceanside aside and focusing solely on presentment, Gonite alleges, based on his personal knowledge, that residents at Oceanside enrolled.  Doc. 52 ¶¶ 230-233.  Again, the Court need not rely on "mathematical guesswork" to conclude that claims were submitted to Medicare.  *See Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1277 (11th Cir. 2018).  Each enrollment of an Oceanside resident was the presentment of a claim and Gonite participated in the presentment of that claim.

Gonite has plausibly pled presentment.

*2. Gonite plausibly pleads falsity*

An FCA relator must allege that the claims at issue are false—for example, that an "entity fails to comply with statutory, regulatory, or contractual requirements but certifies that it has complied with them."  *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1299 (11th Cir. 2021).  A legal falsity may be based on either an express or an implied certification.  *See Urquilla-Diaz*, 780 F.3d at 1045; *Ruckh v. Salus Rehab., LLC,* 963 F.3d 1089, 1103 (11th Cir. 2020).  United contends that Gonite has not sufficiently alleged that United's certifications, with respect to the alleged marketing violations, were false.[5]  Doc. 69-1 at 24-26.

Gonite alleges that federal regulations require United to make certifications as part of its contract with CMS.  *See* Doc. 52 ¶¶ 58, 71-75, 128, 371, 373 (citing 42 C.F.R. § 422.504).  As a condition for receiving monthly payments, United must certify that it is

---

[5] United does not argue that Gonite's allegations of falsity with respect to United's certifications of AKS compliance are insufficient.  Doc. 69-1 at 24-26.  *See* 42 C.F.R. § 422.504(h) (Medicare Advantage organizations required to certify compliance with the AKS).

only seeking payment for valid enrollees.  Doc. 52 ¶ 73 (citing 42 C.F.R. § 422.504(l)).

Specifically, the signatory must "certify that each enrollee for whom the organization is

requesting payment is validly enrolled in an MA plan offered by the organization and the

information relied upon by CMS in determining payment (based on best knowledge,

information, and belief) is accurate, complete, and truthful."  42 C.F.R. § 422.504(l).

United also certifies that it agrees to comply with "[f]ederal laws and regulations

designed to prevent or ameliorate fraud, waste, and abuse" and "HIPAA administrative

simplification rules at 45 CFR parts 160, 162, and 164."  Doc. 52 ¶ 85 (quoting 42

C.F.R. § 422.504(h)).

Gonite's complaint identifies a number of Medicare marketing and HIPAA rules

and alleges that United's violations of these rules render its CMS contract certifications

false.  *See id*. ¶¶ 83-99, 107-112.   Federal regulations prohibit, for example,

unauthorized use or disclosure of personal health information.  *Id*. ¶¶ 111, 112 (citing 45

C.F.R. § 164.508(a)); *see, e.g*., *id*. ¶¶ 226-27 (alleging United requested and received

from Oceanside a list of all current residents and their HIPAA-protected information).

Further, regulations place limitations on SNFs' marketing or enrollment activities on

behalf of an MAO.  *Id*. ¶¶ 96, 97 (citing 42 C.F.R. § 422.2266(d)); *see id*. ¶¶ 183, 186,

196 ("[T]he UnitedHealth Defendants directed the SNFs to do their bidding instead—

having the SNFs themselves market UnitedHealth's ISNP in direct violation of federal

regulations.").  These are but illustrative examples of the violations which form the basis

of Gonite's false certification claim.

United argues that "the only courts that have allowed an FCA case to proceed

under [] sub-section [422.504(l)] have involved allegations concerning the purported

falsification of risk adjustment data." Doc. 69-1 at 25 (citing *United States ex rel. Osinek v. Permanente Med. Grp., Inc*, 640 F. Supp. 3d 885, 908 (N.D. Cal. 2022)). Further, United maintains that § 422.504(l) relates to "accuracy," and Gonite does not challenge the accuracy of enrollment information or any information that United provides to CMS. *Id*. United does not contest the falsity of express or implied false certifications under other subsections of 42 C.F.R. § 422.504, thus the Court considers only whether a false certification was made under § 422.504(l).

The Court agrees with United that the completeness or accuracy of enrollment information is not at issue in this case. But aside from acknowledging the dearth of binding legal authority, United does not identify any reason for the Court to rule, as a matter of law, that illegal marketing practices cannot render enrollments invalid. In its contract with CMS, United was required to certify "valid[]" enrollment. 42 C.F.R. § 422.504(l). United asks the Court to ignore the "validly enrolled" component or translate it to read enrolled based on "accurate" enrollment data. *See* Doc. 69-1 at 25 ("[T]the C.F.R. provision applies only to accuracy."). But on its face the provision plainly requires United to certify that "each enrollee … is validly enrolled … *and* the information relied upon by CMS in determining payment … is accurate, complete, and truthful." *Id.* (emphasis added). United's interpretation would render the "validly enrolled" requirement meaningless, and thus the Court rejects it. *See In re Walter Energy, Inc*., 911 F.3d 1121, 1146 (11th Cir. 2018) ("[W]e generally construe a statute so that no clause, sentence, or word is rendered superfluous, void, or insignificant.") (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)).

Gonite has plausibly pled falsity.

*3. Gonite plausibly pleads FCA materiality*

FCA claims can only be supported by material misrepresentations.  *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 178 (2016).  The FCA "defines 'material' to mean 'having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'"  *Id*. at 182 (quoting 31 U.S.C. § 3729(b)(4)).  The materiality requirement is "rigorous" and "demanding."  *Id*. at 192, 194.  "And while several factors can be relevant to the analysis, 'materiality cannot rest on a single fact or occurrence as always determinative.'"  *Bibby*, 987 F.3d at 1347 (citing *Escobar*, 579 U.S. at 191).  Although "no single factor is dispositive, some factors that are relevant to the materiality analysis include: (1) whether the requirement is a condition of the government's payment, (2) whether the misrepresentations went to the essence of the bargain with the government, and (3) to the extent the government had actual knowledge of the misrepresentations, the effect on the government's behavior." *Id*.  United argues that the alleged false certifications based on HIPAA and marketing violations were not material to the government's payment decision.[6]  Doc. 69-1 at 26.

a. Condition of payment

For the first factor, "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive" of materiality. *Bibby,* 987 F.3d at 1343 (citing *Escobar*, 579 U.S. at 194).  Gonite alleges that "[a]s a *condition for receiving monthly payments from CMS*, a MAO must … attest to the fact that each enrollee for whom the organization is requesting payment is validly enrolled in

---

[6] United does not contend that Gonite's allegations of materiality with respect to its alleged AKS false certifications are insufficient.  Doc. 69-1 at 26-29.

a Medicare Advantage plan offered by the MAO and that the information relied upon by CMS in determining payment is accurate, complete, and truthful." Doc. 52 ¶ 73 (citing 42 C.F.R. § 422.504(l)) (emphasis added).

United argues that compliance with marketing and HIPAA rules are not conditions of payment because "'general statements that an entity must comply with applicable regulations [are] insufficient'" to satisfy the first factor. Doc. 69-1 at 27 (citing *United States ex rel. Holt v. Medicare Medicaid Advisors, Inc.,* 115 F.4th 908, 920 (8th Cir. 2024); and *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 308 (3d Cir. 2011)). In *Holt*, the Eighth Circuit considered an MAO's certification under 42 C.F.R. § 422.504(h) and determined that such certification did not render compliance with marketing rules a condition of payment. 115 F.4th at 920. The relator in *Holt*, however, did not plead HIPAA violations as part of the alleged marketing scheme.

HIPAA compliance is an express condition of payment. 42 C.F.R. § 422.504(h) specifically names compliance with "HIPAA administrative simplification rules at 45 CFR parts 160, 162, and 164" as a contract requirement. *See Wilkins*, 659 F.3d at 313-314 (holding that compliance with the AKS is a condition of payment under Medicare Part C because "Medicare regulations specifically name the AKS as a statute that is 'designed to prevent or ameliorate fraud, waste, and abuse'") (quoting 42 C.F.R. § 422.504(h)). Further, the Ninth Circuit has determined that an MAO's certification under 42 C.F.R. § 422.504(l) is an express condition of payment. *See United States ex rel. Silingo v. Wellpoint, Inc.*, 904 F.3d 667, 673 (9th Cir. 2018) ("[I]t is an express condition of payment that a Medicare Advantage organization 'certify (based on best knowledge,

information, and belief) that the [risk adjustment] data it submits … are accurate, complete, and truthful.'" (quoting 42 C.F.R. § 422.504(l)(2)).

On the other hand, Gonite has not identified any provision that clearly designates compliance with marketing rules a condition of payment. Likely for that reason, Gonite stated at the motion hearing that he ultimately may pursue an implied certification theory. *See Marsteller ex rel. United States v. Lynn Tilton, Patriarch Partners, LLC,* 880 F.3d 1302, 1308 n.13 (11th Cir. 2018) (explaining that "an FCA action is available on an implied certification theory even absent an express designation as a condition of payment, where the requirement plainly satisfies materiality"). As discussed, whether HIPAA and marketing violations render enrollments invalid under 42 C.F.R. § 422.504(l) is a fact question—there is no express certification of compliance with marketing rules to establish an express condition of payment in this provision.

In sum, compliance with HIPAA administrative rules is an express condition of payment, but compliance with marketing rules likely is not.

b. Essence of the bargain

Gonite plausibly alleges that the HIPAA and marketing violations go "to the essence of the bargain with the government." *Bibby*, 987 F.3d at 1347. United argues that "'[r]egulatory violations that go to the essence of Medicare's programs would have to impact [the] ability to provide healthcare services to those who qualify. Marketing violations … likely do not hinder CMS's or a carrier's ability to provide those medical services.'" Doc. 69-1 at 28 (citing *Holt*, 115 F.4th at 920). The Court disagrees that the purpose of the contract between CMS and United can be so narrowly construed.

As Gonite alleges, "safeguarding vulnerable patients from being illegally recruited into [a] Part C plan in the first place" is an essential rather than an ancillary component of the Medicare Part C program.  Doc. 52 ¶ 59.  The factual allegations set forth in the complaint are substantial and concerning: by colluding with SNFs to refer patients and provide HIPAA-protected information, United exploited a fiduciary-like relationship between the patients and SNFs for the precise reason that SNFs were in a position to offer United the information it needed to enroll more patients.  The complaint plausibly alleges that the HIPAA and marketing violations deprived a vulnerable population of the opportunity to make an informed choice about their medical care, fundamentally impacting the purpose of a program designed to benefit the elderly and disabled.

Moreover, Gonite argues that the HIPAA and marketing violations are at the core of CMS's contract because the alleged "widespread, multi-year fraudulent scheme [] requires that the SNFs participate in the illegal marketing scheme in order … to obtain the ISNP contract."  Doc. 74 at 19.  In short, CMS does not make payments without enrollments, and Gonite alleges that the enrollments at issue would not have occurred but for United's fraudulent scheme because United would not enter into contracts with SNFs unless the SNFs agreed to provide HIPAA-protected information and refer patients.  *See* Doc. 52 ¶ 367 ("[W]hat triggers the payment of the capitated payment claim … is the patient's enrollment in the ISNP, an enrollment that would not have occurred without the illegal marketing."); *id*. ¶ 206 ("[United] offered to provide and provided remuneration, that is, the opportunity to participate in the UnitedHealth Defendants' provider network, to induce the Skilled Nursing Facilities to steer and refer their Medicare residents to the ISNPs.").  Gonite has plausibly alleged that compliance

with HIPAA and marketing rules goes to the "essence of the bargain." This factor weighs in favor of materiality.

> c. Government enforcement

The third factor turns on whether the Government would deny United's Medicare payments if it knew of the alleged violations. If the Government "refuses to pay claims in the mine run of cases based on noncompliance" with a particular rule, then the requirement is almost certainly material. *Escobar,* 579 U.S. at 194-95. In contrast, if the Government "regularly pays a particular type of claim in full despite actual knowledge" of the violations, this weighs against a finding of materiality. *Id*.

This factor, for now, is neutral. The record contains no evidence of how CMS responds when it has actual knowledge of marketing or HIPAA violations. *See Holt,* 115 F.4th at 919 n.5 ("[I]t would be illogical to require a relator (or the United States) to plead allegations about past government action in order to survive a motion to dismiss … Indeed, the Government's legal investigations are often conducted in secrecy; we do not expect [a relator] to know precisely the Government's prosecutorial practices without the benefit of discovery.") (citing *United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155 (5th Cir. 2019); *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 831 (6th Cir. 2018) (internal quotations omitted).

In weighing the three factors, the Court finds that Gonite has plausibly alleged materiality.

> *4. Gonite plausibly pleads FCA scienter*

"With regard to scienter, a relator must show that the defendant acted 'knowingly,' which the FCA defines as either 'actual knowledge,' 'deliberate ignorance,' or 'reckless

disregard.'" *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017) (citing 31 U.S.C. § 3729(b)).  This standard was designed to include "those who fail 'to make such inquiry as would be reasonable and prudent to conduct under the circumstances.'"  *Urquilla-Diaz*, 780 F.3d at 1058 (citation omitted).  Although relators "must state with particularity the circumstances constituting fraud," they may generally allege scienter under Rule 9(b).  *Id.* at 1051; *United States ex rel. Matheny v. Medco Health Solutions*, *Inc.,* 671 F.3d 1217, 1224 (11th Cir. 2012).  With respect to corporations, all material facts known by its officers and agents who are working for the corporation's benefit are imputed to the corporation.  *Badger v. S. Farm Bureau Life Ins. Co.*, 612 F.3d 1334, 1347 (11th Cir. 2010).  Thus, "where the [complaint] gives specific, detailed notice to [the] defendant of what wrongdoing it is alleged to have engaged in, and which of its agents or representatives were purportedly involved," the complaint need not "identify a particular corporate agent who made a certain statement or decision" to satisfy Rule 9(b).  *United States v. Crumb*, 2016 WL 4480690 at *21 (S.D. Ala. Aug. 24, 2016).

United contends that Gonite cannot plausibly allege that United acted with scienter.   First, United argues that "although Relator claims to have personal knowledge regarding certain marketing activities and contractual payments made to SNFs, he does not allege 'to have observed the submission of an actual false claim' and did not 'personally participate in the submission of false claims.'"  Doc. 69-1 at 30 (quoting *Est. of Helmly v. Bethany Hospice & Palliative Care of Coastal Ga., LLC,* 853 F. App'x 496, 502 (11th Cir. 2021).  As discussed in the context of presentment, the Court rejects that argument.  Gonite alleges that he observed and was a participant in the

submission of false claims, i.e., enrollments. *See* Doc. 52 ¶¶ 226-233. Gonite plausibly

alleges personal knowledge about the false claims submitted to the Government.

United next argues that Gonite cannot support his allegation that the defendants

"'knew their illegal marketing and kickback schemes were unlawful.'" Doc. 69-1 at 30

(quoting Doc. 52 ¶ 361). Specifically, United maintains that Gonite improperly "tries to

impute the 'collective knowledge' of himself and his supervisor to the entire enterprise."

*Id*. But Gonite's knowledge and that of his supervisors can be imputed to United.

*Badger*, 612 F.3d at 1347. The complaint describes specific examples of wrongdoing

and identifies specific corporate officers who engaged in wrongdoing. For example,

Gonite alleges that the illegal marketing scheme and AKS violations began "when

James Rodgers took over as the Director of Sales for Georgia, Alabama, and Florida."

Doc. 52 ¶ 174. He further alleges that a Vice President based in New York participated

in calls discussing the illegal schemes and put "enormous pressure on Rodgers and set

unreasonable sales goals that could only be met through improper marketing." *Id*. ¶¶

181, 202. The complaint proceeds to describe in detail the resulting marketing and anti-

kickback violations. *See, e.g*., Doc. 52 ¶¶ 170-202; 203-221. Moreover, the complaint

identifies both internal policies and certifications of compliance that establish United's

awareness of the illegality of its marketing and AKS violations. *See, e.g., id*. ¶¶ 58, 71-

75, 128, 149-162, 163-169, 356-64, 371.

Gonite has plausibly pled scienter.

## C. Gonite plausibly pleads AKS violations

United argues that Gonite fails to plead the AKS theory of his FCA claims

because he does not sufficiently allege (1) remuneration to induce referrals; (2)

referrals; (3) claims that resulted from the alleged kickbacks; and (4) that United acted knowingly and willfully.  Doc. 69-1.

### 1. Remuneration to induce referrals

#### a. "One purpose" or "motivating factor"

"An AKS violation requires the offering or payment of 'remuneration' to induce a transaction."  *United States ex rel. Heller v. Guardian Pharmacy, LLC*, 521 F. Supp. 3d 1254, 1278 (N.D. Ga. 2021) (citing *Bingham v. HCA, Inc.*, 783 F. App'x 868, 873 (11th Cir. 2019).  *See* 42 U.S.C. § 1320a-7b(b)(2)(A), (B).  Gonite and the Government maintain that a relator need only sufficiently allege that "one purpose" of the remuneration was to induce Medicare referrals.  Docs. 74 at 24-25; 77 at 7 (citing *Heller*, 521 F. Supp. 3d at 1271) ("Courts are clear that an AKS violation exists if one purpose of the alleged remuneration was to induce Medicare purchases, even if other legitimate purposes for the remuneration existed") (collecting cases) (internal quotations and citations omitted)).  United argues that the "one purpose" test "ignores economic realities inherent to [Medicare Advantage]" because "the government explicitly recognizes that value-based care arrangements may inherently result in 'referrals.'" Doc. 69-1 at 33 (citing 85 Fed. Reg. 77684, 77733 (Dec. 2, 2020)).  Further, United laments that "applying the one purpose test in the context of value-based care … would require a determination of whether the value-based care arrangement at issue naturally resulted in referrals or was instead willfully designed to unlawfully induce them."  Doc. 84 at 17-18.

No court has replaced the widely accepted "one purpose" test with a "motivating factor" test.  *See United States v. McClatchey,* 217 F.3d 823, 834 (10th Cir. 2000)

23

(adopting the one-purpose rule); *United States v. Omnicare, Inc.,* 663 F. App'x 368 (5th Cir. 2016); *Heller*, 521 F. Supp. 3d at 1271.  The "motivating factor" language comes from a footnote in *McClatchey* where the court ultimately adopted the "one purpose" test.  217 F.3d at 834 n.7.  For the following reasons, the Court declines to invent a "motivating factor" test.

First, United acknowledges that HHS has created "several AKS safe harbors specifically for value-based care arrangements."  Doc. 84 at 17.  Thus, it appears HHS has already carved out exemptions to address the policy concerns raised by United. Moreover, courts applying the "one purpose" test, and the value-based care regulations themselves, have easily recognized the ultimate distinction that United deems unduly "problematic"—a natural consequence is not the same as a "purpose" and juries are capable of determining the difference.  *See United States v. Omnicare, Inc.,* 663 F. App'x 368 (5th Cir. 2016) ("There is no AKS violation … where the defendant merely hopes or expects referrals from benefits that were designed wholly for other purposes); *United States v. McClatchey,* 217 F.3d 823, 834 (10th Cir. 2000) (same); 85 Fed. Reg. at 77733 ("[C]hanges in referral patterns alone are not the goal of a value-based arrangement but may be the consequence.").  Distinguishing between a "purpose" and a collateral hope or expectation is precisely the role of a jury.  *McClatchey*, 217 F.3d at 834 n.7.  The value-based care backdrop of this case thus does not warrant exceptional treatment for United.

b. Illegal remuneration

Remuneration under the AKS "include[s] anything of value in any form whatsoever,"—"directly or indirectly, overtly or covertly, in cash or in kind."  *Heller*, 521 F.

Supp. 3d at 1266.  As discussed, a relator must plausibly allege that one purpose of the remuneration was to induce Medicare referrals.  United argues that the alleged kickbacks do not constitute illegal remuneration under the AKS.  Doc. 69-1 at 33-37. Gonite responds that he sufficiently pleads the following forms of illegal remuneration: the opportunity to contract and implementation and incentive payments.  Doc. 74 at 24.

### *i. The opportunity to contract*

Gonite maintains that the opportunity to contract with United was illegal remuneration because it was something of value leveraged for the purpose of inducing referrals.  Doc. 74 at 24 (citing *United States v. Bay State Ambulance & Hospital Rental Service, Inc.,* 874 F.2d 20, 29 (1st Cir. 1989) and *United States v. SouthEast Eye Specialists, PLLC,* 570 F. Supp. 3d 561, 576 (M.D. Ten. 2021)).  Specifically, Gonite alleges that each SNF's opportunity to do business with United was "contingent upon the SNF participating in [United's] illegal marketing efforts and meeting a quota of enrollees."  Doc. 52 ¶ 205.  In other words, "[United] offered to provide and provided remuneration, that is, the opportunity to participate in the UnitedHealth [] provider network, to induce the Skilled Nursing Facilities to steer and refer their Medicare residents to the ISNPs."  *Id*. ¶ 206.

United argues that the contracts alleged were nothing other than "typical, arms'-length agreements to pay for services and quality delivered to Medicare beneficiaries of the type that every MAO running an I-SNP *must* execute with SNFs."  Doc. 84 at 21. Taking the factual allegations as true, this argument clearly fails.  As discussed, Gonite alleges that each SNF's opportunity to contract with United was contingent on the SNF's participation in marketing and HIPAA violations to induce referrals.  Doc. 52 ¶¶ 205-206.

This is the opposite of a "typical, arms' length agreement." *See, e.g.,* Doc. 52 ¶ 237 ("In order to obtain the opportunity to contract with United … SNFs were instructed "to provide patient lists and patients' PHI … so that the UnitedHealth Defendants' employees could improperly target the patients or their responsible parties.").

Furthermore, the AKS was designed to capture a wide range of kickbacks and schemes.  42 U.S.C. § 1320a-7b(b)(2)(A), (B); *see United States ex rel. Hart v. McKesson Corp.,* 96 F.4th 145, 155 (2d Cir. 2024) (explaining that the "plain language [of the AKS] is expansive" and Congress created both statutory exceptions and regulatory regimes "to cabin the statute's broad reach").  While it may be the case that an opportunity to contract alone, without the condition of participation in an illegal marketing scheme, would not constitute remuneration to induce referrals, the fact that the contracts alleged here *were* contingent on such conduct is sufficient to render the opportunity to contract unlawful remuneration.

*ii. Incentive and implementation payments*

Gonite alleges that United paid incentive and implementation payments to SNFs to induce enrollments.  *See, e.g.*, Doc. 52 ¶¶ 212-221.  United argues that the incentive payments are "harmless" because they "reward clinical performance" and because "enrollment in a Medicare Advantage plan necessarily comes with payment," thus payments always increase as enrollments increase.  Docs. 69-1 at 25-36; 84 at 22.  Regarding the implementation payments, United contends that Gonite has failed to satisfy Rule 9(b) because he does not allege "which SNFs received implementation payments, when they received them, and how much they amounted to."  Doc. 69-1 at 36.

It is true that Gonite alleges potentially proper purposes for the incentive payments.  Doc. 52 ¶¶ 142-147.  But he also alleges that he personally overheard conversations among United sales personnel and leadership about using implementation and incentive payments to convince SNFs to refer more patients.  *Id*. ¶¶ 216; 219.  Again, under the "one purpose" test, incentive payments can be designed to both induce referrals (i.e., increase enrollments) and reward SNFs for achieving quality or utilization measures.  While Gonite does not allege which SNFs received the implementation payments besides one, he alleges that he personally delivered payments, the amounts of the payments, and who approved and directed him to make the payments.  *See* Doc. 52 ¶¶ 212-216.  And despite Gonite's allegation that implementation payments were specifically designed to induce referrals,[7] United does not argue a proper purpose for the implementation payments at all.  *See* Docs. 69-1; 84.

Finally, United does not argue now that the incentive or implementation payments fall within a statutory exception or regulatory "safe harbor," which are affirmative defenses.  Yet United suggests in a footnote that the value-based care safe harbors *do* apply to the remuneration alleged, which gives the Court pause about why United argues that the payments alleged are not within the ambit of the AKS.  Doc. 84 at 15-16 n.7 ("[M]ultiple safe harbors have been designed to support payment systems like the one Relator challenges.  A finding that the alleged remuneration streams do *not* fall within a safe harbor would undermine and disrupt participation in that system.") (emphasis in original).  No doubt, United will advance a safe harbor defense.  But for

---

[7] Doc. 52 ¶¶ 212-216.

now, the Court cannot say as a matter of law that the incentive and implementation payments alleged do not constitute unlawful remuneration.

Gonite has plausibly pled remuneration to induce referrals.

### 2. Referrals

United argues that Gonite "has not alleged that SNFs were induced to provide 'referrals.'"  Doc. 69-1 at 37.  United argues that at most, Gonite alleges that "residents were approached about the possibility of enrolling in the I-SNP outside of the 'consent to contact' process; they were not 'referred' into I-SNP enrollment, forced to enroll, or required to remain enrolled."  *Id*.  Gonite and the Government contend that United construes "referrals" under the AKS too narrowly.  Docs. 74 at 25; 77 at 13.  The Court agrees.  *See Stop Illinois Health Care Fraud, LLC v. Sayeed*, 957 F.3d 743, 750 (7th Cir. 2020) ("[R]eferral under the Anti-Kickback Statute is broad, encapsulating both direct and indirect means of connecting a patient with a provider. It goes beyond explicit [referrals or] recommendations to include more subtle arrangements."); *United States v. Cooper*, 38 F.4th 428, 432-433 (5th Cir. 2022) (same).  There is nothing in the text of the AKS that warrants the conclusion that connecting residents to United's ISNP is not a referral under the statute.

Gonite has plausibly pled referrals.

### 3. AKS causation

United argues that Gonite has not sufficiently alleged the necessary causal link between AKS violations and false claims.  Doc. 69-1 at 39.  United maintains that the 2010 amendment to the AKS requires but-for causation, thus, a "relator must show that the alleged false claims would not have been submitted 'but for' the alleged

remuneration." *Id*.  Gonite responds that the Eleventh Circuit imposes a lesser

causation standard to claims brought under the 2010 amendment, but regardless of the

applicable standard, he says he has sufficiently pled causation.  Doc. 74 at 27-28.

In *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc*., 423 F.3d 1256,

1259-1260, the Eleventh Circuit held that a violation of the AKS can form a basis for a

claim pursuant to the FCA.  *McNutt* was decided before the 2010 amendment to the

AKS, which added a provision that "a claim that includes items or services resulting

from a violation of [the AKS] constitute[] a false or fraudulent claim for purposes of [the

FCA]."  42 U.S.C. § 1320a-7b(g) 1320a-7b(g).  One district court in the Eleventh Circuit

has held that the 2010 amendment does not require but-for causation.  *United States ex*

*rel. Heller v. Guardian Pharm. of Atlanta, LLC*, 2023 WL 11909741 at *27–28 (N.D. Ga.

Sept. 30. 2023).

While the Eleventh Circuit has not decided the question of which causation

standard applies to claims brought under the 2010 amendment, three circuit courts have

adopted the but-for causation standard.  *See United States ex rel. Cairns v. D.S. Med.*

*LLC*, 42 F.4th 828, 835–36 (8th Cir. 2022) (holding that the phrase "resulting from" in the

2010 amendment imposes a but-for causation requirement); *United States ex rel. Martin*

*v. Hathaway*, 63 F.4th 1043, 1052–53 (6th Cir. 2023) (same); *United States v.*

*Regeneron Pharms., Inc.*, 128 F.4th 324, 330 (1st Cir. 2025) (same).  The Third Circuit

has held that a lesser causation standard applies to claims brought under the 2010

amendment.  *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89,

100 (3d Cir. 2018)).

In this case, Gonite does not rely solely on the 2010 amendment to establish falsity but also asserts a false certification theory under the FCA.  *See* Doc. 52 ¶¶ 54-58 (alleging that United certified compliance with the AKS and such compliance was a material condition of payment) (citing 42 C.F.R. § 422.504(h)).  The same circuit courts that have imposed a but-for causation standard in claims brought under the 2010 amendment have made clear that a causal link is not required for claims brought under a false certification theory.  *See Regeneron*, 128 F.4th at 333-334 ("[T]he 2010 amendment offers a pathway to establish falsity in FCA actions based on AKS violations without reliance on the false certification theory … [C]laims under the 2010 amendment run on a separate track than do claims under a false certification theory.") (internal citations and quotations omitted); *Cairns*, 42 F.4th at 836 (same); *Martin*, 63 F.4th at 1053 (same).  United conceded at the motion hearing that AKS causation is not an element in false certification claims.  A material misrepresentation of compliance with the AKS is enough.[8]  In sum, Gonite's complaint is not subject to dismissal on AKS causation.  The Court need not determine the applicable causation standard for claims brought under the 2010 amendment on this motion.

### 4. Scienter

To violate the AKS, the defendant must act "knowingly and willfully."  42 U.S.C. § 1320a-7b(b).  Regarding knowledge, a defendant "need not have actual knowledge of [the AKS] or specific intent to commit a violation of [the AKS]."  *Id.* § 1320a-7b(b), (h).

---

[8] Unlike false certification claims, some courts have found that claims brought under the 2010 amendment are material as a matter of law.  42 U.S.C. § 1320a-7b(g).  *See, e.g., Guilfoile v. Shields,* 913 F.3d 178, 190 (1st Cir. 2019) ( "[T]he AKS amendment … obviat[es] the need for a plaintiff to plead materiality."); *United States ex rel. Heller v. Guardian Pharmacy, LLC*, 521 F. Supp. 3d 1254, 1277–79 (N.D. Ga. 2021) (collecting cases).

Though "willfully" is not defined in the AKS, it requires "the specific intent to do something the law forbids."  *United States v. Vernon*, 723 F.3d 1234, 1256 (11th Cir. 2013).

United argues that Gonite has failed to sufficiently allege scienter because there is no "concealment" in this case—many of the alleged kickbacks were memorialized in written agreements.  Doc. 69-1 at 41.  But concealment is not an element of an AKS claim; United only argues that in "most AKS cases, there is evidence of concealment." *Id*.  Gonite has alleged that United was aware of its obligation to comply with the AKS and still offered kickbacks, including the opportunity to contract, to induce referrals. *See, e.g.,* Doc. 52 ¶¶ 58, 72, 170, 363.  And the mere fact that certain agreements were in writing does not mean the complaint is lacking allegations of concealment, deception, or disguise.  Gonite's allegations, taken as true, support an inference that United's scheme to induce referrals via illegal conduct was concealed, for example, within payment arrangements purporting to reward clinical quality and as an unwritten condition of its contracts with SNFs.  Gonite need only plead scienter generally under Rule 9(b), and he has carried this light burden.

Gonite has plausibly alleged scienter.

**D. Remaining FCA claims**

United maintains that the other FCA claims in the complaint should be dismissed. Doc. 69-1 at 43.  United's brief argument on the reverse false claim and Georgia False Medicaid Claims Act claim is this: if the Court finds that Gonite fails to state a claim under 31 U.S.C. § 3729(a)(1)(A) and (B), these claims should likewise fail.  Docs. 69-1 at 42-43; 84 at 30-32.  The Court determined that Gonite plausibly pled violations of §

3729(a)(1)(A) and (B).  Thus, Gonite has plausibly pled his reverse false claim and state law claim.

On the fraudulent inducement claim, United initially maintains that "a successful fraudulent inducement claim requires a completely different set of facts" that Gonite "cannot possibly allege."  Doc. 69-1 at 42.  But United proceeds to argue that Gonite fails to identify "the who, what, where, when, and how … the alleged fraud took place"— the exact basis for dismissal it raised for FCA presentment.  *Id.*  The Court considered and rejected argument in the presentment context.  Thus, Gonite has plausibly pled fraudulent inducement.[9]

Finally, on the false claims conspiracy claim under 31 U.S.C. § 3729(a)(1)(C)), Gonite simply alleges that United "entered into a conspiracy or conspiracies through their employees and others to defraud the United States."  Doc. 52 ¶ 401.  To state a claim for conspiracy under the FCA, the plaintiff must show "(1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim."[10]  *Gose v. Nativ Am. Serv. Corp.,* 109 F.4th 1297 (11th Cir. 2024) (citing *Corsello v. Lincare, Inc.,* 428 F.3d 1008, 1014 (11th Cir. 2005)).  Rule 9(b)'s heightened pleading standard applies to claims brought under the conspiracy provision. *Corsello,* 428 F.3d at 1014.  United argues that Gonite's allegation is insufficient

---

[9] However, the Court notes that Gonite's fraudulent inducement claim appears to be duplicative and thus likely unnecessary.

[10] It is not clear whether damages remain a required element under the new conspiracy provision following the 2009 amendments.  *Gose*, 109 F.4th at 1297 n.28 (citations and quotations omitted).

because he "alleges nothing about who conspired with who and how this constitutes a conspiracy under the law."  Doc. 84 at 32.  The Court agrees.  *See United States v. HPC Healthcare, Inc.,* 723 F. App'x 783, 791 (11th Cir. 2018) (dismissing a complaint which "alleged merely that 'Defendants knowingly conspired with each other' to violate §§ 3729(a)(1)(A) and 3729(a)(1)(B)").  Gonite's failure to identify which individuals or entities conspired with each other, or to cite specific facts that show an unlawful agreement, is fatal to his conspiracy claim.  Accordingly, the FCA conspiracy claim is **DISMISSED without prejudice.**

## IV. CONCLUSION

For the reasons discussed, United's motion to dismiss (Doc. 69) is **DENIED in part** and **GRANTED in part**.[11]

**SO ORDERED**, this 23rd day of April, 2025.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

---

[11] In his response to United's motion to dismiss, Gonite requests leave to amend the amended complaint "[i]f the Court [d]eems the [first amended complaint] [i]nadequate."  Doc. 74 at 31.  Gonite's request in a responsive brief is not a proper motion to amend.  *See Newton v. Duke Energy Fl., LLC,* 895 F.3d 1270, 1277 (11th Cir. 2018) ("Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly.").  Accordingly, Gonite's request to amend is **DENIED**.